IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| JOIE JOLEVARE *et al.* : | |
| Plaintiffs : | CASE NUMBER  1:05CV-01982 |
| v. : | |
| ALPHA KAPPA ALPHA : | |
| SORORITY, INC. : | |
| Defendant : | |

From:   Salome Tinker
        c/o Jimmy A. Bell, Esq.
        Law Office of Jimmy A. Bell, P.C.
        9610 Marlboro Pike
        Upper Marlboro, Maryland 20772

To:     Defendant Alpha Kappa Alpha Sorority, Inc.
        c/o Thomas S. Schaufelberger
        SAUL EWING, LLP
        1025 Thomas Jefferson Street, NW
        Suite 425 West
        Washington, DC 20007-5209

**PLAINTIFF SALOME TINKER'S SECOND SUPPLEMENTAL
RESPONSES TO DEFENDANT, ALPHA KAPPA ALPHA
SORORITY, INC'S FIRST SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 33, Plaintiff Salome Tinker, by and through counsel Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C., hereby further Supplements Plaintiff Tinker's response to Defendant Alpha Kappa Alpha's First Set of Interrogatories furnishes knowledge, facts, and information presently available and, as requested, if subsequent or different information is obtained before trial, this Response to Defendant's First Set of Interrogatories will be appropriately further

1

supplemented, either formally or informally, by communicating the information to all parties.

## GENERAL OBJECTIONS

A. The Plaintiff objects to the Defendant's First Set of Interrogatories to the extent that it is not designed to lead to relevant discovery in this case.

B. Plaintiff's investigation is continuing and to the extent further information, responsive to these Interrogatories becomes known to this Plaintiff, these answers will be supplemented.

C. In addition to these General Objections, which apply to each Response below, the Plaintiff has noted certain additional specific objections in response to the various requests for production.

D. Plaintiff re-raises any and all objections raised in Plaintiff Tinker's Responses to Defendant's First Set of Interrogatories

## SUPPLEMENTED RESPONSES

**INTERROGATORY NO. 17:** With respect to damages, itemize all amounts you are seeking to recover from AKA in this action, indicate the basis upon which you claim they are owed, how each item was calculated, persons with knowledge about these amounts and identify all documents that refer or reflect such amounts.

**SUPPLEMENTAL RESPONSE NO. 17:** Plaintiff Tinker ("Plaintiff") is currently a certified public accountant ("CPA") licensed in the District of Columbia and Maryland. In addition to being a senior manager at a major corporation, Plaintiff co-owns an accounting business ("TSC Enterprises") with her husband as well as a newly established restaurant ("TSC Wings, LLC d/b/a Wings Over Washington") near the campus of

2

Howard University. Plaintiff has sustained severe mental damage, injuries to her professional opportunities, and severe damages to your as a result of Defendant Alpha Kappa Alpha, Inc.'s ("Defendant") acts and/or omissions.

### 1. Emotional Injuries

Plaintiff suffered severe emotional shock, humiliation, embarrassment, disgrace, and anguish in front of her peers, friends, and sorority sisters on or about September 3, 2005 when Defendant by and through its agent, representative, and/or employee, Joy Elaine Daley ("Daley") announced that Plaintiff was suspended from the sorority in front of over two hundred (200) of her sorority sisters. At that meeting, Daley severely twisted the facts to paint Plaintiff as being a hazer and involved in an ongoing scheme to disregard the rules of Alpha Kappa Alpha. Plaintiff was completely aghast, as Plaintiff was not given prior warning that such a suspension would be in effect, nor did she know the basis for the same. Plaintiff felt a strong bond to Alpha Kappa Alpha Sorority and her sorority sisters and intended to keep that bond strong and intact throughout the remainder of her life. Plaintiff felt like a part of her life had been ripped from her without reason. To date, Plaintiff has been deprived of the opportunity to defend her good name.

