**IN THE UNITED STATES DISRTICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **JOIE JOLEVARE, et al.** | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : **Case No.: 1:05-cv-01982 (RBW)** |
| v. | : |
| | : |
| **ALPHA KAPPA ALPHA** | : |
| **SORORITY, INC.** | : |
| | : |
| Defendant. | : |

---

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiffs, Joie Jolevare, et al., by and through counsel, Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C. and hereby submits this Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment on all counts of Plaintiffs' Complaint. For cause, Plaintiffs state as follows:

### STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE

1.      In 2005, Alpha Chapter had a rush with over 400 applicants seeking membership.

2.      In 2005, Alpha Chapter initiated 137 women into the organization.

3.      In 2005, the new Alpha Chapter (without any graduate influence) voted to have a campus introduction show (the "show").

4.      As per the AKA rules, regulations, and guidelines, the show had to be held within seven (7) days following their initiation.


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

5.    However, the school was on Spring Break so a request was made to the Regional Director ("RD" or "Ms. Daley") to have the show with an extension of time to March 22nd (Tuesday) when school was in session. Exhibit A, Plaintiff Joie Jolevare's Suspension Appeal Letter at 3.

6.    Since there was only one senior member of Alpha Chapter, graduate sorors were required to assist with teaching the newly initiated 137 sorors the AKA song and step that members perform on campus. Id.

7.    After initiation, the Members of AKA began to practice for the show.

8.    Plaintiffs are Graduate Certified Advisors. Id. at 3; Exhibit B, Plaintiff Salome Tinker at 3.

9.    Plaintiffs have been members of the Xi Omega Chapter since they graduated from Howard University.

10.    AKA alleges that Plaintiffs participated in hazing activities in violation of AKA Const. Art. V.

11.    Defendant's Rule 30(b)(6) Representative, Evelyn Sample-Oates, North Atlantic Regional Director, testified during her deposition on December 6, 2006, that Defendant had certain documents which contained information regarding prohibitions of hazing. The Undergraduate Membership Intake Process was marked as Exhibit 1 during said deposition, the Graduate Advisors' Intake Manual was marked as Exhibit 2, Exhibit C, Deposition of Evelyn Sample-Oates at 10:7-14, the Manual of Standard Procedure (2004) was marked as Exhibit 3, the Anti-Hazing Handbook – Say No to Hazing was marked

2



Exhibit 4, and the Constitution and Bylaws (2004) were marked Exhibit 5, Id. at 11:14-22; 12:1-9.

12.     Hazing is described as "an act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha." AKA Const. Art. V; Exhibit C at 33:18-22.

13.     However, there was no evidence, nor was it ever alleged, that Plaintiffs ever committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. Id. at 34:13 (post-initiation activity "is not hazing if permission is granted by the Regional Director).

14.     Ms. Sample-Oates, Defendant's North Atlantic Regional Director, explained that she had not reviewed any documents from any of the 125 participants in the post-initiation ceremony which stated that any participant felt that they had been hazed.  Specifically, Ms. Sample-Oates testified regarding any such evidence of hazing as follows:

```
20      Q    Have you reviewed any documents which are
21   statements from the 125 undergraduates who were admitted
22   in 2005; have you reviewed any documents from them where
0041
 1   they stated they felt they were being hazed?
 2          MS. BATES:  Objection, it's not clear you
 3   read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6   individuals from the 2005 Howard University membership
 7   intake class that alleged that they felt they were being
 8   hazed?
 9      A    No.
10      Q    Have you read any documents or seen any
11   documents where those 125 women at Howard University for
12   the 2005 class said they felt humiliated?
13      A    No. Id. at 40:20-22; 41:1-13.
```

3


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

15.    Ms. Sample-Oates went on to admit, when asked if any of these 125 women came

forward to state that they had been hazed, that:

> 2     Q     Did any of the 125 young women from the
> 3    Howard 2005 membership intake class come forward and say
> 4    that they were hazed by my clients?
> 5     A     I'm not aware of that; I was not involved
> 6    with that.
> 7     Q     Have you read any documents that say that?
> 8     A     No, I have not…
> 11    Q     Did you see any document -- that from one of
> 12    those 125 women -- where it stated that they felt that
> 13    they shouldn't have been out there?
> 14    A     I did not.
> 15    Q     Did you see any document from those 125 women
> 16    that stated that they didn't want to be out there and
> 17    they were forced to be out there?
> 18    A     I did not.
> 19    Q     Did you see any document that stated that
> 20    they felt uncomfortable about the weather out there?
> 21    A     I did not. Id. at 46:2-8; 60:11-21.

16.    Ms. Sample-Oates further admitted that she had not reviewed any documentation that

contained any evidence that the 125 participants in the post-initiation ceremony reported

that either Plaintiff engaged in any activity that would meet the Defendant's definition of

hazing.  Specifically, Ms. Sample-Oates admitted that:

> 1     Q     Okay.  Have you see any written document that
> 2    -- this is going to be a long sentence because I'm
> 3    reading from here, counsel -- any written document from
> 4    one of the 125 individuals from the Howard University
> 5    2005 membership intake class that stated that my clients,
> 6    either one of them, caused them shame?
> 7     A     I have not seen it.
> 8     Q     What about abuse?
> 9     A     No.
> 10    Q     An insult?
> 11    A     No.
> 12    Q     Humiliation?

 created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

13    A    No.

14    Q    Intimidation?

15    A    No.

16    Q    Disgrace?

17    A    No.

18    Q    That they participated in an underground

19  hazing?

20    A    I haven't seen a document that says that.

21    Q    Financial hazing?

22    A    No…

11    Q    Okay.  Back to the other question.  Have you

12  seen any document as it relates to my clients written by

13  any one of the 125 women from Howard University's 2005

14  membership intake class that said that my clients engaged

15  in pre-pledging?

16    A    No.

17    Q    Post-pledging?

18    A    No.

19    Q    Post-initiation pledging?

20    A    No.

21    Q    You stated earlier that hazing is more

22  serious than even stealing?

0080

1    A    Yes.

2    Q    Can you tell me why?

3    A    Well, hazing could result in death; it's

4  physically abusing somebody or mentally abusing them.

5  Money you can get back but people you can't.

6    Q    Have you seen any document where there's any

7  allegation that my clients physically abused any of the

8  125 women from the Howard University 2005 membership

9  intake class?

10    A    I have not seen documents for that…

9    Q    I'm going to show you Exhibit 6 again and I'm

10  going to ask you a quick question about that.  You stated

11  that Exhibit 6 -- the letter from Ms. Daley -- says that

12  my clients were out with 125 women in 35-degree weather

13  at nighttime and the women were singing, is that correct?

14    A    If that's what this letter says, yes.

15    Q    Does it say that the activity caused those

16  125 women to be at risk of serious bodily injury?

17    A    No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-

17.

5



17.   Regardless, AKA suspended Plaintiffs without regard for its own policies, procedures, rules, regulations, and/or guidelines and in violation of Plaintiffs' rights afforded to her by the AKA Constitution and by State and Federal Law.

18.   Ms. Daley prepared a letter ("Recommendation Letter") recommending Plaintiffs' suspension, and a letter ("Suspension Letter") suspending Plaintiffs.

19.   In the Recommendation Letter, Ms. Daley states that she "found" the Undergraduate Activity Members singing in the parking lot on March 22, 2005.  Ms. Sample-Oates testified that Ms. Daley's letter stated that, "[m]embers of the Undergraduate Activities Committee were found at approximately 2:00 a.m. singing in the parking lot at 35-degree temperature…" Id. at 47:21-22; 48:1-2.

20.   However, Ms. Sample-Oates admitted that Defendant did not have any policies and/or procedures providing restrictions or prohibitions on time and temperature for practices and/or ceremonies.  When questions about such provisions, Ms. Sample-Oates specifically admitted that:

```
20      Q    Is there anything in Exhibits 1, 2, 3, 4, and
21   5 that prohibits having activities when it's 50 degrees?
22      A    No.
0043
1      Q    What about when it's 35 degrees?
2      A    No.
3      Q    What about 25 degrees?
4      A    No.
5      Q    How actively were you involved in the
6   undergraduate activities when you were basileus?
7      A    Very.
8      Q    And did you ever attend any events when it
9   was cold?
10      A    Yes.
11      Q    Were you aware whether or not the colleges
12   were open when it was cold?
13      A    Yes.
```



14    Q    What about when it snowed?

15    A    Were they open?

16    Q    Yes.

17    A    Yes, uh-hum.

18    Q    Did you ever have any activities when it

19   snowed?

