# Law Office of Jimmy A. Bell, P.C.

9610 Marlboro Pike ~ Upper Marlboro, MD 20772
Phone (301) 599-7620 ~ Fax (301) 599-7623
Website: www.jimbellesq.com
Email: jimbellesq@aol.com

October 7, 2005

<u>Via First Class Mail and Facsimile</u>
Betty N. James, Executive Director
Alpha Kappa Alpha Sorority, Inc.
5656 South Stony Island Avenue
Chicago, Illinois 60637-1997

Linda White, Supreme Basileus
Alpha Kappa Alpha Sorority, Inc.
5656 South Stony Island Avenue
Chicago, Illinois 60637-1997

Joy Elaine Daley
North Atlantic Regional Director
Alpha Kappa Alpha Sorority, Inc.
Highland Estates
37 Ramona Road
Newburgh, New York 12550

      RE: **Memorandum For Appeal From Suspension Of Salome Tinker**

Dear Ms. White, Ms. Daley, and Ms. James,

    I represent Ms. Salome Tinker and have prepared this statement to be presented at the appeals hearing for Ms. Tinker. Please take note that all of the following related to the Alpha Kappa Alpha Sorority, Inc. ("AKA") recommendation of suspension correspondence dated September 3, 2005 (the "recommendation letter") and the AKA suspension correspondence dated September 19, 2005 (the "suspension letter").

    Upon review of the facts and circumstances described in the recommendation letter and the suspension letter, the suspension must be overturned. First, the allegations set forth in the recommendation letter suffer from severe factual deficiencies. Second, the conclusions set forth in the recommendation letter are unsupported by the facts and/or do not constitute "impropriety" and/or "hazing" under AKA bylaws, rules, and/or regulations (collectively, the "AKA regulations"). Third, in its investigation and suspension of Ms. Tinker, AKA violated its own policies and procedures and deprived Ms. Tinker of her rights. Finally, AKA's failure to punishment of other members who acted precisely the same way as Ms. Tinker makes Ms. Tinker's suspension arbitrary. As a result, these recommendations cannot serve as a basis for Ms. Tinker's suspension.



## Background

- The last initiation held at Howard University was in 2001.
- In 2002, Alpha Chapter voted not to bring in new members.
- In 2003, a moratorium was placed nationally on the sorority for the hazing incident in California. No chapter could initiate new members.
- In 2004, with few members left on the campus, the work of the Undergraduate Activities Committee was still limited to merely filling in where the Graduate Advisor could not be in attendance due to personal/work conflicts. The Alpha Chapter knew it had to successfully initiate new members for continuity, thus, an official request was made to the Regional Director within the proper timeframe. The paperwork remained with the Regional Director for some time. Numerous calls were made to her to release the paperwork with no success.[1] When she finally approved and sent the paperwork to the Graduate Advisor, Howard indicated that it was submitted past the school's deadline and thus the initiation attempt was denied by the school.[2] Only one Alpha Chapter member would be returning to campus.
- In 2004, Xi Omega sorority members were asked to help put on programs and solicit any sorors that might be transfers on campus to join Alpha Chapter to help with keeping the chapter on campus until an intake could be conducted in the Spring.
- In 2004, with the help of the Xi Omega sorors, programs held by the Alpha Chapter were widely successful.
- In 2004, when the Alpha Chapter lost one of the transfer students to academic suspension per the sorority's minimum requirement for active status for undergraduate members, the Xi Omega sorors took on a more active role to help that soror plan events and maintain her academic standing.
- Lisa Braz was the transfer student already attending Howard University. The second transfer student, Tiarra Etheridge, transferred over the summer. She was initiated in the Spring 2004 and approximately 34 of 55 of her Chapter members were suspended for hazing activities at Morgan State University. Although Ms. Etheridge had not been suspended, members of the Undergraduate Activities Committee were not clear about her role in the Chapter's activities because they were not privy to the fact-finding report. As a result, members of the Undergraduate Activities Committee wanted to make sure her activities did not deviate from the national policies and took extra care to make sure they would not be introduced to Alpha Chapter.
- In 2005, Alpha Chapter had a rush with over 400 applicants seeking membership.
- In 2005, Alpha Chapter initiated 137 women into the organization.