Thereafter, Plaintiff suffered further shock, humiliation, embarrassment, disgrace, and anguish in front of her peers, friends, and sorority sisters when she was ordered out of the meeting by the chapter president based on pressure received from the regional director. Plaintiff also suffered confusion because she and Plaintiff Jolevare were singled out in the meeting and thereafter and both felt isolated. Although some sorority sisters names were mentioned in the citation, they did not receive the same harsh suspension.

Others who were initially suspended were later removed from the list without giving the Plaintiffs any reason.

As a former officer of the chapter, Plaintiff would not be able to realize her aspirations of running for higher levels of leadership within the chapter and throughout the organization. Likewise, her ability to serve at a higher level within the organization that would have come to fruition during this period was abruptly halted. In or around September 2005, the National treasurer issued a call for all CPA to serve on a financial task force to address key issues within the organization. Plaintiff was denied this opportunity.

Plaintiff was scheduled to be the auditor for the Step show, one of the Chapter's fundraising activities, that was scheduled for the week following her suspension. The Plaintiff continued with the contract because it was too late to find a replacement. During this performance, Plaintiff was forced to wear plain clothes and was not honored or recognized for her participation and contribution(s) to the same as a sorority sister. Rather, Plaintiff, feeling disgraced, humiliated, and shunned, never came out of the back nor could Plaintiff cheer for the Alpha Kappa Alpha members. Vendors were present at the Step Show. Plaintiff could not purchase any of the items at the event because it all bore Alpha Kappa Alpha symbols. This experience left Plaintiff feeling awkward and irreparably depressed.

In addition, Plaintiff suffered damages when Defendant published her name on Alpha Kappa Alpha's national and public website which identified her as being suspended and listed her as being guilty of having conducted hazing activities even prior

to her appeal hearing. As a result, Plaintiff became the center of negative discussion and scrutiny on the worldwide sorority e-mail distribution entitled the "The Vine."

In addition, prior to her suspension, Plaintiff had been used as a keynote speaker for sorority hosted campus activities prior to Defendant's acts and/or omissions. Plaintiff deemed these speeches an honor and an opportunity to promote her business discussed *infra*. Because Plaintiff was suspended from Alpha Kappa Alpha by Defendant, Plaintiff was not offered the opportunity to participate in these events again.

Thereafter, Plaintiff was banned from associating with any Alpha Kappa Alpha activities as a chapter member. Plaintiff was denied the opportunity to participate in various membership conferences, such as the national conference that only occurs once every two years, leadership conferences, regional conferences, and local chapter cluster conferences. Plaintiff suffered shame and humiliation to hear that the case was being discussed by the regional director at many of these events.

In addition, when Plaintiff's ten-year reunion is celebrated, she is not allowed to participate in any of the activities planned to promote and honor her chapter of Alpha Kappa Alpha. This includes the chapter's Rally and the chapter's reception for alumni members. Plaintiff can never get back that moment in her sorority that is supposed to be a milestone. Instead it is viewed as a day of mourning.

Due to her suspension by Defendant, Plaintiff was not allowed to wear Alpha Kappa Alpha letters. As a result, she could not wear several pieces in her wardrobe and had to take the license plate frames off of her vehicle.

In or about 2005, Plaintiff was honored by being assigned as a mentor for three (3) members of the newly-initiated 2005 Alpha Kappa Alpha class because of her

achievements, qualifications, and dedication to the sorority. However, because of Defendant's acts and/or omissions, Plaintiff was stripped of her mentoring responsibilities, given a lifetime ban from ever being a mentor in Alpha Kappa Alpha and ordered not to have any contact with undergraduate sisters of Alpha Kappa Alpha again. This is in spite of position of authority in the business world that enables Plaintiff to be a role model for younger women to emulate.

In addition, Plaintiff was denied the opportunity to sponsor her designated candidate for Alpha Kappa Alpha in the past graduate initiation process. Plaintiff had eagerly awaited the opportunity to sponsor a candidate for four (4) years, but was then forbidden from participating in a sponsorship by Defendant. Plaintiff will not have another opportunity to sponsor a candidate for at least two (2) more years.