20    A    Sometimes we did; if it was too bad, we

21   cancelled them.

22    Q    Too bad meaning what?

0044

1    A    Driving conditions were bad, too much snow,

2   too much ice on the ground.

3    Q    So not because of the coldness but because of

4   the safety issue as it relates to the driving conditions?

5    A    Yes.

6    Q    In your position as a Regional Director, have

7   you ever had to have meetings with 10 people?

8    A    Yes.

9    Q    How hard is it to arrange meetings with 10

10   people?

11    A    Hard.

12    Q    Can you tell me why?

13    A    Well, people have different schedules and all

14   10 of them may not be able to attend.

15    Q    Okay.  Do you think it would be much more

16   difficult if you had over 100 people?

17    A    Yes.

18    Q    How difficult do you think it would be to get

19   100 undergraduates together at one particular time to

20   learn the songs and the steps for a coming-out show?

21    A    Very difficult.

22    Q    In Exhibits 1, 2, 3, 4, and 5, can you tell

0045

1   me which one of these documents has a provision in there

2   that talks about the time that individuals could come

3   together to practice for a coming-out show?

4    A    The time for practices?

5    Q    Yes.

6    A    None, no documents.

7    Q    So there's nothing in writing that delineates

8   the time that they can practice?

9    A    No. Id. at 42:20-22; 43-44; 45:1-9.

21.    In the Recommendation Letter, Ms. Daley states that Members of the Anti-Hazing Task

Force conducted a fact-finding.  As part of this "fact-finding," Ms. Sample-Oates

7



admitted that Defendant's policies and procedures dictate that alleged victims of hazing are to be interviewed. Id. at 8-12.

22.    In the Recommendation Letter, Ms. Daley states that 125 Undergraduates were in the parking lot in addition to Plaintiffs (members of the Xi Omega Chapter).

23.    In the Recommendation Letter, Ms. Daley states that Members of the Undergraduate Activities Committee Dominated the Alpha Chapter Meetings by determining what activities occur.

24.    In the Recommendation Letter, Ms. Daley states that Prior to the last MIP the two members of Alpha Chapter were required to wear black and study AKA history and other information before they could initiate anyone into Alpha Chapter.

25.    In the Recommendation Letter, Ms. Daley states that they were given notebooks to record information and the Graduate Advisor was a part of the group that met with them and gave them study information.

26.    Plaintiffs were present at all chapter meetings.

27.    Both participants and witnesses are obligated to report incidents of hazing. Exhibit C at 30:11-13. Members must sign documents stating that they will not participate in hazing. Id. at 30:20-22; 31:1-5, 12-17.

28.    Ms. Sample-Oates admitted that she had not seen any documents which stated the participants in the post-initiation ceremony were suspended. Ms. Sample-Oates specifically testified that:

> 14    Q   Have you seen any documents where those 125
> 15  women from the 2005 membership intake class were
> 16  suspended?
> 17    A   No, I have not seen any.



18    Q    Do you have any knowledge that those 125 were

19  suspended for failing to report that my clients hazed

20  them?

21      MS. BATES:  Objection.  I just want to make

22  sure I understand that it's clear that we're talking

0062

 1  about the undergraduate sorors?

 2      MR. BELL:  Yeah, the 125 -- yeah.

 3      THE WITNESS:  No, I have not – no

                …

 9    Q    And that my clients were subsequently

10  suspended for having those 125 women out there singing,

11  is that correct?

12    A   Yes.

13    Q    Now, those 125 women are members of Alpha

14  Kappa Alpha Sorority, is that correct?

15    A   Yes.

16    Q    And none of them were suspended for failing

17  to report that my clients hazed them, is that correct?

18    A   They weren't suspended, yes; that is correct.

19    Q    For the same activity; because if they were

20  hazed, they would've had to be participants in the

21  hazing, am I correct?

22    A   Yes.

0064

 1      MS. BATES:  Objection.

 2  BY MR. BELL:

 3    Q    But they were not suspended?

 4    A   No, as far as I know they were not. Id. at 61:14-22; 62:1-3;

63:9-22; 64:1-4.

29.      On Saturday October 2, 2005, Joy Elaine Daley attended the Alpha Chapter meeting in

her capacity as regional director for AKA.

30.      During that meeting, Joy Elaine Daley stated that "the only reason [the other members of

Alpha Chapter] were not suspended like [Plaintiffs] was because they were young and

students." Exhibit A at 10.

31.      Defendant's national website lists the names of those persons suspended for hazing.

Exhibit C at 57:13-17.  Ms. Sample-Oates specifically stated that, "The website is for

hazing, those individuals that have been found to be involved in hazing activities will be

9


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

on the website.  Those that are suspended for other reasons will not be; it's only for hazing. Id. at 76:5-8.

32.  Members suspended for hazing "can no longer attend chapter meetings, they cannot vote, they cannot participate in any Alpha Kappa Alpha functions that are strictly just for members, they should not wear paraphernalia or represent themselves on behalf of the sorority at all." Id. at 3-8.  Suspended members are also prohibited from participating in "[m]embership intake process, voting, step shows, service projects…" Id. at 5-8.

33.  When questioned about other ramifications for being suspended for hazing, Ms. Sample-Oates testified as follows:

```
 6      Q    So if a person was suspended for hazing, once
 7   they come back in they could still participate in the
 8   membership intake process?
 9      A    Yes.
10      Q    And be a -- what did you call them, a
11   graduate?
12      A    Advisor.
13      Q    Graduate Advisor?
14      A    No, they cannot be a Graduate Advisor;
15   they're very different.
16      Q    Okay.  Tell me the difference.
17      A    Anybody can -- as long as you're financial,
18   you go through the membership intake process workshop and
19   you're a financial member, you can participate in the
20   membership intake process; but you cannot be a Graduate
21   Advisor or serve on the Graduate Advisors' Council if
22   you've ever been suspended.
0092
 1      Q    For how long?
 2      A    Forever.
 3      Q    So it has -- the suspension for hazing has a
 4   permanent disqualification from participating and being a
 5   Graduate Advisor or the Graduate Advisors' Council for
 6   the rest of your life?
 7      A    Yes.
 8      Q    The person who gets suspended for stealing
 9   money, do they have that same prohibition?
10      A    No.
```

10


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

11    Q    That prohibition is only for people who were
12  suspended for hazing?
13    A    Right, yes. <u>Id.</u> at 91:6-22; 92:1-13.

## I.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, the Court must grant summary judgment when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Haavistola v. Community Fire Co. of Rising Sun, Inc.</u>, 6 F.3d 211, 214 (4th Cir. 1993); <u>Etefia v. East Baltimore Comm. Corp.</u>, 2 F. Supp.2d 751, 756 (D.Md. 1998). The court is required to "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." <u>Masson v. New Yorker Magazine</u>, 501 U.S. 496, 520 (1991) (citations omitted). Evidence submitted by the non-movant is to be believed and all justifiable inferences drawn in his or her favor.  In its response to a motion for summary judgment, the non-moving party must show evidence of specific facts from which the finder of fact could reasonably return a verdict in his or her favor. <u>Anderson</u>, 477 U.S. at 252; <u>Celotex</u>, 477 at 322-23.  In this way, the opposing party demonstrates that he has discovered admissible evidence for presentation at trial. <u>Celotex</u>, 477 U.S. at 327. If the opponent fails to establish a genuine dispute as to a material fact, the moving party is entitled to judgment as a matter of law. <u>Celotex</u>, 477 U.S. at 323. While the non-moving party must do more than merely raise some doubt as to the existence of a fact, the moving party ultimately bears the burden of demonstrating the absence of all genuine issues of material fact. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).



## II.   SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF PLAINTIFFS ON COUNT ONE AS PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW FOR DEFENDANT'S VIOLATIONS OF THE DCHRA

The DCHRA make it unlawful to discriminate on the basis of age. D.C. Code § 2-1402.11(a)(1). DCHRA claims for which there is no direct evidence of discrimination are analyzed under the Title VII burden-shifting scheme developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1155 (D.C. Cir. 2004); Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999); Carpenter v. Fannie Mae, 334 U.S. App. D.C. 124, 165 F.3d 69, 72 (D.C. Cir. 1999). According to McDonnell Douglas, Plaintiffs must first establish a prima facie case of prohibited discrimination. Hall, 175 F.3d at 1077, citing, Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1988) (en banc).