---

[1] Assuming 137 Members would have joined AKA at this time at approximately $800.00 each in dues, Alpha Chapter's membership would have generated $109,600.00 in revenue for Alpha Kappa Alpha Sorority, Inc. locally and nationally, but this revenue was lost because Ms. Daley failed to file the proper paperwork in a timely manner.

[2] This of failure to file the proper paperwork typifies Ms. Daley's grossly negligent and careless business practices that is evident throughout her faulty investigative procedures, baseless conclusory statements, and total failure to comply with AKA policies and/or requirements throughout the entire investigative and disciplinary process as applied to Ms. Tinker.



- In 2005, the new Alpha Chapter (without any graduate influence) voted to have a campus introduction show (the "show").
- As per the AKA rules, regulations, and guidelines, the show had to be held within seven (7) days following their initiation. However, the school was on Spring Break so a request was made to the Regional Director ("RD" or "Ms. Daley") to have the show with an extension of time to March 22nd (Tuesday) when school was in session.
- Since there was only one senior member of Alpha Chapter, graduate sorors were required to assist with teaching the newly initiated 137 sorors the AKA song and step that members perform on campus.
- After initiation, the Members of AKA began to practice for the show.
- Ms. Tinker has been a member of the Xi Omega Chapter since 1997.
- Ms. Tinker graduated from Howard University in 1996.
- Ms. Tinker is the immediate past Tamiouchos of Xi Omega Chapter (2003-2004).

## Summary

AKA alleges that Ms. Tinker participated in hazing activities in violation of AKA Const. Art. V. Hazing is described as "an act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha." AKA Const. Art. V. However, there was no evidence, nor was it ever alleged, that Ms. Tinker ever committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. Regardless, AKA suspended Ms. Tinker without regard for its own policies, procedures, rules, regulations, and/or guidelines and in violation of Ms. Tinker's rights afforded to her by the AKA Constitution and by State and Federal Law.

### I. The Letter Has Severe Factual Deficiencies That Prevent A Fair Finding Of Impropriety

In the recommendation letter, Ms. Daley states that she "found" the Undergraduate Activity Members singing in the parking lot on March 22, 2005. In addition, Ms. Daley states, in material part, that the following:

- Members of the Anti-Hazing Task Force conducted a fact-finding that revealed the following:

- 125 Undergraduates were in the parking lot in addition to [Joie Jolivere and Salome Tinker] (members of the Xi Omega Chapter).

- Members of the Undergraduate Activities Committee Dominated the Alpha Chapter Meetings by determining what activities occur…



- Prior to the last MIP the two members of Alpha Chapter were required to wear black and study AKA history and other information before they could initiate anyone into Alpha Chapter.  They were given notebooks to record information and the Graduate Advisor was a part of the group that met with them and gave them study information…

- [The suspendees were] present at all chapter meetings.

See Recommendation Letter, 2.

      However, Ms. Daley does not describe Ms. Tinker's relationship to the chapter in her recommendation letter other than to state that Ms. Tinker was a "soror." Id.  Had Ms. Daley conducted sufficient fact-finding to investigate this relationship, she would have found that *Ms. Tinker did not and could not have known that "members of Alpha Chapter were required to wear black and study AKA history and other information*." In fact, Ms. Tinker graduated in 1996 and has no involvement with such activities. Regardless, Ms. Daley uses this allegation in support of her recommendation for her suspension.

      In addition, Ms. Daley does not discuss how her allegation that "Soror Chew told the transfer students . . . that they were not made the Alpha Chapter way" relates to Ms. Tinker. Id. Any fair reading of this allegation cannot even suggest that *Ms. Tinker was responsible for Soror Chew's actions or even that she was aware of those actions*. Regardless, Ms. Daley also uses this allegation in support of her recommendation for her suspension.