Plaintiff's overall integrity as a businesswoman was tarnished as a result of Defendants acts and/or omissions because Defendant's publication of Plaintiff's suspension caused Plaintiff's peers and associates to believe that she had hazed other individuals. Likewise, as a condition for retaining her CPA license, CPAs are held to the highest standard of business and moral ethics. Such is evidences by the Maryland requirement to take an ethics course every two years for license renewal. Such public involvement in this issue can be viewed as a criminal activity could be considered just cause for a reevaluation and revocation of Plaintiff's CPA designation. Plaintiff's job is contingent upon her being a CPA.

Marjorie Holloman Parker, a former national president) and member of Plaintiff's chapter, passed away in October 2005. Ms. Parker played a large role in the history of Alpha Kappa Alpha and was a significant member of the organization. Prior to her

suspension, Plaintiff was the fund administrator for Ms. Parker's scholarship fund. As part of tradition, Alpha Kappa Alpha sisters hold a special service for those members who pass away as a memorial to honor the deceased and their achievements ("The Ivy Beyond the Wall Service"). Plaintiff could not participate in The Ivy Beyond the Wall Service for Ms. Parker. When Plaintiff arrived at the ceremony, they had the pews roped off for only sorority sisters in their white ritual colors with passer-by seating in the rear. As more and more sorority sisters arrived, they kept moving the ropes back. Since Plaintiff was not deemed a sorority sister at this time, she could not wear the ceremonial colors which would have misconstrued acting like a in good standing sister, had to keep moving her seat. Plaintiff cried profusely as a result of her inability to participate and honor Ms. Parker. Plaintiff was not allowed the opportunity to participate in any of the ceremonial rituals in saying my last farewell to such a great and remarkable woman but instead had to sit in the back of the service like a stranger.

In October 2005, Dr. Cecille Edwards, an Alpha Kappa Alpha member, passed away. Ms. Edwards's family requested that the ceremonial burial rituals (described *supra*) be performed at her funeral. At the time, Plaintiff worked for Ms. Edwards son, Gerald Edwards, Chief Accountant with the Federal Reserve. Due to her relationship with Mr. Edwards, Plaintiff was expected by the deceased's family to participate in these rituals that was performed by her graduate chapter, Plaintiff could not participate. Plaintiffs coworkers having knowledge of her affiliation with Alpha Kappa Alpha began questioning her as to why she was not in the ceremony. Plaintiff was concerned that her non-participation would result in all of her colleagues obtaining knowledge of her suspension, which would have a negative impact her job. Overall, the situation was

deemed inconsiderate and disgust in the eyes of Plaintiff's coworkers citing the reason for lack of participations was because she forgot to wear the ceremonial colors. Plaintiff felt deep humiliation, disgrace and sadness that she could not honor Ms. Edwards, a remarkable woman who had been a dean at Howard University and had been commissioned to write several position papers for the Alpha Kappa Alpha. Due to the lack of Plaintiff's participation, the family did not know any of the other sorority members, which made the ceremony less personal.

In addition, Plaintiff's daughter at the time of suspension was a debutant in the 2005-2005 Cotillion. In order to be designated as a debutante, the young lady has to be sponsored by a chapter member. The debutant, through her chapter sponsor, then solicits the community and other sorority sisters to support her candidate. The debutant learns things that they can apply to their everyday life, such as the importance of community service, etiquette and social awareness. The winner is judged based on factors, which include raising funds in support of the chapter's program activities. The winner received half of the proceeds raised as a result of her efforts. Other debutants receive a portion of their raised funds as well. Plaintiff comes from a long line of pageant winners as a result of sales.

In her hometown of Gary, Indiana, the Plaintiff herself won the title, "Ms Edison Middle School" and the Plaintiff's sister won her title of "Ms Tolleston Middle School." Plaintiff had lined up a slew of activities that were going to bring in funds for her daughter. In keeping with the history of the family tradition, all Plaintiff's daughter did not raise, mom would have supplemented to ensure the win. Certain planned fundraising activities that were already approved were shopping trip to Woodbury Commons in New

York during Christmas season, a Night at the Races fundraiser, a casino night and a Sunday brunch on the Odyssey. However, the Plaintiff could not allow the same shame, scorn and humiliation to be passed on her daughter and, as a result, removed her from the competition.