To establish a prima facie case, Plaintiffs must show (1) that Plaintiffs were older members of Defendant's organization; (2) that Plaintiffs suffered adverse action; and (3) said action was based on Plaintiffs' age and source of income. Id., citing, Paquin v. Fannie Mae, 119 F.3d 23, 26 (D.C. Cir. 1997); Bryant v. Brownlee, 265 F. Supp. 2d 52, 58 (D.D.C. 2003). Once Plaintiffs establishe a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its action that, if believed by the trier of fact, would show that unlawful age discrimination was not the reason for the adverse action. Id.  When Defendant articulates such a reason, "the presumption of discrimination raised by the prima facie showing is rebutted and 'drops from the case.'" Id. at 1078, quoting, Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n. 10 (1981). The burden then shifts back to the Plaintiffs to show that the

12


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

proffered reasons were a pretext for age discrimination. <u>Id.</u> at 1078.

A.       **Plaintiffs Have Established a Prima Facie Case of Discrimination**.

Plaintiffs have established a prima facie case of discrimination based on age and source of income.  Specifically, Plaintiffs are older members of Defendant's organization and are no longer students.  Plaintiffs are Graduate Certified Advisors. <u>Exhibit A</u> at 3; <u>Exhibit B</u> at 3. Plaintiffs were present during a post-initiation ceremony practice, at which 125 younger members, who are still students, of Defendant's organization were also present.  Plaintiffs were suspended for allegations of hazing arising from their presence at said practice.  The 125 younger members of Defendant's organization were not suspended for their participation in said practice.

The Anti-Hazing Handbook states "what our hazing policy is and it covers if you are suspended; well, it defines what hazing is and then it talks about if you are suspended, if there's a fact-finding committee that's assigned, what your appeal process can be, the different rights someone has if they're suspended…" <u>Exhibit C</u> at 29:12-17.  In the instant case, Plaintiffs were suspended for allegations of hazing when younger, student members of Defendant's organization were not suspended, despite Defendant's policies and procedures stating that participants and witnesses to hazing that do not come forward are to be suspended.

Hazing is described as "an act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha."  AKA Const. Art. V. <u>Exhibit C</u> at 33:18-22.  There is not any evidence, nor was it ever alleged, that Plaintiffs ever committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. <u>Id.</u> at 34:13 (post-initiation activity "is not hazing if permission is

13



granted by the Regional Director).  Moreover, as part of this "fact-finding," Ms. Sample-Oates

admitted that Defendant's policies and procedures dictate that alleged victims of hazing are to be

interviewed. Id. at 8-12.

Surprisingly, Ms. Sample-Oates, Defendant's North Atlantic Regional Director,

explained that she had not reviewed any documents from any of the 125 participants in the post-

initiation ceremony which stated that any participant felt that they had been hazed.

Specifically, Ms. Sample-Oates testified regarding any such evidence of hazing as

follows:

> 20     Q    Have you reviewed any documents which are
> 21   statements from the 125 undergraduates who were admitted
> 22   in 2005; have you reviewed any documents from them where
> 0041
>  1   they stated they felt they were being hazed?
>  2         MS. BATES:  Objection, it's not clear you
>  3   read documents from them.  You may answer the question.
>  4     A    No.
>  5     Q    Are you aware of any documents from those 125
>  6   individuals from the 2005 Howard University membership
>  7   intake class that alleged that they felt they were being
>  8   hazed?
>  9     A    No.
> 10     Q    Have you read any documents or seen any
> 11   documents where those 125 women at Howard University for
> 12   the 2005 class said they felt humiliated?
> 13     A    No. Id. at 40:20-22; 41:1-13.

Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to

state that they had been hazed, that:

>  2     Q    Did any of the 125 young women from the
>  3   Howard 2005 membership intake class come forward and say
>  4   that they were hazed by my clients?
>  5     A    I'm not aware of that; I was not involved
>  6   with that.
>  7     Q    Have you read any documents that say that?
>  8     A    No, I have not…



```
11     Q    Did you see any document -- that from one of
12   those 125 women -- where it stated that they felt that
13   they shouldn't have been out there?
14     A    I did not.
15     Q    Did you see any document from those 125 women
16   that stated that they didn't want to be out there and
17   they were forced to be out there?
18     A    I did not.
19     Q    Did you see any document that stated that
20   they felt uncomfortable about the weather out there?
21     A    I did not. Id. at 46:2-8; 60:11-21.
```

Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained

any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff

engaged in any activity that would meet the Defendant's definition of hazing.  Specifically, Ms.

Sample-Oates admitted that:

```
1      Q    Okay.  Have you see any written document that
2    -- this is going to be a long sentence because I'm
3    reading from here, counsel -- any written document from
4    one of the 125 individuals from the Howard University
5    2005 membership intake class that stated that my clients,
6    either one of them, caused them shame?
7      A    I have not seen it.
8      Q    What about abuse?
9      A    No.
10     Q    An insult?
11     A    No.
12     Q    Humiliation?
13     A    No.
14     Q    Intimidation?
15     A    No.
16     Q    Disgrace?
17     A    No.
18     Q    That they participated in an underground
19   hazing?
20     A    I haven't seen a document that says that.
21     Q    Financial hazing?
22     A    No…
11     Q    Okay.  Back to the other question.  Have you
12   seen any document as it relates to my clients written by
13   any one of the 125 women from Howard University's 2005
14   membership intake class that said that my clients engaged
```


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

15  in pre-pledging?
16     A    No.
17     Q    Post-pledging?
18     A    No.
19     Q    Post-initiation pledging?
20     A    No.
21     Q    You stated earlier that hazing is more
22  serious than even stealing?
0080
1     A    Yes.
2     Q    Can you tell me why?
3     A    Well, hazing could result in death; it's
4  physically abusing somebody or mentally abusing them.
5  Money you can get back but people you can't.
6     Q    Have you seen any document where there's any
7  allegation that my clients physically abused any of the
8  125 women from the Howard University 2005 membership
9  intake class?
10     A    I have not seen documents for that…
9     Q    I'm going to show you Exhibit 6 again and I'm
10  going to ask you a quick question about that.  You stated
11  that Exhibit 6 -- the letter from Ms. Daley -- says that
12  my clients were out with 125 women in 35-degree weather
13  at nighttime and the women were singing, is that correct?
14     A    If that's what this letter says, yes.
15     Q    Does it say that the activity caused those
16  125 women to be at risk of serious bodily injury?
17     A    No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-
17.

Moreover, Ms. Sample-Oates testified that Ms. Daley's letter regarding Defendant's recommendations in this case stated that, "[m]embers of the Undergraduate Activities Committee were found at approximately 2:00 a.m. singing in the parking lot at 35-degree temperature…" Id. at 47:21-22; 48:1-2.  However, Ms. Sample-Oates admitted that Defendant did not have any policies and/or procedures providing restrictions or prohibitions on time and temperature for practices and/or ceremonies.

When questions about such provisions, Ms. Sample-Oates specifically admitted that:

20     Q    Is there anything in Exhibits 1, 2, 3, 4, and

16



21  5 that prohibits having activities when it's 50 degrees?
22     A    No.
0043
 1     Q    What about when it's 35 degrees?
 2     A    No.
 3     Q    What about 25 degrees?
 4     A    No.
 5     Q    How actively were you involved in the
 6  undergraduate activities when you were basileus?
 7     A    Very.
 8     Q    And did you ever attend any events when it
 9  was cold?
10     A    Yes.
11     Q    Were you aware whether or not the colleges
12  were open when it was cold?
13     A    Yes.
14     Q    What about when it snowed?
15     A    Were they open?
16     Q    Yes.
17     A    Yes, uh-hum.
18     Q    Did you ever have any activities when it
19  snowed?
20     A    Sometimes we did; if it was too bad, we
21  cancelled them.
22     Q    Too bad meaning what?
0044
 1     A    Driving conditions were bad, too much snow,
 2  too much ice on the ground.
 3     Q    So not because of the coldness but because of
 4  the safety issue as it relates to the driving conditions?
 5     A    Yes.
 6     Q    In your position as a Regional Director, have
 7  you ever had to have meetings with 10 people?
 8     A    Yes.
 9     Q    How hard is it to arrange meetings with 10
10  people?
11     A    Hard.
12     Q    Can you tell me why?
13     A    Well, people have different schedules and all
14  10 of them may not be able to attend.
15     Q    Okay.  Do you think it would be much more
16  difficult if you had over 100 people?
17     A    Yes.
18     Q    How difficult do you think it would be to get
19  100 undergraduates together at one particular time to
20  learn the songs and the steps for a coming-out show?
21     A    Very difficult.
22     Q    In Exhibits 1, 2, 3, 4, and 5, can you tell