      Further allegations in the recommendation letter state that the "Undergraduate Activities Committee dominated the Chapter Meetings… and the undergraduate advisor allowed it to happen."  In addition, the meetings were dominated by "former members of the Alpha Chapter." Id. In light of the fact that "dominate" means "to exert the supreme determining or guiding influence" and is inherently an activity that can only be conducted by one party at a time, your appellant is curious to know how the meetings were "dominated" by two (2) different parties as alleged by Ms. Daley.  Mirriam-Webster Online Dictionary, available at http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=dominate.  Notwithstanding this linguistic impossibility and self-contradiction, Ms. Daley failed to point out that *Ms. Tinker had never attended a single Alpha Chapter Meeting*.

      Also absent from the Ms. Daley's letter was any mention that the practice on March 22, 2005 was held at a time and place that was agreed on by all of the participating AKA members.  The recommendation letter implies that the time and place were inappropriate, but fails to properly examine the facts and circumstances surrounding that conclusion.  Rather, this was the only time that the 125 student participants were able to practice due to prior academic, employment, familial, and other commitments.  In addition, the recommendation letter makes no mention that the show was imminent and



that the practice was optional. In light of these circumstances, the time and place of the practice was not only appropriate, but necessary.

Finally, the recommendation letter states that it was "35 degrees" during the practice. Id. This statement further implies that the practice took place at an inappropriate venue. However, this implication is deficient for two reasons. First, the there is no indication that Ms. Daley had any knowledge of what the temperature was. In fact, it was at least 5 degrees warmer than she claimed. Second, Ms. Daley failed to mention that the sorors had been counseled about the weather from earlier practices and were dressed to handle the cold weather and that some sorors in attendance were trained Emergency Medical Technicians.

In light of these grievous factual errors, insufficient fact-finding, and allegations entirely unrelated to the appellant, Ms. Tinker's suspension must be overturned. In addition, AKA is barred from asserting further allegations of impropriety against Ms. Tinker regarding these events because such proceedings can be reviewed only by the evidence that is present on the record. Overton Park v. Volpe, 401 U.S. 402, 419 (1971); Camp v. Pitts, 411 U.S. 138, 143 (1973). Here, the factual record is limited to the information presented in the recommendation letter, which is fatally inaccurate and entirely insufficient to support Ms. Tinker's suspension.

In fact, the only "fact-finding" that even applies to Ms. Tinker is that she was "in the parking lot" when undergraduates were found singing there. See Recommendation Letter, 2. However, noticeably absent from the recommendation letter was that the activity on March 22, 2005 was *practice for a show that was approved by Daley herself*. The undersigned is at a loss as to how the Regional Director is able to approve AKA participation in a show, with full knowledge that the show would take place soon and that it required practice, yet find that such practice constitutes an "impropriety."

## II. Even Assuming That The Allegations Are True, The Activity Described Does Not Constitute "Hazing" in Violation of the AKA Constitution, Article V

Even assuming, *arguendo*, that the allegations set forth in the recommendation letter are true and accurate, these activities do not rise to the level of "hazing" or other impropriety. In the suspension letter, Ms. Daley states that Ms. Tinker has acted in violation of Article V and Article VI Sections 1, 2, 3(b) and 8 of the Bylaws of AKA. Suspension Letter. However, an analysis of Article VI shows that Ms. Tinker could not possibly violate Art. VI §§ 2, 3(b) and 8 and that § 1 is merely superfluous.

Art. VI § 1 states that members of AKA must know and follow the AKA Constitution and By-laws in good faith. However, § 1 itself does not describe any activity that would violate such regulations. Rather, as applied to Ms. Tinker, § 1 must be read to further emphasize the charge of violating Art. V (which describes such activity) and is merely superfluous. At best, the allegations under Art. VI §1 should be merged with the allegation that Ms. Tinker violated Art. V (discussed *infra*) and are therefore irrelevant as applied to Ms. Tinker. Moreover, this charge does not meet the AKA requirements of "Rights . . . of the Respondent" because it does not advise her of



the "specific allegations made against her" and is therefore in violation of AKA's own policies.  <u>AKA Anti-Hazing Handbook</u>, 13 (1st ed. AKA Inc.).