Likewise, Plaintiff's daughter has indicated that she is interested in trying to join Alpha Kappa Alpha in or about 2008. This 2008 initiation class is significant because it is the centennial year of the organization. Since Howard is the first chapter of the organization, the criteria obtaining membership may be very high, as many young ladies will also be vying for one of the few slots. Ordinarily, Plaintiff's daughter could use her legacy status so long as her mother is an active member of Alpha Kappa Alpha. As a result of that suspension, however, Plaintiff cannot discuss membership in Alpha Kappa Alpha as much as she would like and it may not be possible for her to enter as a legacy candidate because of Plaintiff's suspension "inactive" status in 2008 or during her college years thereafter.

Overall, membership to Alpha Kappa Alpha played a large role in Plaintiff's life. For example, in or about 2005, Plaintiff proudly helped revamp Alpha Kappa Alpha's financial structure by redesigning the accounting systems for both the chapter and foundation, rewriting the foundation's bylaws, by acting as the financial investment advisor, and preparing Alpha Kappa Alpha's 990 tax return. Plaintiff's dedication and commitment to the success of the chapter and sorority as a whole was prevalent. As the treasurer, Plaintiff would proudly devote over twenty five (25) hours a week conducting chapter business. Sadly, when Defendant's allegations against Plaintiff were made public, Plaintiff's years of commitment to Alpha Kappa Alpha were ignored and her

peers and sorority sisters looked at her with scorn. Plaintiff's reputation amongst Alpha Kappa Alpha members was ruined, notwithstanding Defendant's failure to conduct any proper investigation of the allegations against Plaintiff. Plaintiff's personal and professional relationships with many persons were irreparably destroyed and/or harmed as a result of Plaintiff's suspension.

### 2. Medical Injuries

Moreover, Plaintiff's emotional harm was exacerbated by her pre-existing medical conditions. Specifically the stress and emotional harm, discussed *supra*, were particularly devastating to Plaintiff because she suffers from three (3) pre-existing medical conditions, which amplify and augment the effect(s) of stressful and emotionally draining situations. First, Plaintiff suffers from a Pseudo tumor, which manifests itself with increased pressure in the spinal column. The symptoms of a Pseudo tumor include migraine headaches and blurred vision, which are both increase in frequency and intensity during stressful situations, such as those described *supra*. Second, Plaintiff has had to have her thyroid removed to treat her thyroid cancer. One effect of her thyroid removal is a hormonal imbalance that exacerbates and amplifies mental stress and emotional damage. Third, Plaintiff suffers from a medical condition called Proctalgia Fugax. The frequency of Plaintiff's episodes of Protalgia Fugax increased and caused Plaintiff to increase her pain medication. Episodes of Protalgia Fugax are linked to stress.

Plaintiff's suspension from Alpha Kappa Alpha was particularly stressful and traumatizing because a large percentage of Plaintiff's friends, business colleagues, and


peers and sorority sisters looked at her with scorn. Plaintiff's reputation amongst Alpha Kappa Alpha members was ruined, notwithstanding Defendant's failure to conduct any proper investigation of the allegations against Plaintiff. Plaintiff's personal and professional relationships with many persons were irreparably destroyed and/or harmed as a result of Plaintiff's suspension.

### 2. Medical Injuries

Moreover, Plaintiff's emotional harm was exacerbated by her pre-existing medical conditions. Specifically the stress and emotional harm, discussed *supra*, were particularly devastating to Plaintiff because she suffers from three (3) pre-existing medical conditions, which amplify and augment the effect(s) of stressful and emotionally draining situations. First, Plaintiff suffers from a Pseudo tumor, which manifests itself with increased pressure in the spinal column. The symptoms of a Pseudo tumor include migraine headaches and blurred vision, which are both increase in frequency and intensity during stressful situations, such as those described *supra*. Second, Plaintiff has had to have her thyroid removed to treat her thyroid cancer. One effect of her thyroid removal is a hormonal imbalance that exacerbates and amplifies mental stress and emotional damage. Third, Plaintiff suffers from a medical condition called Proctalgia Fugax. The frequency of Plaintiff's episodes of Protalgia Fugax increased and caused Plaintiff to increase her pain medication. Episodes of Protalgia Fugax are linked to stress.