17



```
0045
 1  me which one of these documents has a provision in there
 2  that talks about the time that individuals could come
 3  together to practice for a coming-out show?
 4      A    The time for practices?
 5      Q    Yes.
 6      A    None, no documents.
 7      Q    So there's nothing in writing that delineates
 8  the time that they can practice?
 9      A    No. Id. at 42:20-22; 43-44; 45:1-9.
```

Most importantly, while Defendant contends Plaintiffs engaged in hazing by being present at a post-initiation practice and admits that it would be a violation for any of the 125 participants to take part in an unauthorized post-initiation show, Id. at 14:19-22; 15:1-3, and further that persons subject to and/or witnesses of hazing should be disciplined for their failure to report hazing activities, Id. at 30:9-13, Defendant admittedly treated younger members of its organization more favorably than Plaintiffs in that none of the 125 younger members were suspended for their participation in the same events. Id. at 61:14-20; 62:3.

Specifically, Ms. Sample-Oates stated the following:

```
    Q    Okay.  My clients were suspended for hazing
 5  by Alpha Kappa Alpha, is that correct?
 6      A    Yes.
 7      Q    And you stated that in your "Say 'No' To
 8  Hazing!" manual, there's a requirement for individuals
 9  who witnessed hazing to report it?
10      A    Yes.
11      Q    And if they didn't report it, that they would
12  be disciplined, is that correct?
13      A    Yes.
14      Q    Have you seen any documents where those 125
15  women from the 2005 membership intake class were
16  suspended?
17      A    No, I have not seen any.
18      Q    Do you have any knowledge that those 125 were
19  suspended for failing to report that my clients hazed
20  them?
                    …
```

18


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

0062
1   about the undergraduate sorors?
2           MR. BELL:  Yeah, the 125 -- yeah.
3           THE WITNESS:  No, I have not -- no. <u>Id.</u> at 61:4-20; 62:1-3.

Ms. Sample-Oates went on to admit that according to Defendant's policies and

procedures, persons that did not come forward regarding allegations of hazing "would be put on

inactive status and it would be investigated and possibly result in suspension." <u>Id.</u> at 45:20-22.

She also admitted that she had not reviewed any documents that would tend to show that any of

the 125 participants had ever come forward regarding the events that led to Plaintiffs'

suspension, <u>Id.</u> at 2-8, yet none of the younger members of Defendant's organization were

suspended.   In fact, Ms. Daley attended an Alpha Chapter meeting on October 1, 2005 and

during the course of this meeting Ms. Daley stated, "the only reason [you girls] are not all

suspended is because you are young."  <u>Exhibit A</u> at 10.

Defendant's actions in violation of DCHRA, namely suspending Plaintiffs, older, non-

students, when younger, student members of Defendant's organization were not suspended, has

resulted in injury to Plaintiffs' reputations, their standing in the community, and Plaintiffs have

lost the enjoyment of privileges and benefits of membership in Defendant's organization as a

result of Defendant's negligent actions.  Specifically, Plaintiffs "can no longer attend chapter

meetings, they cannot vote, they cannot participate in any Alpha Kappa Alpha functions that are

strictly just for members, they should not wear paraphernalia or represent themselves on behalf of

the sorority at all." <u>Id.</u> at 3-8.  Plaintiffs are also prohibited from participating in "[m]embership

intake process, voting, step shows, service projects…" <u>Id.</u> at 5-8.

Moreover, when questioned about other ramifications for being suspended for hazing,

Ms. Sample-Oates testified as follows:

19


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

```
 6      Q    So if a person was suspended for hazing, once
 7   they come back in they could still participate in the
 8   membership intake process?
 9      A    Yes.
10      Q    And be a -- what did you call them, a
11   graduate?
12      A    Advisor.
13      Q    Graduate Advisor?
14      A    No, they cannot be a Graduate Advisor;
15   they're very different.
16      Q    Okay.  Tell me the difference.
17      A    Anybody can -- as long as you're financial,
18   you go through the membership intake process workshop and
19   you're a financial member, you can participate in the
20   membership intake process; but you cannot be a Graduate
21   Advisor or serve on the Graduate Advisors' Council if
22   you've ever been suspended.
0092
 1      Q    For how long?
 2      A    Forever.
 3      Q    So it has -- the suspension for hazing has a
 4   permanent disqualification from participating and being a
 5   Graduate Advisor or the Graduate Advisors' Council for
 6   the rest of your life?
 7      A    Yes.
 8      Q    The person who gets suspended for stealing
 9   money, do they have that same prohibition?
10      A    No.
11      Q    That prohibition is only for people who were
12   suspended for hazing?
13      A    Right, yes. Id. at 91:6-22; 92:1-13.
```

Ms. Sample-Oates went further to state that "[h]azing is more serious in our eyes than

maybe lying or fraudulent behavior." Id. at 76:21-22.  Thus, Plaintiff's are not only viewed by

Defendant's organization and it's members as being worse than liars and thieves, but they

permanently lost their ability to become a Graduate Advisor or member of the Graduate

Advisor's Counsel, a right that someone suspended for any other infraction would not lose.

20



created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

**B.     Defendant Cannot Offer a Legitimate Non-Discriminatory Reason for its Actions as Defendant has Admitted that Younger Members were not Suspended Because They are Young, Students.**

Ms. Sample-Oates readily admitted that according to Defendant's policies and procedures, persons that did not come forward regarding allegations of hazing "would be put on inactive status and it would be investigated and possibly result in suspension." Id. at 45:20-22. She also admitted that she had not reviewed any documents that would tend to show that any of the 125 participants had ever come forward regarding the events that led to Plaintiffs' suspension, Id. at 2-8, yet none of the younger, student members of Defendant's organization were suspended.

Most importantly, while Defendant contends Plaintiffs engaged in hazing by being present at a post-initiation practice and admits that it would be a violation for any of the 125 participants to take part in an unauthorized post-initiation show, Id. at 14:19-22; 15:1-3, and further that persons subject to and/or witnesses of hazing should be disciplined for their failure to report hazing activities, Id. at 30:9-13, Defendant admittedly treated younger members of its organization more favorably than Plaintiffs in that none of the 125 younger members were suspended for their participation in the same events. Id. at 61:14-20; 62:3.

Specifically, Ms. Sample-Oates stated the following:

```
Q    Okay.  My clients were suspended for hazing
5  by Alpha Kappa Alpha, is that correct?
6       A    Yes.
7       Q    And you stated that in your "Say 'No' To
8  Hazing!" manual, there's a requirement for individuals
9  who witnessed hazing to report it?
10      A    Yes.
11      Q    And if they didn't report it, that they would
12  be disciplined, is that correct?
13      A    Yes.
```

21


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

```
14      Q    Have you seen any documents where those 125
15  women from the 2005 membership intake class were
16  suspended?
17      A    No, I have not seen any.
18      Q    Do you have any knowledge that those 125 were
19  suspended for failing to report that my clients hazed
20  them?
                    …
0062
 1  about the undergraduate sorors?
 2          MR. BELL:  Yeah, the 125 -- yeah.
 3          THE WITNESS:  No, I have not -- no. Id. at 61:4-20; 62:1-3.
```

In fact, Ms. Daley attended an Alpha Chapter meeting on October 1, 2005 and during the

course of this meeting Ms. Daley stated, "the only reason [you girls] are not all suspended is

because you are young."  Exhibit A at 10.  Therefore, the fact that younger, student members of

Defendant's organization were admittedly not suspended for their participation in the events at

issue, allegedly in violation of Defendant's own policies, taken together with Ms. Delay's

statement that "the only reason [you girls] are not all suspended is because you are young,"

Exhibit A at 10, Defendant cannot now contend that another reason actually existed for its failure

to suspend its younger, student members.