Art VI, § 2 grants the regional director the authority to determine whether a violation has occurred.  The only way Ms. Tinker could have violated Art. 2 was if she had refused to grant the regional director such authority, which is entirely nonsensical.  Therefore, this violation cannot apply to Ms. Tinker and must be overturned.

Art. VI § 3(b) is part of a table of penalties for alleged violations.  Again, how Ms. Tinker could violate a table of penalties is entirely beyond your appellant, and perhaps beyond the realm of logical possibility.  Therefore, this violation cannot apply to Ms. Tinker and must be overturned.

Art. VI § 8 defines suspension and the process by which it is implemented.  Since Ms. Tinker has not expelled any member of her sorority, it clearly does not apply to her.  As a result, it cannot be a basis for her suspension.  Therefore, this violation cannot apply to Ms. Tinker and must be overturned.

Art. V defines hazing as

> [a]n act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha.
>
> Hazing also includes but is not limited to, behavior which is directed against any individual(s) for the purpose of causing shame, abuse, insult, humiliation, intimidation, or disgrace.  <u>AKA Anti-Hazing Handbook</u>, 7 (1st ed. AKA Inc.); <u>see also</u> AKA Const. Art. V.

However, as discussed *supra*, activities that apply to Ms. Tinker are that she "dominated the meetings" and being present "in the parking lot." Recommendation Letter, 2.  These activities, it then seems, must be sufficient to rise to the level of violating Art. V in order to support Ms. Tinker's suspension.

A fair reading of the AKA Constitution does not support the allegation that "dominating the meetings" or "being present" at the practice is a violation of Art. V.  Surely it cannot be suggested, nor is it alleged, that "dominating" a meeting means that Ms. Tinker physically harmed any individual or behaved in a way meant to shame or disgrace the other members of AKA.  Absent facts that are not suggested here (and are therefore barred because they are absent from the administrative record, as discussed in the analysis of <u>Overton Park</u>, *supra*), Ms. Tinker's alleged "dominance" over the meeting could not constitute "hazing."  To suggest otherwise would require a stretching the definition of hazing beyond its fair and natural meaning, and would certainly be beyond the intent of the drafters of the AKA Constitution. Therefore, Ms. Tinker's alleged "dominance" over the chapter meetings does not violate Art. V.



In addition, Ms. Tinker's activity in relation to the practice does not rise to the level of hazing. First, hazing, as defined by the AKA Constitution, *supra*, is an affirmative act. The terms "behavior, striking, hitting, laying hands on" all connote an affirmative act by the violator. Mere presence is not such an affirmative act. Therefore Ms. Tinker's presence in the parking lot does not constitute a violation of Article V.

Significantly, the inference made by the Recommendation Letter is that the practice itself was hazing. This inference is ludicrous in light of the circumstances. However, Ms. Daley had approved AKA participation in the show for which they were practicing. It does not follow that a practice for a show approved by Ms. Daley was for the purpose of causing shame, abuse, insult, humiliation, intimidation, or disgrace. Ms. Daley knew or should have known that participation in the show would require practicing. In fact, going on stage disorganized and without practice would be truly humiliating and disgraceful. As a result, Ms. Daley indirectly had approved such practices. In light of her endorsement, for Ms. Daley to now suggest that they violated Art. V would be akin to a set-up against the members of AKA. As a result, Ms. Tinker did not violate Art. V and can not be suspended based on such a violation.

Moreover, Ms. Daley also ignores the fact that the 125 people involved in the practice were not pledges. The women were full-fledged members of AKA. As a result, they would not susceptible to "hazing" techniques that would have affected pledges. More importantly, the participants *voluntarily chose* to take part in the show and the accompanying practices. It would indeed be odd that members, who were already awarded the privileges of membership, chose of their own free will to participate in activity that had adverse effects on them. In fact, during the fact-finding proceedings, the 125 AKA members stated that they were not being hazed. A fair appraisal of the situation would be that there was, in fact, no hazing activity occurring.