Plaintiff's suspension from Alpha Kappa Alpha was particularly stressful and traumatizing because a large percentage of Plaintiff's friends, business colleagues, and

social and professional peers are members of Alpha Kappa Alpha. Plaintiff's suspension thus alienated her from and disgraced her in front of her peers, friends, and colleagues.

In or about May 2006 Plaintiff's headaches were so bad, Plaintiff had to go to the emergency room at the Veterans Affairs Hospital in Gary, Indiana while visiting her mother. Plaintiff had to purchase various medications. As a result of this incident, Plaintiff suffered severe physical and mental strain. Since this incident, doctors have changed her prescription to a stronger medicine. Plaintiff finds that she must now take the medication around the clock to keep the pain away. Plaintiff notes that the headaches have worsened as her anxiety level rises in anticipation of the trial and conclusion of this case.

The Plaintiff's prior diagnosis of hypertension is also affected by this ordeal.

### 3. Financial Losses

Upon information and belief, Plaintiff missed job opportunities because Alpha Kappa Alpha members were responsible for hiring employees. As a result of Plaintiff's suspension, Plaintiff was not hired.

Plaintiff's aforementioned restaurant business directly and indirectly suffered financial losses of approximately twenty five thousand dollars ($25,000.00) because Plaintiff could no longer use the sorority as a conduit to promote her restaurant. At least twenty (20) members of Alpha Kappa Alpha who were regular customers of Plaintiff's restaurant were told to avoid Plaintiff's restaurant by Defendant under threat of being suspended themselves and did so.

As a result of the suspension, the Plaintiff had to immediately withdraw her daughter from the above-mentioned Cotillion. Plaintiff felt that the chapter members

would look down on her daughter with the same scorn, shame and humiliation that was shown to her at the September 2005 chapter meeting thus having an unnecessary negative impact on her daughter's chance to solicit other sorority sisters for sponsorship. Over the last few cotillions, the amounts raised have been steadily increasing. The bar was set when the debutant for 2003 raised close to a whopping $55,000, the 2nd place winner raised approximately $53,000 and the third place winner raised approximately $48,000. Other subsequent winners raised close to this figure as well. The debutants received half of the funds raised. Without the support of her sorority sisters, Plaintiff's daughter would not have come close to raising the funds necessary to win. The Plaintiff believes that only few sorority sisters would have supported her either through financial contributions or through attending her events. In the end, it would have been the Plaintiff herself basically writing a check if she ever stood a chance. Therefore, Plaintiff assesses damages suffered as a result of not being able to compete at $53,000.

In or about November 2005, Plaintiff reduced her working hours to a part time schedule at her former job because she was overly stressed. Plaintiff's increase in stress was caused by Defendant's acts and/or omissions. Prior to her reduction in hours, Plaintiff's salary was $93,800. After a brief stint from March to April where Plaintiff tried to return to work full-time, Plaintiff's stress remained too high to return to work and Plaintiff quit her job and was unemployed for three (3) months. (E) Legal Fees Plaintiff's total legal fees accrued to date are $2,100.00.[1]

### III. Person(s) and/or Witness(es)

---

[1] This figure only reflects Plaintiff's retainer and consultation fees. This figure may not be used to calculate any legal expenses incurred by or hourly fee earned by Plaintiff's counsel.