**C.      Assuming Defendant Does Offer a Legitimate Non-Discriminatory Reason
for its Actions, Defendant's Admissions that Younger Members were not
Suspended Because of Their Age Proves that Any Reasons Offered by
Defendant are but Pretext for Illegal Discrimination.**

Assuming the Defendant does offer a legitimate non-discriminatory reason for its actions,

Ms. Delay's statement regarding the reason for not suspending younger, student members,

coupled with Defendant's failure to interview those 125 younger members, and suspension of

only older members of Defendant's organization without any statements from the 125 younger,

22


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

student members evidencing hazing, demonstrates that Defendant's reasons will be but pretext for illegal discrimination.

The most telling indication of Defendant's reasoning for suspending only older, non-student members of its organization is Ms. Delay's own admission that Defendant's younger members were not suspended for their participation in the events at issue, allegedly in violation of Defendant's own policies, "because you are young," Exhibit A at 10. Moreover, although Ms. Sample-Oates admitted that according to Defendant's policies and procedures, persons that did not come forward regarding allegations of hazing "would be put on inactive status and it would be investigated and possibly result in suspension." Id. at 45:20-22. She also admitted that she had not reviewed any documents that would tend to show that any of the 125 participants had ever come forward regarding the events that led to Plaintiffs' suspension, Id. at 2-8, yet none of the younger members of Defendant's organization were suspended.

Furthermore, Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff engaged in any activity that would meet the Defendant's definition of hazing. Specifically, Ms. Sample-Oates admitted that:

```
1     Q     Okay.  Have you see any written document that
2     -- this is going to be a long sentence because I'm
3     reading from here, counsel -- any written document from
4     one of the 125 individuals from the Howard University
5     2005 membership intake class that stated that my clients,
6     either one of them, caused them shame?
7     A     I have not seen it.
8     Q     What about abuse?
9     A     No.
10    Q     An insult?
11    A     No.
12    Q     Humiliation?
13    A     No.
```

23


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

14    Q    Intimidation?
15    A    No.
16    Q    Disgrace?
17    A    No.
18    Q    That they participated in an underground
19  hazing?
20    A    I haven't seen a document that says that.
21    Q    Financial hazing?
22    A    No…
11    Q    Okay.  Back to the other question.  Have you
12  seen any document as it relates to my clients written by
13  any one of the 125 women from Howard University's 2005
14  membership intake class that said that my clients engaged
15  in pre-pledging?
16    A    No.
17    Q    Post-pledging?
18    A    No.
19    Q    Post-initiation pledging?
20    A    No.
21    Q    You stated earlier that hazing is more
22  serious than even stealing?
0080
1    A    Yes.
2    Q    Can you tell me why?
3    A    Well, hazing could result in death; it's
4  physically abusing somebody or mentally abusing them.
5  Money you can get back but people you can't.
6    Q    Have you seen any document where there's any
7  allegation that my clients physically abused any of the
8  125 women from the Howard University 2005 membership
9  intake class?
10    A    I have not seen documents for that…
9    Q    I'm going to show you Exhibit 6 again and I'm
10  going to ask you a quick question about that.  You stated
11  that Exhibit 6 -- the letter from Ms. Daley -- says that
12  my clients were out with 125 women in 35-degree weather
13  at nighttime and the women were singing, is that correct?
14    A    If that's what this letter says, yes.
15    Q    Does it say that the activity caused those
16  125 women to be at risk of serious bodily injury?
17    A    No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-
17.

Thus, as discussed above, because Plaintiffs were treated less favorably than younger,

student members of Defendant's organization, Plaintiffs are entitled to judgment as a matter of

24


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

law and summary judgment must be granted in Plaintiffs' favor on their claim of violations of DCHRA.

**III.    SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF PLAINTIFFS ON COUNT II (BREACH OF CONTRACT) BECAUSE PLAINTIFFS HAVE ESTABLISHED THAT A CONTRACT EXISTED BETWEEN PLAINTIFFS AND DEFENDANT, WHICH DEFENDANT'S 30(B)(6) REPRESENTATIVE ADMITTED WAS BREACHED BY DEFENDANT.**

In order to bring an action for breach of contract in the District of Columbia, a plaintiff must establish the formation of a contract and breach of the said contract. See In re Papandreau, 329 U.S. App. D.C. 210 (1988); Browzin v. Catholic University of America, 174 U.S. App. D.C. 60, 527 F.2d 843 (1975).  In the instant case, a contract existed between Plaintiffs and Defendant regarding hazing and the procedures to be followed when someone is accused of hazing. Specifically, members must sign documents stating that they will not participate in hazing. Exhibit C at 30:20-22; 31:1-5, 12-17.  The Anti-Hazing Handbook states "what our hazing policy is and it covers if you are suspended; well, it defines what hazing is and then it talks about if you are suspended, if there's a fact-finding committee that's assigned, what your appeal process can be, the different rights someone has if they're suspended…" Id. at 29:12-17.

Defendant breached this contract when it did not follow its own policies and/or procedures before it suspended Plaintiffs for unsubstantiated allegations of hazing.  Specifically, Plaintiffs participation in an approved post-initiation ceremony did not amount to hazing, Defendant does not have any statements from any of the 125 participants supporting allegations of hazing, nor does Defendant have any documents demonstrating that any of the 125 participants



were interview as a part of the "fact-finding" process as required by Defendant's own policies and procedures.

Hazing is described as "an act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha." <u>AKA Const.</u> <u>Art. V</u>; <u>Exhibit</u> C at 33:18-22.  However, there was no evidence, nor was it ever alleged, that Plaintiffs ever committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. <u>Id.</u> at 34:13 (post-initiation activity "is not hazing if permission is granted by the Regional Director).  Moreover, as part of this "fact-finding," Ms. Sample-Oates admitted that Defendant's policies and procedures dictate that alleged victims of hazing are to be interviewed. <u>Id.</u> at 8-12.

Surprisingly, Ms. Sample-Oates, Defendant's North Atlantic Regional Director, explained that she had not reviewed any documents from any of the 125 participants in the post-initiation ceremony which stated that any participant felt that they had been hazed.

Specifically, Ms. Sample-Oates testified regarding any such evidence of hazing as follows:

```
20      Q    Have you reviewed any documents which are
21  statements from the 125 undergraduates who were admitted
22  in 2005; have you reviewed any documents from them where
0041
 1  they stated they felt they were being hazed?
 2          MS. BATES:  Objection, it's not clear you
 3  read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6  individuals from the 2005 Howard University membership
 7  intake class that alleged that they felt they were being
 8  hazed?
 9      A    No.
```



```
10    Q    Have you read any documents or seen any
11  documents where those 125 women at Howard University for
12  the 2005 class said they felt humiliated?
13      A    No. Id. at 40:20-22; 41:1-13.
```

Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to

state that they had been hazed, that:

```
 2    Q    Did any of the 125 young women from the
 3  Howard 2005 membership intake class come forward and say
 4  that they were hazed by my clients?
 5      A    I'm not aware of that; I was not involved
 6  with that.
 7    Q    Have you read any documents that say that?
 8      A    No, I have not…
11    Q    Did you see any document -- that from one of
12  those 125 women -- where it stated that they felt that
13  they shouldn't have been out there?
14      A    I did not.
15    Q    Did you see any document from those 125 women
16  that stated that they didn't want to be out there and
17  they were forced to be out there?
18      A    I did not.
19    Q    Did you see any document that stated that
20  they felt uncomfortable about the weather out there?
21      A    I did not. Id. at 46:2-8; 60:11-21.
```

Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained

any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff

engaged in any activity that would meet the Defendant's definition of hazing.  Specifically, Ms.