Ms. Daley also failed to investigate Ms. Tinker's training. In fact, Ms. Tinker is a licensed certified Emergency Medical Technician and has received and taught training on numerous occasions on hot and cold weather injuries. She was also a CPR instructor based on the American Heart Association guidelines and maintains current licensure in BLS as part of this occupation. With this training, she is *required* to prevent such injuries from happening. However, Ms. Tinker, with her extensive training, knew that there was no danger of cold-related injuries because the AKA members were all dressed appropriately.

In addition, the members of the Alpha Chapter did not believe this activity constituted hazing. Each member of the Chapter was required under AKA Constitution Art. VI § 1 to abide by the requirements set forth in the Regional Director's Letter to Rush Participants. This letter, in relevant part, states that hazing "must be reported immediately" to the graduate advisor of the chapter. AKA Anti-Hazing Handbook at 37. However, of the 125 undergraduates in attendance of the practice on March 22, 2005, no member reported such "hazing" because they did not believe such activity was taking place.



The suspension letter states that the basis for Ms. Tinker's suspension was violation of Art. V and Art. VI §§ 1, 2, 3(b), and 8. However, it would be a physical impossibility for Ms. Tinker to violate Art. VI §§ 2, 3(b), and 8. In addition, as discussed, Ms. Tinker did not violate Art. VI § 1 or Art. V. Since Ms. Tinker did not violate the AKA constitution her suspension must be overturned.

### III. The Investigation And Suspension Violated Ms. Tinker's Rights And Violated Alpha Kappa Alpha's Own Policies And Procedures

The AKA Regulations grant a Respondent certain rights during the fact-finding procedure. However, Ms. Tinker was deprived of those rights due to extreme neglect by the fact-finder and/or an inexcusable failure by AKA.

On Mother's Day, Ms. Tinker received a call from the Anti-Hazing task force regarding the night of March 22, 2005. During the course of the conversation, Ms Tinker answered all of their questions, but felt that they were asked to justify an opinion they already had, rather than objective questions to ascertain the truth. Ms. Tinker was unable engage in more dialog because her mother was in town from Indiana and was on her way out to dinner.

Ms. Tinker did not hear anything further from Ms. Daley until September 2005. During the September 2005 chapter meeting, Ms. Daley, read the recommendation letter in the Chapter meeting (in front of my fellow sorors and peers). During that reading, Ms. Daley stated that Ms. Tinker was suspended from the sorority, but had not obtained the Supreme Basilius's approval to do so, in violation of AKA rules and procedures, discussed *infra*.

Ms. Tinker had never been given notice of this suspension or afforded the opportunity to confront the charges against her, in violation of AKA rules and procedures, discussed *infra*. When Ms. Tinker asked Ms. Daley to inform her of the specific charges against her, Daley refused, in violation of AKA rules and procedures, discussed *infra*. To date, Ms. Tinker has not been informed of the charges against her. Ms. Tinker was then ordered to leave the chapter meeting.

The rights granted to Ms. Tinker are enumerated in AKA Anti-Hazing Handbook. See <u>AKA Anti-Hazing Handbook</u>, 13. The rights themselves and corresponding violation of those rights are as follows:

- **To be advised by the fact-finder of the specific allegations made against her *during the fact-finding process*** - Ms. Tinker was not informed of the charges against her. She received correspondence dated September 19, 2005, which clearly states that a determination had already been made (e.g., no further fact-finding was to be conducted). As a result, Ms. Tinker was deprived of her right to be advised of the specific allegations against her.

- **To be advised of the process for conducting the fact-finding and of her responsibilities during the course of the fact-finding** - Ms. Tinker has never been informed of the fact-finding process.