Plaintiff identifies the following individuals who know or have reason to know of any or all of the above-referenced damages[2]:

- Joy Jolevare;
- Joie Jolevare;
- Christopher Tinker;
- Phyllis Young, and other chapter members, present at the Ivy Beyond the Wall Ceremony for Dr. Cecille Edwards;
- Toni Hughes- Sponsor Team, present at Ms Parkers funeral
- Xi Omega members present at Marjorie Parker's funeral;
- Xi Omega members present at the September 3, 2005 meeting;
- Chair of Xi Omega's 2005 Cotillion Committee;
- Sharon Anderson and Norma Jean Johnson, Co-Chairs of Xi Omega's 2003 Cotillion Committee;
- Bianca Johnson (minor daughter);
- 137 initiates Alpha Chapter, AKA March 2005;
- Lisa Braz;
- Members of the Alpha Chapter Undergraduate Activities Committee, including, but not limited to the following persons:
    - Pamela Chew
    - Julita Blair
    - Jorielle Brown
    - Miesha Darrough
    - Awshantee Dingle
    - Ronisha Franklin
    - Tamika J. McCormack
    - Khamilah Muhammed
    - Alexandria C. Jones

---

[2] Contact information for some of these individuals in Plaintiff's possession is annexed hereto.

- Leslie Jones
- Karleen D. Roy
- Rhashida Rogers
- Candace Reynolds
- Kendall Richardson
- Kia Toilett
- Alyssa King Turner

### 3. Note on Damages

Defendant's counsel requests that Plaintiff quantify, monetarily, damages incurred by Defendant's actions and/or omissions. However, while Plaintiff is pleased to enumerate the actual financial damages incurred as a result of Defendant's actions and/or omissions (discussed in section II, *supra*), Plaintiff simply cannot quantify the emotional, psychological, social, and physical damage caused by each and every event where Defendant's acts and/or omissions affected her adversely, nor should she be required to do so. In *Peyton v. DiMario*, the D.C. Circuit held that psychological and emotional damages need not be quantified, nor is it appropriate to do so. Rather, a jury should assess such damages. 287 F.3d 1121, 1126 (D.C. Cir. 2002) As a result, Plaintiff will not speculate on the value of her own emotional stability, her friendship(s) with her sorority sisters, the importance of Alpha Kappa Alpha to her life, the humiliation of being ostracized from her circle of friends, the disgrace of not being able to honor deceased sisters, or the trauma caused by missing once-in-a-lifetime events whose memories she will not have to cherish for the rest of her life.

### 3. Note on Damages

Defendant's counsel requests that Plaintiff quantify, monetarily, damages incurred by Defendant's actions and/or omissions. However, while Plaintiff is pleased to enumerate the actual financial damages incurred as a result of Defendant's actions and/or omissions (discussed in section II, *supra*), Plaintiff simply cannot quantify the emotional, psychological, social, and physical damage caused by each and every event where Defendant's acts and/or omissions affected her adversely, nor should she be required to do so. In *Payton v. DiMario*, the D.C. Circuit held that psychological and emotional damages need not be quantified, nor is it appropriate to do so. Rather, a jury should assess such damages. 287 F.3d 1121, 1126 (D.C. Cir. 2002) As a result, Plaintiff will not speculate on the value of her own emotional stability, her friendship(s) with her sorority sisters, the importance of Alpha Kappa Alpha to her life, the humiliation of being ostracized from her circle of friends, the disgrace of not being able to honor deceased sisters, or the trauma caused by missing once-in-a-lifetime events whose memories she will not have to cherish for the rest of her life.

Subscribed and sworn under oath this 15 day of September, 2006, by

*[signature]*
Salome J. Tinker, Plaintiff

Respectfully submitted,

*[signature]*
Jimmy A. Bell, Esq.

14

\*\* TOTAL PAGE.15 \*\*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8 day of September 2006, a copy of the foregoing Second Supplemental Responses to Defendant's First Set of Interrogatories was mailed, first-class postage pre-paid to:

Thomas S. Schaufelberger
SAUL EWING, LLP
1025 Thomas Jefferson Street, NW
Suite 425 West
Washington, DC 20007-5209

_____
Jimmy A. Bell, Esq.

12