Sample-Oates admitted that:

```
 1    Q    Okay.  Have you see any written document that
 2  -- this is going to be a long sentence because I'm
 3  reading from here, counsel -- any written document from
 4  one of the 125 individuals from the Howard University
 5  2005 membership intake class that stated that my clients,
 6  either one of them, caused them shame?
 7      A    I have not seen it.
 8    Q    What about abuse?
```



9    A    No.
10    Q    An insult?
11    A    No.
12    Q    Humiliation?
13    A    No.
14    Q    Intimidation?
15    A    No.
16    Q    Disgrace?
17    A    No.
18    Q    That they participated in an underground
19  hazing?
20    A    I haven't seen a document that says that.
21    Q    Financial hazing?
22    A    No…
11    Q    Okay.  Back to the other question.  Have you
12  seen any document as it relates to my clients written by
13  any one of the 125 women from Howard University's 2005
14  membership intake class that said that my clients engaged
15  in pre-pledging?
16    A    No.
17    Q    Post-pledging?
18    A    No.
19    Q    Post-initiation pledging?
20    A    No.
21    Q    You stated earlier that hazing is more
22  serious than even stealing?
0080
1    A    Yes.
2    Q    Can you tell me why?
3    A    Well, hazing could result in death; it's
4  physically abusing somebody or mentally abusing them.
5  Money you can get back but people you can't.
6    Q    Have you seen any document where there's any
7  allegation that my clients physically abused any of the
8  125 women from the Howard University 2005 membership
9  intake class?
10    A    I have not seen documents for that…
9    Q    I'm going to show you Exhibit 6 again and I'm
10  going to ask you a quick question about that.  You stated
11  that Exhibit 6 -- the letter from Ms. Daley -- says that
12  my clients were out with 125 women in 35-degree weather
13  at nighttime and the women were singing, is that correct?
14    A    If that's what this letter says, yes.
15    Q    Does it say that the activity caused those
16  125 women to be at risk of serious bodily injury?
17    A    No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-
17.

28


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

Although Plaintiffs had a contract with Defendant detailing the procedures to be followed before suspending a person for allegations of hazing, Defendant breached said contract when it suspended Plaintiffs without regard for its own policies, procedures, rules, regulations, and/or guidelines and in violation of Plaintiffs' rights afforded to them by said contract.  As such, Plaintiffs are entitled to judgment as a matter of law and this Court must enter summary judgment in favor of Plaintiffs on their claim of breach of contract.

IV.    **SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF PLAINTIFFS ON COUNT III (DEFAMATION) AS PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON SAID COUNT.**

To establish a *prima facie* case of defamation, Plaintiffs must show that: (1) Defendant made false statements concerning Plaintiffs; (2) Defendant published the statements without privilege to a third party; (3) that Defendant was at least negligent in publishing the statement; and (4) that either the statement was actionable without regard to special harm or that its publication caused Plaintiffs harm. Beeton v. District of Columbia, 779 A.2d 918, 923 (D.C. App. 2001).  Here, Defendant (1) made false statements concerning Plaintiffs, namely that they participated in hazing; (2) published said statements on its national website; (3) Defendant was at least negligent in publishing said statements as it did not have any evidence that Plaintiffs had participated in hazing and thus, knew said statements to be false; and (4) Defendant's publication of said statements has caused Plaintiffs harm to the reputation, standing in the community, and loss of enjoyment of privileges of membership in Defendant's organization.

A.    **Defendant's Statements Regarding Plaintiffs' Participation in Hazing were False.**



As previously discussed, Defendant describes hazing as "an act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha." AKA Const. Art. V; Exhibit C at 33:18-22.  In the instant case, there was not any evidence, nor was it ever alleged, that Plaintiffs committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. Id. at 34:13 (post-initiation activity "is not hazing if permission is granted by the Regional Director).  Specifically, Ms. Sample-Oates, Defendant's North Atlantic Regional Director, explained that she had not reviewed any documents from any of the 125 participants in the post-initiation ceremony which stated that any participant felt that they had been hazed.

Ms. Sample-Oates testified, during her deposition, regarding any such evidence of hazing as follows:

```
20      Q    Have you reviewed any documents which are
21   statements from the 125 undergraduates who were admitted
22   in 2005; have you reviewed any documents from them where
0041
 1   they stated they felt they were being hazed?
 2            MS. BATES:  Objection, it's not clear you
 3   read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6   individuals from the 2005 Howard University membership
 7   intake class that alleged that they felt they were being
 8   hazed?
 9      A    No.
10      Q    Have you read any documents or seen any
11   documents where those 125 women at Howard University for
12   the 2005 class said they felt humiliated?
13      A    No. Id. at 40:20-22; 41:1-13.
```



Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to

state that they had been hazed, that:

> 2     Q    Did any of the 125 young women from the
> 3   Howard 2005 membership intake class come forward and say
> 4   that they were hazed by my clients?
> 5     A    I'm not aware of that; I was not involved
> 6   with that.
> 7     Q    Have you read any documents that say that?
> 8     A    No, I have not…
> 11    Q    Did you see any document -- that from one of
> 12  those 125 women -- where it stated that they felt that
> 13  they shouldn't have been out there?
> 14    A    I did not.
> 15    Q    Did you see any document from those 125 women
> 16  that stated that they didn't want to be out there and
> 17  they were forced to be out there?
> 18    A    I did not.
> 19    Q    Did you see any document that stated that
> 20  they felt uncomfortable about the weather out there?
> 21    A    I did not. <u>Id.</u> at 46:2-8; 60:11-21.

Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained

any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff

engaged in any activity that would meet the Defendant's definition of hazing.  Specifically, Ms.

Sample-Oates admitted that:

> 1     Q    Okay.  Have you see any written document that
> 2   -- this is going to be a long sentence because I'm
> 3   reading from here, counsel -- any written document from
> 4   one of the 125 individuals from the Howard University
> 5   2005 membership intake class that stated that my clients,
> 6   either one of them, caused them shame?
> 7     A    I have not seen it.
> 8     Q    What about abuse?
> 9     A    No.
> 10    Q    An insult?
> 11    A    No.
> 12    Q    Humiliation?
> 13    A    No.
> 14    Q    Intimidation?

31


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

15      A      No.
16      Q      Disgrace?
17      A      No.
18      Q      That they participated in an underground
19  hazing?
20      A      I haven't seen a document that says that.
21      Q      Financial hazing?
22      A      No…
11      Q      Okay.  Back to the other question.  Have you
12  seen any document as it relates to my clients written by
13  any one of the 125 women from Howard University's 2005
14  membership intake class that said that my clients engaged
15  in pre-pledging?
16      A      No.
17      Q      Post-pledging?
18      A      No.
19      Q      Post-initiation pledging?
20      A      No.
21      Q      You stated earlier that hazing is more
22  serious than even stealing?
0080
1      A      Yes.
2      Q      Can you tell me why?
3      A      Well, hazing could result in death; it's
4  physically abusing somebody or mentally abusing them.
5  Money you can get back but people you can't.
6      Q      Have you seen any document where there's any
7  allegation that my clients physically abused any of the
8  125 women from the Howard University 2005 membership
9  intake class?
10      A      I have not seen documents for that…
9      Q      I'm going to show you Exhibit 6 again and I'm
10  going to ask you a quick question about that.  You stated
11  that Exhibit 6 -- the letter from Ms. Daley -- says that
12  my clients were out with 125 women in 35-degree weather
13  at nighttime and the women were singing, is that correct?
14      A      If that's what this letter says, yes.
15      Q      Does it say that the activity caused those
16  125 women to be at risk of serious bodily injury?
17      A      No, it does not say that. <u>Id.</u> at 78; 79:11-22; 80:1-10; 81:9-
17.

As detailed above, Defendant's own admissions make clear that Plaintiffs

did not violation any hazing provisions, making Defendant's statements to the

contrary false.

32



**B.     Defendant Published Said False Statements on its National Website.**

Ms. Sample-Oates admitted that Defendant's national website lists the names of those persons suspended for hazing. Exhibit C at 57:13-17.  Ms. Sample-Oates specifically stated that, "The website is for hazing, those individuals that have been found to be involved in hazing activities will be on the website.  Those that are suspended for other reasons will not be; it's only for hazing. Id. at 76:5-8.

**C.     Defendant was at Lease Negligent in its Publishing of Said Statements as it had No Evidence to Support its Statements that Plaintiffs had Participated in Hazing.**

While Defendant suspended Plaintiffs because they were in attendance at a post-initiation ceremony practice at 2:00 a.m., in alleged 35-degree weather, Defendant does not have any policies prohibiting such practices, thus, Defendant was at least negligent when it published statements to the effect that Plaintiffs' presence constituted hazing.  As discussed at length in Section IV-A, Defendant does not have any documents from any of the 125 participants in the post-initiation ceremony practices that allege Plaintiffs committed any acts that would constitute hazing according to Defendant's policies.

Moreover, Ms. Sample-Oates testified that Ms. Daley's letter regarding Defendant's recommendations in this case stated that, "[m]embers of the Undergraduate Activities Committee were found at approximately 2:00 a.m. singing in the parking lot at 35-degree temperature…" Exhibit C at 47:21-22; 48:1-2.  However, Ms. Sample-Oates admitted that Defendant did not have any policies and/or procedures providing restrictions or prohibitions on time and temperature for practices and/or ceremonies.