- **To submit a contemporaneous written statement of her position concerning the allegations** – Because Ms. Tinker was never informed of the allegations against her, she was constructively deprived of the opportunity to respond to such allegations.

- **To be notified, in writing, at the conclusion of the fact-finding of the action taken** - Ms. Tinker has never been informed about the conclusions regarding the fact-finding as it relates to her suspension.

In addition, the investigation itself suffers from fatal deficiencies in violation of AKA Regulations. Specifically, AKA did not follow its own policies for following up a hazing complaint as follows:

- The Regional Director did not immediately place Ms. Tinker on "inactive status" within 3 days of the violation as required by the AKA Anti-Hazing Handbook. Id. at 13. Rather, Ms. Tinker remained a member in good standing until September 19, 2005 and was even permitted to attend "members only" AKA events for the remainder of the Spring 2005 semester and during the summer of 2005.

- In the suspension letter, Ms. Daley back-dated the suspension to July 1, 2005, in violation of the AKA Constitution Art. VI.

- Upon information and belief, the fact-finding team consisted of more than 3 members, in violation of the AKA Anti-Hazing Handbook. Id.

- Upon information and belief, the fact-finding team never submitted its final report from the Supreme Basilius as required by the AKA Anti-Hazing Handbook. Id.

- Upon information and belief, the regional director did not get the Supreme Basilius' approval for sanctions against Ms. Tinker as required by the AKA Anti-Hazing Handbook. Id.

AKA failed to follow its own rules and procedures of due process. It is inconceivable the AKA can rely on investigative findings by an individual who we have shown to have consistently violated AKA's own rules and regulations. In light of these grievous, fatal, and inexcusable disregard for Ms. Tinker's rights and the fact-finding procedure required by AKA, Ms. Tinker's suspension must be overturned.

### IV. The Suspension Is Arbitrary And Capricious

As discussed *supra*, each member of the Chapter was required under AKA Constitution Art. VI § 1 to abide by the requirements set forth in the Regional Director's Letter to Rush Participants. This letter, in relevant part, states that hazing "must be



reported immediately" to the graduate advisor of the chapter.  <u>AKA Anti-Hazing Handbook</u> at 37.  However, of the 125 undergraduates in attendance of the practice on March 22, 2005, no member reported such "hazing" because they did not believe such activity was taking place.

Assuming *arguendo* that hazing was, in fact, taking place, then each one of the AKA members that attended the practice on March 22, 2005, including Ms. Tinker, violated the same AKA regulations.  However, as discussed in the recommendation letter, only a select group of AKA members were singled out.  Ms. Daley even commented to one individual, "you are lucky.  You just barely made it."  Ms. Daley, to date, has not given any explanation as to why certain sorors were singled out in her Recommendation Letter, nor as to why one was never suspended and why one was later deleted from the record (Leslie Johnson Williams and Julita Blaire).

However, upon information and belief, Ms. Daley attended an Alpha Chapter meeting on October 1, 2005.  During the course of this meeting she told the Basilius, "the only reason [you girls] are not all suspended is because you are young."  This selection and suspension of Ms. Tinker was either entirely arbitrary and capricious or discriminatory based on age and therefore must be overturned because of this perversion and abuse of process.  <u>Morowitz v. Marvel</u>, 423 A.2d 190 (D.C. 1980).

**Conclusion**

In light of the severe factual deficiencies in the investigation and recommendation letters, the failure to allege proper violations of the AKA Constitution by Ms. Tinker, the violation of Ms. Tinker's own rights under the AKA Constitution, AKA's violation of its own mandatory investigative procedures, and the arbitrary and capricious nature of the adverse action taken against Ms. Tinker, the suspension of Ms. Tinker is neither necessary nor warranted.  The erroneous and unsupported factual analysis in the investigation can not support Ms. Tinker's suspension and the AKA's failure to follow its own procedures dictate that Ms. Tinker's suspension must be overturned.

Sincerely,

_____
Jimmy A. Bell, Esq.
The Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, Maryland 20772
Phone: (301) 599-7620
Fax: (301) 599-7623