33


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

When questions about such provisions, Ms. Sample-Oates specifically admitted that:

    20      Q    Is there anything in Exhibits 1, 2, 3, 4, and
    21   5 that prohibits having activities when it's 50 degrees?
    22      A    No.
    0043
    1       Q    What about when it's 35 degrees?
    2       A    No.
    3       Q    What about 25 degrees?
    4       A    No.
    5       Q    How actively were you involved in the
    6   undergraduate activities when you were basileus?
    7       A    Very.
    8       Q    And did you ever attend any events when it
    9   was cold?
    10      A    Yes.
    11      Q    Were you aware whether or not the colleges
    12   were open when it was cold?
    13      A    Yes.
    14      Q    What about when it snowed?
    15      A    Were they open?
    16      Q    Yes.
    17      A    Yes, uh-hum.
    18      Q    Did you ever have any activities when it
    19   snowed?
    20      A    Sometimes we did; if it was too bad, we
    21   cancelled them.
    22      Q    Too bad meaning what?
    0044
    1       A    Driving conditions were bad, too much snow,
    2   too much ice on the ground.
    3       Q    So not because of the coldness but because of
    4   the safety issue as it relates to the driving conditions?
    5       A    Yes.
    6       Q    In your position as a Regional Director, have
    7   you ever had to have meetings with 10 people?
    8       A    Yes.
    9       Q    How hard is it to arrange meetings with 10
    10   people?
    11      A    Hard.
    12      Q    Can you tell me why?
    13      A    Well, people have different schedules and all
    14   10 of them may not be able to attend.
    15      Q    Okay.  Do you think it would be much more
    16   difficult if you had over 100 people?
    17      A    Yes.
    18      Q    How difficult do you think it would be to get
    19   100 undergraduates together at one particular time to

34


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

20   learn the songs and the steps for a coming-out show?
21       A     Very difficult.
22       Q     In Exhibits 1, 2, 3, 4, and 5, can you tell
0045
 1   me which one of these documents has a provision in there
 2   that talks about the time that individuals could come
 3   together to practice for a coming-out show?
 4       A     The time for practices?
 5       Q     Yes.
 6       A     None, no documents.
 7       Q     So there's nothing in writing that delineates
 8   the time that they can practice?
 9       A     No. Id. at 42:20-22; 43-44; 45:1-9.

As Defendant's did not have any evidence to support its published statements regarding

Plaintiffs alleged participation in hazing activities, Defendant's publication of said statements

was at least negligent.

**D.     Plaintiffs Suffered Harm as a Result of Defendant's
         Publication of Said Statements.**

Plaintiffs have suffered harm to their reputations, their standing in the community, and

have lost the enjoyment of privileges and benefits of membership in Defendant's organization.

Specifically, members suspended for hazing "can no longer attend chapter meetings, they cannot

vote, they cannot participate in any Alpha Kappa Alpha functions that are strictly just for

members, they should not wear paraphernalia or represent themselves on behalf of the sorority at

all." Id. at 3-8.  Suspended members are also prohibited from participating in "[m]embership

intake process, voting, step shows, service projects…" Id. at 5-8.

Moreover, when questioned about other ramifications for being suspended for hazing,

Ms. Sample-Oates testified as follows:

 6       Q     So if a person was suspended for hazing, once
 7   they come back in they could still participate in the
 8   membership intake process?



```
 9     A    Yes.
10     Q    And be a -- what did you call them, a
11  graduate?
12     A    Advisor.
13     Q    Graduate Advisor?
14     A    No, they cannot be a Graduate Advisor;
15  they're very different.
16     Q    Okay.  Tell me the difference.
17     A    Anybody can -- as long as you're financial,
18  you go through the membership intake process workshop and
19  you're a financial member, you can participate in the
20  membership intake process; but you cannot be a Graduate
21  Advisor or serve on the Graduate Advisors' Council if
22  you've ever been suspended.
0092
 1     Q    For how long?
 2     A    Forever.
 3     Q    So it has -- the suspension for hazing has a
 4  permanent disqualification from participating and being a
 5  Graduate Advisor or the Graduate Advisors' Council for
 6  the rest of your life?
 7     A    Yes.
 8     Q    The person who gets suspended for stealing
 9  money, do they have that same prohibition?
10     A    No.
11     Q    That prohibition is only for people who were
12  suspended for hazing?
13     A    Right, yes. Id. at 91:6-22; 92:1-13.
```

Ms. Sample-Oates went further to state that "[h]azing is more serious in our eyes than maybe lying or fraudulent behavior." Id. at 76:21-22.  Thus, Plaintiff's are not only viewed by Defendant's organization and it's members as being worse than liars and thieves, but they permanently lost their ability to become a Graduate Advisor or member of the Graduate Advisor's Counsel, a right that someone suspended for any other infraction would not lose. Because Plaintiffs have established their claim of defamation and are entitled to judgment as a matter of law, this Court must grant summary judgment in Plaintiffs' favor on their claim of defamation.

36



## V.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT IV (NEGLIGENCE), AS SUCH, THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS.

In order to prove a claim of negligence, Plaintiffs must prove that Defendant owed Plaintiffs a duty, Defendant's breached that duty, Plaintiffs' suffered harm. Scott v. District of Columbia, 322 U.S. App. D.C. 75 (D.C. Cir. 1996), citing, Toy v. District of Columbia, 549 A.2d 1, 6 (D.C. 1988).   Here, Defendant had a duty to abide by its own policies and procedures regarding the investigation and/or resolution of allegations of hazing.  Defendant breached that duty when it suspended Plaintiffs in contravention of its own policies and procedures.  Plaintiffs suffered suspension, diminished reputations, and loss of enjoyment of the privileges and benefits of membership in Defendant's organization.

The Anti-Hazing Handbook states "what our hazing policy is and it covers if you are suspended; well, it defines what hazing is and then it talks about if you are suspended, if there's a fact-finding committee that's assigned, what your appeal process can be, the different rights someone has if they're suspended..." Exhibit C at 29:12-17.  Defendant had a duty to follow its anti-hazing policies and/or procedures as outlined in the Anti-Hazing Handbook.

Defendant breached this duty when it did not follow its own policies and/or procedures before it suspended Plaintiffs for unsubstantiated allegations of hazing.  Specifically, Plaintiffs participation in an approved post-initiation ceremony did not amount to hazing, Defendant does not have any statements from any of the 125 participants supporting allegations of hazing, nor does Defendant have any documents demonstrating that any of the 125 participants were

37



interview as a part of the "fact-finding" process as required by Defendant's own policies and procedures.

Hazing is described as "an act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha."  AKA Const. Art. V. Exhibit C at 33:18-22.  However, there was no evidence, nor was it ever alleged, that Plaintiffs ever committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. Id. at 34:13 (post-initiation activity "is not hazing if permission is granted by the Regional Director).  Moreover, as part of this "fact-finding," Ms. Sample-Oates admitted that Defendant's policies and procedures dictate that alleged victims of hazing are to be interviewed. Id. at 8-12.

Surprisingly, Ms. Sample-Oates, Defendant's North Atlantic Regional Director, explained that she had not reviewed any documents from any of the 125 participants in the post-initiation ceremony which stated that any participant felt that they had been hazed.

Specifically, Ms. Sample-Oates testified regarding any such evidence of hazing as follows:

```
20      Q    Have you reviewed any documents which are
21  statements from the 125 undergraduates who were admitted
22  in 2005; have you reviewed any documents from them where
0041
 1  they stated they felt they were being hazed?
 2          MS. BATES:  Objection, it's not clear you
 3  read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6  individuals from the 2005 Howard University membership
 7  intake class that alleged that they felt they were being
 8  hazed?
 9      A    No.
```

38


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

```
10      Q    Have you read any documents or seen any
11   documents where those 125 women at Howard University for
12   the 2005 class said they felt humiliated?
13      A    No. Id. at 40:20-22; 41:1-13.
```

Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to

state that they had been hazed, that:

```
2      Q    Did any of the 125 young women from the
3   Howard 2005 membership intake class come forward and say
4   that they were hazed by my clients?
5      A    I'm not aware of that; I was not involved
6   with that.
7      Q    Have you read any documents that say that?
8      A    No, I have not…
11      Q    Did you see any document -- that from one of
12   those 125 women -- where it stated that they felt that
13   they shouldn't have been out there?
14      A    I did not.
15      Q    Did you see any document from those 125 women
16   that stated that they didn't want to be out there and
17   they were forced to be out there?
18      A    I did not.
19      Q    Did you see any document that stated that
20   they felt uncomfortable about the weather out there?
21      A    I did not. Id. at 46:2-8; 60:11-21.
```

Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained

any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff

engaged in any activity that would meet the Defendant's definition of hazing.  Specifically, Ms.

Sample-Oates admitted that:

```
1      Q    Okay.  Have you see any written document that
2   -- this is going to be a long sentence because I'm
3   reading from here, counsel -- any written document from
4   one of the 125 individuals from the Howard University
5   2005 membership intake class that stated that my clients,
6   either one of them, caused them shame?
7      A    I have not seen it.
8      Q    What about abuse?
```

39


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

9     A     No.
10    Q     An insult?
11    A     No.
12    Q     Humiliation?
13    A     No.
14    Q     Intimidation?
15    A     No.
16    Q     Disgrace?
17    A     No.
18    Q     That they participated in an underground
19  hazing?
20    A     I haven't seen a document that says that.
21    Q     Financial hazing?
22    A     No…
11    Q     Okay.  Back to the other question.  Have you
12  seen any document as it relates to my clients written by
13  any one of the 125 women from Howard University's 2005
14  membership intake class that said that my clients engaged
15  in pre-pledging?
16    A     No.
17    Q     Post-pledging?
18    A     No.
19    Q     Post-initiation pledging?
20    A     No.
21    Q     You stated earlier that hazing is more
22  serious than even stealing?
0080
1     A     Yes.
2     Q     Can you tell me why?
3     A     Well, hazing could result in death; it's
4   physically abusing somebody or mentally abusing them.
5   Money you can get back but people you can't.
6     Q     Have you seen any document where there's any
7   allegation that my clients physically abused any of the
8   125 women from the Howard University 2005 membership
9   intake class?
10    A     I have not seen documents for that…
9     Q     I'm going to show you Exhibit 6 again and I'm
10  going to ask you a quick question about that.  You stated
11  that Exhibit 6 -- the letter from Ms. Daley -- says that
12  my clients were out with 125 women in 35-degree weather
13  at nighttime and the women were singing, is that correct?
14    A     If that's what this letter says, yes.
15    Q     Does it say that the activity caused those
16  125 women to be at risk of serious bodily injury?
17    A     No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-
17.

40



Moreover, Ms. Sample-Oates testified that Ms. Daley's letter regarding Defendant's recommendations in this case stated that, "[m]embers of the Undergraduate Activities Committee were found at approximately 2:00 a.m. singing in the parking lot at 35-degree temperature…" Id. at 47:21-22; 48:1-2.  However, Ms. Sample-Oates admitted that Defendant did not have any policies and/or procedures providing restrictions or prohibitions on time and temperature for practices and/or ceremonies.

When questions about such provisions, Ms. Sample-Oates specifically admitted that:

```
20      Q    Is there anything in Exhibits 1, 2, 3, 4, and
21   5 that prohibits having activities when it's 50 degrees?
22      A    No.
0043
 1      Q    What about when it's 35 degrees?
 2      A    No.
 3      Q    What about 25 degrees?
 4      A    No.
 5      Q    How actively were you involved in the
 6  undergraduate activities when you were basileus?
 7      A    Very.
 8      Q    And did you ever attend any events when it
 9  was cold?
10      A    Yes.
11      Q    Were you aware whether or not the colleges
12   were open when it was cold?
13      A    Yes.
14      Q    What about when it snowed?
15      A    Were they open?
16      Q    Yes.
17      A    Yes, uh-hum.
18      Q    Did you ever have any activities when it
19   snowed?
20      A    Sometimes we did; if it was too bad, we
21   cancelled them.
22      Q    Too bad meaning what?
0044
 1      A    Driving conditions were bad, too much snow,
 2   too much ice on the ground.
 3      Q    So not because of the coldness but because of
 4   the safety issue as it relates to the driving conditions?
 5      A    Yes.
```

41


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

6    Q    In your position as a Regional Director, have
7  you ever had to have meetings with 10 people?
8    A    Yes.
9    Q    How hard is it to arrange meetings with 10
10  people?
11    A    Hard.
12    Q    Can you tell me why?
13    A    Well, people have different schedules and all
14  10 of them may not be able to attend.
15    Q    Okay.  Do you think it would be much more
16  difficult if you had over 100 people?
17    A    Yes.
18    Q    How difficult do you think it would be to get
19  100 undergraduates together at one particular time to
20  learn the songs and the steps for a coming-out show?
21    A    Very difficult.
22    Q    In Exhibits 1, 2, 3, 4, and 5, can you tell
0045
1  me which one of these documents has a provision in there
2  that talks about the time that individuals could come
3  together to practice for a coming-out show?
4    A    The time for practices?
5    Q    Yes.
6    A    None, no documents.
7    Q    So there's nothing in writing that delineates
8  the time that they can practice?
9    A    No. <u>Id.</u> at 42:20-22; 43-44; 45:1-9.

Although Defendant's had a duty to follow the policies and procedures outlined in the

Anti-Hazing Handbook, Defendant breached this duty when it suspended Plaintiffs without

regard for its own policies, procedures, rules, regulations, and/or guidelines and in violation of

Plaintiffs' rights afforded to them by Defendant's Anti-Hazing Handbook.

Plaintiffs have suffered harm to their reputations, their standing in the community, and

have lost the enjoyment of privileges and benefits of membership in Defendant's organization as

a result of Defendant's negligent actions.  Specifically, Plaintiffs "can no longer attend chapter

meetings, they cannot vote, they cannot participate in any Alpha Kappa Alpha functions that are

strictly just for members, they should not wear paraphernalia or represent themselves on behalf of

42



the sorority at all." <u>Id.</u> at 3-8.  Plaintiffs are also prohibited from participating in "[m]embership

intake process, voting, step shows, service projects…" <u>Id.</u> at 5-8.

  Moreover, when questioned about other ramifications for being suspended for hazing,

Ms. Sample-Oates testified as follows:

```
         6      Q     So if a person was suspended for hazing, once
         7    they come back in they could still participate in the
         8    membership intake process?
         9      A    Yes.
        10      Q     And be a -- what did you call them, a
        11    graduate?
        12      A    Advisor.
        13      Q    Graduate Advisor?
        14      A    No, they cannot be a Graduate Advisor;
        15    they're very different.
        16      Q    Okay.  Tell me the difference.
        17      A    Anybody can -- as long as you're financial,
        18    you go through the membership intake process workshop and
        19    you're a financial member, you can participate in the
        20    membership intake process; but you cannot be a Graduate
        21    Advisor or serve on the Graduate Advisors' Council if
        22    you've ever been suspended.
    0092
         1      Q     For how long?
         2      A    Forever.
         3      Q     So it has -- the suspension for hazing has a
         4    permanent disqualification from participating and being a
         5    Graduate Advisor or the Graduate Advisors' Council for
         6    the rest of your life?
         7      A    Yes.
         8      Q     The person who gets suspended for stealing
         9    money, do they have that same prohibition?
        10      A    No.
        11      Q     That prohibition is only for people who were
        12    suspended for hazing?
        13      A    Right, yes. Id. at 91:6-22; 92:1-13.
```

  Ms. Sample-Oates went further to state that "[h]azing is more serious in our eyes than

maybe lying or fraudulent behavior." <u>Id.</u> at 76:21-22.  Thus, Plaintiff's are not only viewed by

Defendant's organization and it's members as being worse than liars and thieves, but they



permanently lost their ability to become a Graduate Advisor or member of the Graduate Advisor's Counsel, a right that someone suspended for any other infraction would not lose.

As such, Plaintiffs are entitled to judgment as a matter of law and this Court must enter summary judgment in favor of Plaintiffs on their claim of negligence.

## CONCLUSION

No dispute of material facts exist in this case and Plaintiffs are entitled to judgment as a matter of law on all counts of Plaintiffs Complaint.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment on all counts of Plaintiffs' Complaint.

Respectfully submitted,

_____

Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, Maryland 20772
(301) 599-7620
(301) 599-7623 (Fax)


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image