## IN THE UNITED STATES DISRTICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOIE JOLEVARE, et al.** : | |
| : | |
| : | |
| Plaintiffs, : | |
| : | **Case No.: 1:05-cv-01982 (RBW)** |
| v. : | |
| : | |
| **ALPHA KAPPA ALPHA** : | |
| **SORORITY, INC.** : | |
| : | |
| Defendant. : | |
| : | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiffs, Joie Jolevare, et al., by and through counsel, Jimmy A. Bell,

Esq. and the Law Office of Jimmy A. Bell, P.C. and hereby submits this Opposition to

Defendant's Cross Motion for Summary Judgment.

For cause, Plaintiffs state as follows:

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO DISPUTE

1.  In 2005, Alpha Chapter had a rush with over 400 applicants seeking membership.

2.  In 2005, Alpha Chapter initiated 137 women into the organization.

3.  In 2005, the new Alpha Chapter (without any graduate influence) voted to have a campus

    introduction show (the "show").

4.  As per the AKA rules, regulations, and guidelines, the show had to be held within seven

    (7) days following their initiation.


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

5.      However, the school was on Spring Break so a request was made to the Regional Director ("RD" or "Ms. Daley") to have the show with an extension of time to March 22nd (Tuesday) when school was in session. <u>Plaintiffs' Motion for Summary Judgment, Exhibit A</u> at 3.

6.      Since there was only one senior member of Alpha Chapter, graduate sorors were required to assist with teaching the newly initiated 137 sorors the AKA song and step that members perform on campus. <u>Id.</u>

7.      After initiation, the Members of AKA began to practice for the show.

8.      Plaintiffs are Graduate Certified Advisors. <u>Id.</u> at 3; <u>Plaintiffs' Motion, Exhibit B</u> at 3.

9.      Plaintiffs have been members of the Xi Omega Chapter since they graduated from Howard University.

10.     AKA alleges that Plaintiffs participated in hazing activities in violation of AKA Const. Art. V.

11.     Defendant's Rule 30(b)(6) Representative, Evelyn Sample-Oates, North Atlantic Regional Director, testified during her deposition on December 6, 2006, that Defendant had certain documents which contained information regarding prohibitions of hazing. The Undergraduate Membership Intake Process was marked as Exhibit 1 during said deposition, the Graduate Advisors' Intake Manual was marked as Exhibit 2, <u>Plaintiffs' Motion, Exhibit C</u> at 10:7-14, the Manual of Standard Procedure (2004) was marked as Exhibit 3, the Anti-Hazing Handbook – Say No to Hazing was marked Exhibit 4, and the Constitution and Bylaws (2004) were marked Exhibit 5, <u>Id.</u> at 11:14-22; 12:1-9.



12.    Hazing is described as "an act or series of acts which includes, but is not limited to,

physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm

to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha."

AKA Const. Art. V; Plaintiffs' Motion, Exhibit C at 33:18-22.

13.    However, there was no evidence, nor was it ever alleged, that Plaintiffs ever committed

physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm

to any individual. Id. at 34:13 (post-initiation activity "is not hazing if permission is

granted by the Regional Director).

14.    Ms. Sample-Oates, Defendant's North Atlantic Regional Director, explained that she had

not reviewed any documents from any of the 125 participants in the post-initiation

ceremony which stated that any participant felt that they had been hazed.  Specifically,

Ms. Sample-Oates testified regarding any such evidence of hazing as follows:

```
20      Q    Have you reviewed any documents which are
21   statements from the 125 undergraduates who were admitted
22   in 2005; have you reviewed any documents from them where
0041
 1   they stated they felt they were being hazed?
 2           MS. BATES:  Objection, it's not clear you
 3   read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6   individuals from the 2005 Howard University membership
 7   intake class that alleged that they felt they were being
 8   hazed?
 9      A    No.
10      Q    Have you read any documents or seen any
11   documents where those 125 women at Howard University for
12   the 2005 class said they felt humiliated?
13      A    No. Id. at 40:20-22; 41:1-13.
```



15.    Ms. Sample-Oates went on to admit, when asked if any of these 125 women came

forward to state that they had been hazed, that:

```
2      Q    Did any of the 125 young women from the
3   Howard 2005 membership intake class come forward and say
4   that they were hazed by my clients?
5      A    I'm not aware of that; I was not involved
6   with that.
7      Q    Have you read any documents that say that?
8      A    No, I have not…
11     Q    Did you see any document -- that from one of
12  those 125 women -- where it stated that they felt that
13  they shouldn't have been out there?
14     A    I did not.
15     Q    Did you see any document from those 125 women
16  that stated that they didn't want to be out there and
17  they were forced to be out there?
18     A    I did not.
19     Q    Did you see any document that stated that
20  they felt uncomfortable about the weather out there?
21     A    I did not. Id. at 46:2-8; 60:11-21.
```

16.    Ms. Sample-Oates further admitted that she had not reviewed any documentation that

contained any evidence that the 125 participants in the post-initiation ceremony reported

that either Plaintiff engaged in any activity that would meet the Defendant's definition of

hazing.  Specifically, Ms. Sample-Oates admitted that:

```
1      Q    Okay.  Have you see any written document that
2   -- this is going to be a long sentence because I'm
3   reading from here, counsel -- any written document from
4   one of the 125 individuals from the Howard University
5   2005 membership intake class that stated that my clients,
6   either one of them, caused them shame?
7      A    I have not seen it.
8      Q    What about abuse?
9      A    No.
10     Q    An insult?
11     A    No.
12     Q    Humiliation?
13     A    No.
14     Q    Intimidation?
```


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

15      A     No.
16      Q     Disgrace?
17      A     No.
18      Q     That they participated in an underground
19   hazing?
20      A     I haven't seen a document that says that.
21      Q     Financial hazing?
22      A     No…
11      Q     Okay.  Back to the other question.  Have you
12   seen any document as it relates to my clients written by
13   any one of the 125 women from Howard University's 2005
14   membership intake class that said that my clients engaged
15   in pre-pledging?
16      A     No.
17      Q     Post-pledging?
18      A     No.
19      Q     Post-initiation pledging?
20      A     No.
21      Q     You stated earlier that hazing is more
22   serious than even stealing?
0080
1      A     Yes.
2      Q     Can you tell me why?
3      A     Well, hazing could result in death; it's
4   physically abusing somebody or mentally abusing them.
5   Money you can get back but people you can't.
6      Q     Have you seen any document where there's any
7   allegation that my clients physically abused any of the
8   125 women from the Howard University 2005 membership
9   intake class?
10      A     I have not seen documents for that…
9      Q     I'm going to show you Exhibit 6 again and I'm
10   going to ask you a quick question about that.  You stated
11   that Exhibit 6 -- the letter from Ms. Daley -- says that
12   my clients were out with 125 women in 35-degree weather
13   at nighttime and the women were singing, is that correct?
14      A     If that's what this letter says, yes.
15      Q     Does it say that the activity caused those
16   125 women to be at risk of serious bodily injury?
17      A     No, it does not say that. <u>Id.</u> at 78; 79:11-22; 80:1-10; 81:9-
17.

5



17.   Regardless, AKA suspended Plaintiffs without regard for its own policies, procedures, rules, regulations, and/or guidelines and in violation of Plaintiffs' rights afforded to her by the AKA Constitution and by State and Federal Law.

18.   Ms. Daley prepared a letter ("Recommendation Letter") recommending Plaintiffs' suspension, and a letter ("Suspension Letter") suspending Plaintiffs.

19.   In the Recommendation Letter, Ms. Daley states that she "found" the Undergraduate Activity Members singing in the parking lot on March 22, 2005.  Ms. Sample-Oates testified that Ms. Daley's letter stated that, "[m]embers of the Undergraduate Activities Committee were found at approximately 2:00 a.m. singing in the parking lot at 35-degree temperature…" Id. at 47:21-22; 48:1-2.

20.   However, Ms. Sample-Oates admitted that Defendant did not have any policies and/or procedures providing restrictions or prohibitions on time and temperature for practices and/or ceremonies.  When questions about such provisions, Ms. Sample-Oates specifically admitted that:

```
20      Q    Is there anything in Exhibits 1, 2, 3, 4, and
21   5 that prohibits having activities when it's 50 degrees?
22      A   No.
0043
 1      Q    What about when it's 35 degrees?
 2      A   No.
 3      Q    What about 25 degrees?
 4      A   No.
 5      Q    How actively were you involved in the
 6   undergraduate activities when you were basileus?
 7      A   Very.
 8      Q    And did you ever attend any events when it
 9   was cold?
10      A   Yes.
11      Q    Were you aware whether or not the colleges
12   were open when it was cold?
13      A   Yes.
```

6


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

14     Q     What about when it snowed?
15     A     Were they open?
16     Q     Yes.
17     A     Yes, uh-hum.
18     Q     Did you ever have any activities when it
19   snowed?
20     A     Sometimes we did; if it was too bad, we
21   cancelled them.
22     Q     Too bad meaning what?
0044
1     A     Driving conditions were bad, too much snow,
2   too much ice on the ground.
3     Q     So not because of the coldness but because of
4   the safety issue as it relates to the driving conditions?
5     A     Yes.
6     Q     In your position as a Regional Director, have
7   you ever had to have meetings with 10 people?
8     A     Yes.
9     Q     How hard is it to arrange meetings with 10
10   people?
11     A     Hard.
12     Q     Can you tell me why?
13     A     Well, people have different schedules and all
14   10 of them may not be able to attend.
15     Q     Okay.  Do you think it would be much more
16   difficult if you had over 100 people?
17     A     Yes.
18     Q     How difficult do you think it would be to get
19   100 undergraduates together at one particular time to
20   learn the songs and the steps for a coming-out show?
21     A     Very difficult.
22     Q     In Exhibits 1, 2, 3, 4, and 5, can you tell
0045
1   me which one of these documents has a provision in there
2   that talks about the time that individuals could come
3   together to practice for a coming-out show?
4     A     The time for practices?
5     Q     Yes.
6     A     None, no documents.
7     Q     So there's nothing in writing that delineates
8   the time that they can practice?
9     A     No. Id. at 42:20-22; 43-44; 45:1-9.


21.    In the Recommendation Letter, Ms. Daley states that Members of the Anti-Hazing Task

Force conducted a fact-finding.  As part of this "fact-finding," Ms. Sample-Oates


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

admitted that Defendant's policies and procedures dictate that alleged victims of hazing are to be interviewed. Id. at 8-12.

22. In the Recommendation Letter, Ms. Daley states that 125 Undergraduates were in the parking lot in addition to Plaintiffs (members of the Xi Omega Chapter).

23. In the Recommendation Letter, Ms. Daley states that Members of the Undergraduate Activities Committee Dominated the Alpha Chapter Meetings by determining what activities occur.

24. In the Recommendation Letter, Ms. Daley states that Prior to the last MIP the two members of Alpha Chapter were required to wear black and study AKA history and other information before they could initiate anyone into Alpha Chapter.

25. In the Recommendation Letter, Ms. Daley states that they were given notebooks to record information and the Graduate Advisor was a part of the group that met with them and gave them study information.

26. Plaintiffs were present at all chapter meetings.

27. Both participants and witnesses are obligated to report incidents of hazing. Plaintiff's Motion, Exhibit C at 30:11-13. Members must sign documents stating that they will not participate in hazing. Id. at 30:20-22; 31:1-5, 12-17.

28. Ms. Sample-Oates admitted that she had not seen any documents which stated the participants in the post-initiation ceremony were suspended. Ms. Sample-Oates specifically testified that:

> 14    Q    Have you seen any documents where those 125
> 15    women from the 2005 membership intake class were
> 16    suspended?
> 17    A    No, I have not seen any.



18    Q    Do you have any knowledge that those 125 were
19  suspended for failing to report that my clients hazed
20  them?
21       MS. BATES:  Objection.  I just want to make
22  sure I understand that it's clear that we're talking
0062
 1  about the undergraduate sorors?
 2       MR. BELL:  Yeah, the 125 -- yeah.
 3       THE WITNESS:  No, I have not – no
                    …
 9    Q    And that my clients were subsequently
10  suspended for having those 125 women out there singing,
11  is that correct?
12    A    Yes.
13    Q    Now, those 125 women are members of Alpha
14  Kappa Alpha Sorority, is that correct?
15    A    Yes.
16    Q    And none of them were suspended for failing
17  to report that my clients hazed them, is that correct?
18    A    They weren't suspended, yes; that is correct.
19    Q    For the same activity; because if they were
20  hazed, they would've had to be participants in the
21  hazing, am I correct?
22    A    Yes.
0064
 1       MS. BATES:  Objection.
 2  BY MR. BELL:
 3    Q    But they were not suspended?
 4    A    No, as far as I know they were not. Id. at 61:14-22; 62:1-3;
63:9-22; 64:1-4.

29.    On Saturday October 2, 2005, Joy Elaine Daley attended the Alpha Chapter meeting in

       her capacity as regional director for AKA.

30.    During that meeting, Joy Elaine Daley stated that "the only reason [the other members of

       Alpha Chapter] were not suspended like [Plaintiffs] was because they were young and

       students." Plaintiffs' Motion, Exhibit A at 10.

31.    Defendant's national website lists the names of those persons suspended for hazing.

       Plaintiffs' Motion, Exhibit C at 57:13-17.  Ms. Sample-Oates specifically stated that,

       "The website is for hazing, those individuals that have been found to be involved in



hazing activities will be on the website.  Those that are suspended for other reasons will not be; it's only for hazing. Id. at 76:5-8.

32.     Members suspended for hazing "can no longer attend chapter meetings, they cannot vote, they cannot participate in any Alpha Kappa Alpha functions that are strictly just for members, they should not wear paraphernalia or represent themselves on behalf of the sorority at all." Id. at 3-8.  Suspended members are also prohibited from participating in "[m]embership intake process, voting, step shows, service projects…" Id. at 5-8.

33.     When questioned about other ramifications for being suspended for hazing, Ms. Sample-Oates testified as follows:

```
 6      Q     So if a person was suspended for hazing, once
 7   they come back in they could still participate in the
 8   membership intake process?
 9      A     Yes.
10      Q     And be a -- what did you call them, a
11   graduate?
12      A     Advisor.
13      Q     Graduate Advisor?
14      A     No, they cannot be a Graduate Advisor;
15   they're very different.
16      Q     Okay.  Tell me the difference.
17      A     Anybody can -- as long as you're financial,
18   you go through the membership intake process workshop and
19   you're a financial member, you can participate in the
20   membership intake process; but you cannot be a Graduate
21   Advisor or serve on the Graduate Advisors' Council if
22   you've ever been suspended.
0092
 1      Q     For how long?
 2      A     Forever.
 3      Q     So it has -- the suspension for hazing has a
 4   permanent disqualification from participating and being a
 5   Graduate Advisor or the Graduate Advisors' Council for
 6   the rest of your life?
 7      A     Yes.
 8      Q     The person who gets suspended for stealing
 9   money, do they have that same prohibition?
10      A     No.
```

10


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

11    Q    That prohibition is only for people who were
12    suspended for hazing?
13    A    Right, yes. <u>Id.</u> at91:6-22; 92:1-13.


## ARGUMENT

**I.    PLAINTIFFS HAVE BROUGHT FORTH SUFFICIENT EVIDENCE TO DEMONSTRATE THEIR ENTITLEMENT TO JUDGMENT AS A MATTER OF LAW FOR DEFENDANT'S VIOLATIONS OF THE DCHRA**

To establish a prima facie case, Plaintiffs must show (1) that Plaintiffs were older members of Defendant's organization; (2) that Plaintiffs suffered adverse action; and (3) said action was based on Plaintiffs' age and source of income. <u>Paquin v. Fannie Mae</u>, 119 F.3d 23, 26 (D.C. Cir. 1997); <u>Bryant v. Brownlee</u>, 265 F. Supp. 2d 52, 58 (D.D.C. 2003). Once Plaintiffs establishe a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its action that, if believed by the trier of fact, would show that unlawful age discrimination was not the reason for the adverse action. <u>Id.</u>  When Defendant articulates such a reason, "the presumption of discrimination raised by the prima facie showing is rebutted and 'drops from the case.'" <u>Id.</u> at 1078, <u>quoting</u>, <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 n. 10 (1981). The burden then shifts back to the Plaintiffs to show that the proffered reasons were a pretext for age discrimination. <u>Id.</u> at 1078.

**A.  Defendant's Conduct is Prohibited by the DCHRA, Therefore, Defendant is not Entitled to Judgment as a Matter of Law.**

In the instant case, a contract, similar in nature to an employment contract, existed between Plaintiffs and Defendant regarding Plaintiffs' actions in representing Defendant's organization, as well as, hazing and the procedures to be followed when someone is accused of hazing.  Specifically, as members Plaintiffs signed documents stating that they will not

11



participate in hazing. <u>Plaintiffs' Motion, Exhibit C</u> at 30:20-22; 31:1-5, 12-17.  The Anti-Hazing

Handbook states "what our hazing policy is and it covers if you are suspended; well, it defines

what hazing is and then it talks about if you are suspended, if there's a fact-finding committee

that's assigned, what your appeal process can be, the different rights someone has if they're

suspended…" <u>Id.</u> at 29:12-17.   In essence, Plaintiffs acted as representatives of Defendant's

organization and their actions were controlled and dictated by Defendant in regards to their role

as representatives of Defendant in a manner similar to that of an employment relationship.

     This Circuit has even found that a defendant can be liable for acts relating to independent

contractors where the defendant is not generally thought to be an employer and here, the case is

even more compelling for finding liability than in an independent contractor case. "As a general

rule, an employer or contractor is not liable for the negligent acts of its independent contractor."

<u>Siegel v. Klingle</u>, U.S. Dist. Ct. for D.C., 2002 U.S. Dist. LEXIS 15208, <u>citing</u>, <u>Wilson v. Good</u>

<u>Humor Corp.</u>, 244 U.S. App. D.C. 298, 757 F.2d 1293, 1301 (D.C. Cir. 1985); <u>Washington Air</u>

<u>Compressor Rental Co. v. Nat'l Union Ins. Co.</u>, 165 A.2d 482, 485 (D.C. App. 1960). However,

this rule is not unqualified because it is still possible for a contracting employer to be held liable

for the actions of the independent contractor. <u>Siegel v. Klingle</u>, U.S. Dist. Ct. for D.C., 2002 U.S.

Dist. LEXIS 15208, <u>citing</u>, <u>Wadley v. Aspillaga</u>, 163 F. Supp. 2d 1, 7 (D.D.C. 2001)(<u>quoting</u>

<u>Safeway Stores, Inc. v. Kelly</u>, 448 A.2d 856, 861 (D.C. 1982); <u>See</u> <u>also</u>, <u>Vale v. Bonnett</u>, 89 U.S.

App. D.C. 116, 191 F.2d 334, 337 (D.C. Cir. 1951) (stating that character and place of work to

be done determine an employer's liability for the actions of an independent contractor).   Here,

Plaintiff's were acting as representatives of Defendant's organization, subject to a contractual

obligation to adhere to Defendant's policies and procedures and as such, their actions were

12


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

controlled by the Defendant.

Specifically, Plaintiffs are older members of Defendant's organization and are no longer students.  Plaintiffs are Graduate Certified Advisors, who admittedly receive training and instruction from Defendant on how to fulfill their obligations prior to certification. Plaintiff's Motion for Summary Judgment, Exhibit A at 3; Id. at Exhibit B at 3.  Plaintiffs were present during a post-initiation ceremony practice, at which 125 younger members, who are still students, of Defendant's organization were also present.  Plaintiffs were suspended for allegations of hazing arising from their presence at said practice.  The 125 younger members of Defendant's organization were not suspended for their participation in said practice.

There is not any evidence, nor was it ever alleged, that Plaintiffs ever committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. Id. at 34:13 (post-initiation activity "is not hazing if permission is granted by the Regional Director).  Moreover, as part of this "fact-finding," Ms. Sample-Oates admitted that Defendant's policies and procedures dictate that alleged victims of hazing are to be interviewed. Id. at 8-12.  There is not any evidence that the 125 participants were ever interviewed.

Specifically, Ms. Sample-Oates testified regarding any such evidence of hazing as follows:

```
20      Q    Have you reviewed any documents which are
21   statements from the 125 undergraduates who were admitted
22   in 2005; have you reviewed any documents from them where
0041
 1   they stated they felt they were being hazed?
 2          MS. BATES:  Objection, it's not clear you
 3   read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6   individuals from the 2005 Howard University membership
```

13


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

> 7   intake class that alleged that they felt they were being
> 8   hazed?
> 9      A   No.
> 10     Q   Have you read any documents or seen any
> 11  documents where those 125 women at Howard University for
> 12  the 2005 class said they felt humiliated?
> 13     A   No. <u>Id.</u> at 40:20-22; 41:1-13.

Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to state that they had been hazed, that:

> 2      Q   Did any of the 125 young women from the
> 3   Howard 2005 membership intake class come forward and say
> 4   that they were hazed by my clients?
> 5      A   I'm not aware of that; I was not involved
> 6   with that.
> 7      Q   Have you read any documents that say that?
> 8      A   No, I have not…
> 11     Q   Did you see any document -- that from one of
> 12  those 125 women -- where it stated that they felt that
> 13  they shouldn't have been out there?
> 14     A   I did not.
> 15     Q   Did you see any document from those 125 women
> 16  that stated that they didn't want to be out there and
> 17  they were forced to be out there?
> 18     A   I did not.
> 19     Q   Did you see any document that stated that
> 20  they felt uncomfortable about the weather out there?
> 21     A   I did not. <u>Id.</u> at 46:2-8; 60:11-21.

Moreover, Ms. Sample-Oates testified that Ms. Daley's letter regarding Defendant's recommendations in this case stated that, "[m]embers of the Undergraduate Activities Committee were found at approximately 2:00 a.m. singing in the parking lot at 35-degree temperature…" <u>Id.</u> at 47:21-22; 48:1-2.  However, Ms. Sample-Oates admitted that Defendant did not have any policies and/or procedures providing restrictions or prohibitions on time and temperature for practices and/or ceremonies.

When questions about such provisions, Ms. Sample-Oates specifically admitted that:

14


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

20    Q    Is there anything in Exhibits 1, 2, 3, 4, and
21  5 that prohibits having activities when it's 50 degrees?
22    A    No.
0043
1    Q    What about when it's 35 degrees?
2    A    No.
3    Q    What about 25 degrees?
4    A    No.
5    Q    How actively were you involved in the
6  undergraduate activities when you were basileus?
7    A    Very.
8    Q    And did you ever attend any events when it
9  was cold?
10    A    Yes.
11    Q    Were you aware whether or not the colleges
12  were open when it was cold?
13    A    Yes.
14    Q    What about when it snowed?
15    A    Were they open?
16    Q    Yes.
17    A    Yes, uh-hum.
18    Q    Did you ever have any activities when it
19  snowed?
20    A    Sometimes we did; if it was too bad, we
21  cancelled them.
22    Q    Too bad meaning what?
0044
1    A    Driving conditions were bad, too much snow,
2  too much ice on the ground.
3    Q    So not because of the coldness but because of
4  the safety issue as it relates to the driving conditions?
5    A    Yes.
6    Q    In your position as a Regional Director, have
7  you ever had to have meetings with 10 people?
8    A    Yes.
9    Q    How hard is it to arrange meetings with 10
10  people?
11    A    Hard.
12    Q    Can you tell me why?
13    A    Well, people have different schedules and all
14  10 of them may not be able to attend.
15    Q    Okay.  Do you think it would be much more
16  difficult if you had over 100 people?
17    A    Yes.
18    Q    How difficult do you think it would be to get
19  100 undergraduates together at one particular time to
20  learn the songs and the steps for a coming-out show?
21    A    Very difficult.

15



22      Q     In Exhibits 1, 2, 3, 4, and 5, can you tell
0045
 1   me which one of these documents has a provision in there
 2   that talks about the time that individuals could come
 3   together to practice for a coming-out show?
 4       A     The time for practices?
 5       Q     Yes.
 6       A     None, no documents.
 7       Q     So there's nothing in writing that delineates
 8   the time that they can practice?
 9       A     No. <u>Id.</u> at 42:20-22; 43-44; 45:1-9.

Most importantly, while Defendant contends Plaintiffs engaged in hazing by being

present at a post-initiation practice and admits that it would be a violation for any of the 125

participants to take part in an unauthorized post-initiation show, <u>Id.</u> at 14:19-22; 15:1-3, and

further that persons subject to and/or witnesses of hazing should be disciplined for their failure to

report hazing activities, <u>Id.</u> at 30:9-13, Defendant admittedly treated younger members of its

organization more favorably than Plaintiffs in that none of the 125 younger members were

suspended for their participation in the same events. <u>Id.</u> at 61:14-20; 62:3.

Specifically, Ms. Sample-Oates stated the following:

Q     Okay.  My clients were suspended for hazing
 5   by Alpha Kappa Alpha, is that correct?
 6       A     Yes.
 7       Q     And you stated that in your "Say 'No' To
 8   Hazing!" manual, there's a requirement for individuals
 9   who witnessed hazing to report it?
10       A     Yes.
11       Q     And if they didn't report it, that they would
12   be disciplined, is that correct?
13       A     Yes.
14       Q     Have you seen any documents where those 125
15   women from the 2005 membership intake class were
16   suspended?
17       A     No, I have not seen any.
18       Q     Do you have any knowledge that those 125 were
19   suspended for failing to report that my clients hazed
20   them?

16



...

```
0062
 1   about the undergraduate sorors?
 2        MR. BELL:  Yeah, the 125 -- yeah.
 3        THE WITNESS:  No, I have not -- no. Id. at 61:4-20; 62:1-3.
```

Ms. Sample-Oates went on to admit that according to Defendant's policies and procedures, persons that did not come forward regarding allegations of hazing "would be put on inactive status and it would be investigated and possibly result in suspension." Id. at 45:20-22. She also admitted that she had not reviewed any documents that would tend to show that any of the 125 participants had ever come forward regarding the events that led to Plaintiffs' suspension, Id. at 2-8, yet none of the younger members of Defendant's organization were suspended.   In fact, Ms. Daley attended an Alpha Chapter meeting on October 1, 2005 and during the course of this meeting Ms. Daley stated, "the only reason [you girls] are not all suspended is because you are young."  Plaintiff's Motion, Exhibit A at 10.

Defendant's actions in violation of DCHRA, namely suspending Plaintiffs, older, non-students, when younger, student members of Defendant's organization were not suspended, has resulted in injury to Plaintiffs' reputations, their standing in the community, and Plaintiffs have lost the enjoyment of privileges and benefits of membership in Defendant's organization as a result of Defendant's negligent actions.  Specifically, Plaintiffs "can no longer attend chapter meetings, they cannot vote, they cannot participate in any Alpha Kappa Alpha functions that are strictly just for members, they should not wear paraphernalia or represent themselves on behalf of the sorority at all." Id. at 3-8.  Plaintiffs are also prohibited from participating in "[m]embership intake process, voting, step shows, service projects..." Id. at 5-8.



Moreover, when questioned about other ramifications for being suspended for hazing, Ms. Sample-Oates testified as follows:

```
 6     Q    So if a person was suspended for hazing, once
 7  they come back in they could still participate in the
 8  membership intake process?
 9     A    Yes.
10     Q    And be a -- what did you call them, a
11  graduate?
12     A    Advisor.
13     Q    Graduate Advisor?
14     A    No, they cannot be a Graduate Advisor;
15  they're very different.
16     Q    Okay.  Tell me the difference.
17     A    Anybody can -- as long as you're financial,
18  you go through the membership intake process workshop and
19  you're a financial member, you can participate in the
20  membership intake process; but you cannot be a Graduate
21  Advisor or serve on the Graduate Advisors' Council if
22  you've ever been suspended.
0092
 1     Q    For how long?
 2     A    Forever.
 3     Q    So it has -- the suspension for hazing has a
 4  permanent disqualification from participating and being a
 5  Graduate Advisor or the Graduate Advisors' Council for
 6  the rest of your life?
 7     A    Yes.
 8     Q    The person who gets suspended for stealing
 9  money, do they have that same prohibition?
10     A    No.
11     Q    That prohibition is only for people who were
12  suspended for hazing?
13     A    Right, yes. Plaintiffs' Motion, Exhibit C at 91:6-22; 92:1-13.
```

Ms. Sample-Oates went further to state that "[h]azing is more serious in our eyes than maybe lying or fraudulent behavior." Id. at 76:21-22.  Thus, Plaintiff's are not only viewed by Defendant's organization and it's members as being worse than liars and thieves, but they permanently lost their ability to become a Graduate Advisor or member of the Graduate Advisor's Counsel, a right that someone suspended for any other infraction would not lose.

18


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

Finally, while Defendant asserts that the DCHRA prohibition on discrimination in places of public accommodation does not apply to Defendant, Defendant does not address <u>James v. Team Washington, Inc.,</u>WL 633323 (DDC 1997). In <u>James v. Team Washington</u>, as in our case, the "defendant overemphasizes the significance of the actual physical location at which the allegedly discriminatory conduct occurred. Moreover, the Defendant ignores the fact that the D.C. Human Rights Act defines places of public accommodation to include "establishments dealing with **goods or services of any kind.**" (emphasis added). Defendant maintains physical locations that provide educational, social, and career services. Based on the court's own definition of places of public accommodation, Defendant falls squarely within the scope of a place of public accommodation. Moreover, <u>James v. Team Washington</u> states that "[t]he conduct prohibited by the D.C. Human Rights Act is the improper denial of the goods and services *of* a place of public accommodation." <u>Id.</u> It is further "undisputed that the D.C. Human Rights Act prohibits discrimination on the basis of race." <u>Id.</u> Therefore, in light of the foregoing, this Court must grant Plaintiff's Motion for Summary Judgment.

**B.      Defendant Has Not Offered, Nor Can Defendant Offer a Legitimate Non-Discriminatory Reason for its Actions as Defendant has Admitted that Younger Members were not Suspended Because They are Young, Students.**

Ms. Sample-Oates readily admitted that according to Defendant's policies and procedures, persons that did not come forward regarding allegations of hazing "would be put on inactive status and it would be investigated and possibly result in suspension." <u>Plaintiff's Motion, Exhibit C</u> at 45:20-22. She also admitted that she had not reviewed any documents that would tend to show that any of the 125 participants had ever come forward regarding the events that led

19



to Plaintiffs' suspension, Id. at 2-8, yet none of the younger, student members of Defendant's organization were suspended.

Most importantly, while Defendant contends Plaintiffs engaged in hazing by being present at a post-initiation practice and admits that it would be a violation for any of the 125 participants to take part in an unauthorized post-initiation show, Id. at 14:19-22; 15:1-3, and further that persons subject to and/or witnesses of hazing should be disciplined for their failure to report hazing activities, Id. at 30:9-13, Defendant admittedly treated younger members of its organization more favorably than Plaintiffs in that none of the 125 younger members were suspended for their participation in the same events. Id. at 61:14-20; 62:3.

Specifically, Ms. Sample-Oates stated the following:

```
Q    Okay.  My clients were suspended for hazing
 5   by Alpha Kappa Alpha, is that correct?
 6       A    Yes.
 7       Q    And you stated that in your "Say 'No' To
 8   Hazing!" manual, there's a requirement for individuals
 9   who witnessed hazing to report it?
10       A    Yes.
11       Q    And if they didn't report it, that they would
12   be disciplined, is that correct?
13       A    Yes.
14       Q    Have you seen any documents where those 125
15   women from the 2005 membership intake class were
16   suspended?
17       A    No, I have not seen any.
18       Q    Do you have any knowledge that those 125 were
19   suspended for failing to report that my clients hazed
20   them?
                    …
0062
 1   about the undergraduate sorors?
 2           MR. BELL:  Yeah, the 125 -- yeah.
 3           THE WITNESS:  No, I have not -- no. Id. at 61:4-20; 62:1-3.
```



In fact, Ms. Daley attended an Alpha Chapter meeting on October 1, 2005 and during the course of this meeting Ms. Daley stated, "the only reason [you girls] are not all suspended is because you are young." Plaintiffs' Motion, Exhibit A at 10. Therefore, the fact that younger, student members of Defendant's organization were admittedly not suspended for their participation in the events at issue, allegedly in violation of Defendant's own policies, taken together with Ms. Delay's statement that "the only reason [you girls] are not all suspended is because you are young," Id., Defendant cannot now contend that another reason actually existed for its failure to suspend its younger, student members and in fact, Defendant has not even attempted to offer any alternative reason for its conduct, thus, summary judgment must be granted in Plaintiff's favor and Defendant's current motion denied.

III.    **DEFENANT'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED ON COUNT II (BREACH OF CONTRACT) BECAUSE PLAINTIFFS HAVE ESTABLISHED THAT A CONTRACT EXISTED BETWEEN PLAINTIFFS AND DEFENDANT, WHICH DEFENDANT'S 30(B)(6) REPRESENTATIVE ADMITTED WAS BREACHED BY DEFENDANT.**

In order to bring an action for breach of contract in the District of Columbia, a plaintiff must establish the formation of a contract and breach of the said contract. See In re Papandreau, 329 U.S. App. D.C. 210 (1988); Browzin v. Catholic University of America, 174 U.S. App. D.C. 60, 527 F.2d 843 (1975). In the instant case, despite Defendant's assertions to the contrary, a contract existed between Plaintiffs and Defendant regarding hazing and the procedures to be followed when someone is accused of hazing. Specifically, Defendant does not dispute that members must sign documents stating that they will not participate in hazing. Plaintiff's Motion, Exhibit C at 30:20-22; 31:1-5, 12-17. The Anti-Hazing Handbook states "what our hazing policy

21



is and it covers if you are suspended; well, it defines what hazing is and then it talks about if you are suspended, if there's a fact-finding committee that's assigned, what your appeal process can be, the different rights someone has if they're suspended…" <u>Id.</u> at 29:12-17.  According to Defendant's own admissions, the documents Plaintiffs were made to sign obligated Plaintiffs to act in a specified manner, outlined the ramifications for deviation from approved conduct, and detailed Defendant's obligations in light of allegations of a breach of said contract. <u>Id.</u>  Clearly, both Plaintiff and Defendant were bound and obligated to act according to said contract.

However, Defendant breached this contract when it did not follow the policies and/or procedures detailed in this contract before it suspended Plaintiffs for unsubstantiated allegations of hazing.  Specifically, Plaintiffs participation in an approved post-initiation ceremony did not amount to hazing, Defendant does not have any statements from any of the 125 participants supporting allegations of hazing, nor does Defendant have any documents demonstrating that any of the 125 participants were interview as a part of the "fact-finding" process as required by Defendant's own policies and procedures.

There has never been any evidence, nor was it ever alleged, that Plaintiffs ever committed physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual. <u>Plaintiff's Motion, Exhibit C</u> at 34:13 (post-initiation activity "is not hazing if permission is granted by the Regional Director).  Moreover, as part of this "fact-finding," Ms. Sample-Oates admitted that Defendant's policies and procedures dictate that alleged victims of hazing are to be interviewed. <u>Id.</u> at 8-12.


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

Surprisingly, Ms. Sample-Oates, Defendant's North Atlantic Regional Director,
explained that she had not reviewed any documents from any of the 125 participants in the post-
initiation ceremony which stated that any participant felt that they had been hazed.

Specifically, Ms. Sample-Oates testified regarding any such evidence of hazing as
follows:

> 20     Q     Have you reviewed any documents which are
> 21   statements from the 125 undergraduates who were admitted
> 22   in 2005; have you reviewed any documents from them where
> 0041
> 1   they stated they felt they were being hazed?
> 2          MS. BATES:  Objection, it's not clear you
> 3   read documents from them.  You may answer the question.
> 4     A     No.
> 5     Q     Are you aware of any documents from those 125
> 6   individuals from the 2005 Howard University membership
> 7   intake class that alleged that they felt they were being
> 8   hazed?
> 9     A     No.
> 10     Q     Have you read any documents or seen any
> 11   documents where those 125 women at Howard University for
> 12   the 2005 class said they felt humiliated?
> 13     A     No. Id. at 40:20-22; 41:1-13.

Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to
state that they had been hazed, that:

> 2     Q     Did any of the 125 young women from the
> 3   Howard 2005 membership intake class come forward and say
> 4   that they were hazed by my clients?
> 5     A     I'm not aware of that; I was not involved
> 6   with that.
> 7     Q     Have you read any documents that say that?
> 8     A     No, I have not…
> 11     Q     Did you see any document -- that from one of
> 12   those 125 women -- where it stated that they felt that
> 13   they shouldn't have been out there?
> 14     A     I did not.
> 15     Q     Did you see any document from those 125 women
> 16   that stated that they didn't want to be out there and



17  they were forced to be out there?
18      A    I did not.
19      Q    Did you see any document that stated that
20  they felt uncomfortable about the weather out there?
21      A    I did not. <u>Id.</u> at 46:2-8; 60:11-21.


Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained

any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff

engaged in any activity that would meet the Defendant's definition of hazing.  Specifically, Ms.

Sample-Oates admitted that:

 1      Q    Okay.  Have you see any written document that
 2  -- this is going to be a long sentence because I'm
 3  reading from here, counsel -- any written document from
 4  one of the 125 individuals from the Howard University
 5  2005 membership intake class that stated that my clients,
 6  either one of them, caused them shame?
 7      A    I have not seen it.
 8      Q    What about abuse?
 9      A    No.
10      Q    An insult?
11      A    No.
12      Q    Humiliation?
13      A    No.
14      Q    Intimidation?
15      A    No.
16      Q    Disgrace?
17      A    No.
18      Q    That they participated in an underground
19  hazing?
20      A    I haven't seen a document that says that.
21      Q    Financial hazing?
22      A    No…
11      Q    Okay.  Back to the other question.  Have you
12  seen any document as it relates to my clients written by
13  any one of the 125 women from Howard University's 2005
14  membership intake class that said that my clients engaged
15  in pre-pledging?
16      A    No.
17      Q    Post-pledging?
18      A    No.
19      Q    Post-initiation pledging?
20      A    No.



21    Q    You stated earlier that hazing is more
22   serious than even stealing?
0080
1     A    Yes.
2     Q    Can you tell me why?
3     A    Well, hazing could result in death; it's
4   physically abusing somebody or mentally abusing them.
5   Money you can get back but people you can't.
6     Q    Have you seen any document where there's any
7   allegation that my clients physically abused any of the
8   125 women from the Howard University 2005 membership
9   intake class?
10     A    I have not seen documents for that…
9     Q    I'm going to show you Exhibit 6 again and I'm
10   going to ask you a quick question about that.  You stated
11   that Exhibit 6 -- the letter from Ms. Daley -- says that
12   my clients were out with 125 women in 35-degree weather
13   at nighttime and the women were singing, is that correct?
14     A    If that's what this letter says, yes.
15     Q    Does it say that the activity caused those
16   125 women to be at risk of serious bodily injury?
17     A    No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-
17.

Although Plaintiffs had a contract with Defendant detailing the procedures to be followed before suspending a person for allegations of hazing, Defendant breached said contract when it suspended Plaintiffs without regard for its own policies, procedures, rules, regulations, and/or guidelines and in violation of Plaintiffs' rights afforded to them by said contract.  As such, Plaintiffs are entitled to judgment as a matter of law and this Court must enter summary judgment in favor of Plaintiffs on their claim of breach of contract and deny Defendant's current motion.

**IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT MUST BE DENIED ON COUNT III (DEFAMATION) AS DEFENANT IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON SAID COUNT.**

To establish a *prima facie* case of defamation, Plaintiffs must show that: (1) Defendant made false statements concerning Plaintiffs; (2) Defendant published the statements without

25


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

privilege to a third party; (3) that Defendant was at least negligent in publishing the statement;

and (4) that either the statement was actionable without regard to special harm or that its

publication caused Plaintiffs harm. Beeton v. District of Columbia, 779 A.2d 918, 923 (D.C.

App. 2001).  Although, Defendant has concentrated on Plaintiff's abbreviation of Defendant's

definition of hazing, Defendant ignores that undisputed fact that Ms. Sample-Oates admitted

during her sworn deposition testimony that she had never reviewed any documents that contained

evidence that Plaintiff's engaged in any acts that would meet Defendant's definition of hazing.

Specifically, there was not any evidence, nor was it ever alleged, that Plaintiffs committed

physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any

individual. Plaintiffs' Motion, Exhibit C at 34:13 (post-initiation activity "is not hazing if

permission is granted by the Regional Director).  Ms. Sample-Oates testified, during her

deposition, regarding any such evidence of hazing as follows:

```
20      Q    Have you reviewed any documents which are
21   statements from the 125 undergraduates who were admitted
22   in 2005; have you reviewed any documents from them where
0041
 1   they stated they felt they were being hazed?
 2           MS. BATES:  Objection, it's not clear you
 3   read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6   individuals from the 2005 Howard University membership
 7   intake class that alleged that they felt they were being
 8   hazed?
 9      A    No.
10      Q    Have you read any documents or seen any
11   documents where those 125 women at Howard University for
12   the 2005 class said they felt humiliated?
13      A    No. Id. at 40:20-22; 41:1-13.
```


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to

state that they had been hazed, that:

> 2      Q    Did any of the 125 young women from the
> 3   Howard 2005 membership intake class come forward and say
> 4   that they were hazed by my clients?
> 5      A    I'm not aware of that; I was not involved
> 6   with that.
> 7      Q    Have you read any documents that say that?
> 8      A    No, I have not…
> 11     Q    Did you see any document -- that from one of
> 12  those 125 women -- where it stated that they felt that
> 13  they shouldn't have been out there?
> 14     A    I did not.
> 15     Q    Did you see any document from those 125 women
> 16  that stated that they didn't want to be out there and
> 17  they were forced to be out there?
> 18     A    I did not.
> 19     Q    Did you see any document that stated that
> 20  they felt uncomfortable about the weather out there?
> 21     A    I did not. Id. at 46:2-8; 60:11-21.

Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained

any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff

engaged in any activity that would meet the Defendant's definition of hazing.  Specifically, Ms.

Sample-Oates admitted that:

> 1      Q    Okay.  Have you see any written document that
> 2   -- this is going to be a long sentence because I'm
> 3   reading from here, counsel -- any written document from
> 4   one of the 125 individuals from the Howard University
> 5   2005 membership intake class that stated that my clients,
> 6   either one of them, caused them shame?
> 7      A    I have not seen it.
> 8      Q    What about abuse?
> 9      A    No.
> 10     Q    An insult?
> 11     A    No.
> 12     Q    Humiliation?
> 13     A    No.
> 14     Q    Intimidation?



15    A    No.
16    Q    Disgrace?
17    A    No.
18    Q    That they participated in an underground
19  hazing?
20    A    I haven't seen a document that says that.
21    Q    Financial hazing?
22    A    No…
11    Q    Okay.  Back to the other question.  Have you
12  seen any document as it relates to my clients written by
13  any one of the 125 women from Howard University's 2005
14  membership intake class that said that my clients engaged
15  in pre-pledging?
16    A    No.
17    Q    Post-pledging?
18    A    No.
19    Q    Post-initiation pledging?
20    A    No.
21    Q    You stated earlier that hazing is more
22  serious than even stealing?
0080
1    A    Yes.
2    Q    Can you tell me why?
3    A    Well, hazing could result in death; it's
4  physically abusing somebody or mentally abusing them.
5  Money you can get back but people you can't.
6    Q    Have you seen any document where there's any
7  allegation that my clients physically abused any of the
8  125 women from the Howard University 2005 membership
9  intake class?
10    A    I have not seen documents for that…
9    Q    I'm going to show you Exhibit 6 again and I'm
10  going to ask you a quick question about that.  You stated
11  that Exhibit 6 -- the letter from Ms. Daley -- says that
12  my clients were out with 125 women in 35-degree weather
13  at nighttime and the women were singing, is that correct?
14    A    If that's what this letter says, yes.
15    Q    Does it say that the activity caused those
16  125 women to be at risk of serious bodily injury?
17    A    No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-
17.

As detailed above, Defendant's own admissions make clear that Plaintiffs did not

violation any hazing provisions, making Defendant's statements to the contrary false.

Specifically, Ms. Sample-Oates admitted that she did not have any evidence that Plaintiffs

28


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

committed any acts that caused even one of the 125 participants shame, humiliation, or disgrace. Id.  Furthermore, Ms. Sample-Oates admitted that she did not have any evidence that Plaintiffs acted in an insulting or intimidating manner or that Plaintiffs participated in financial, underground, or pre and/or post initiation pledging. Id.

Even though, Ms. Sample-Oates admitted that she did not have any evidence to support the allegations of hazing against Plaintiffs, Ms. Sample-Oates admitted that Defendant's national website lists only the names of those persons suspended for hazing. Id. at 57:13-17.  Ms. Sample-Oates specifically stated that, "The website is for hazing, those individuals that have been found to be involved in hazing activities will be on the website.  Those that are suspended for other reasons will not be; it's only for hazing. Id. at 76:5-8.  Accordingly, because Defendant's do not now, nor did Defendant ever have any evidence that Plaintiffs committed any acts that would constitute hazing, Defendant's publications were false and this Court must grant summary judgment in favor of Plaintiffs, denying Defendant's instant motion.

**V.    PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT IV (NEGLIGENCE), AS SUCH, THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS AS EXPERT TESTIMONY IS NEITHER REQUIRED, NOR NECESSARY IN THE INSTANT CASE.**

In order to prove a claim of negligence, Plaintiffs must prove that Defendant owed Plaintiffs a duty, Defendant's breached that duty, Plaintiffs' suffered harm. Scott v. District of Columbia, 322 U.S. App. D.C. 75 (D.C. Cir. 1996), citing, Toy v. District of Columbia, 549 A.2d 1, 6 (D.C. 1988).   Here, Defendant had a duty to abide by its own policies and procedures regarding the investigation and/or resolution of allegations of hazing.  Defendant breached that



duty when it suspended Plaintiffs in contravention of its own policies and procedures.  Plaintiffs suffered suspension, diminished reputations, and loss of enjoyment of the privileges and benefits of membership in Defendant's organization.

Although Defendant asserts that Plaintiffs cannot prevail on their negligence claim because they have not identified an expert to testify regarding the applicable standard of care, Defendant, while acknowledging that no expert is needed to testify regarding the standard of care where the subject matter is within the realm of common knowledge, completely fails to cite a single case that would bring adherence or deviation from written policies and procedures outside of the realm of common knowledge.  Defendant's own Anti-Hazing Handbook states "what our hazing policy is and it covers if you are suspended; well, it defines what hazing is and then it talks about if you are suspended, if there's a fact-finding committee that's assigned, what your appeal process can be, the different rights someone has if they're suspended…" Plaintiff's Motion, Exhibit C at 29:12-17.  Defendant's own admissions demonstrate that Defendant had a duty to follow its anti-hazing policies and/or procedures as outlined in the Anti-Hazing Handbook, the details therein establishing the standard of care applicable to the instant case making expert testimony regarding said issue redundant and wholly unnecessary.

Specifically, Plaintiffs participation in an approved post-initiation ceremony did not amount to hazing, Defendant does not have any statements from any of the 125 participants supporting allegations of hazing, nor does Defendant have any documents demonstrating that any of the 125 participants were interview as a part of the "fact-finding" process as required by Defendant's own policies and procedures.  Moreover, there was no evidence, nor was it ever alleged, that Plaintiffs ever committed physical acts such as hitting, striking, laying hands upon


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

or threatening to do bodily harm to any individual. Id. at 34:13 (post-initiation activity "is not

hazing if permission is granted by the Regional Director). As part of this "fact-finding," Ms.

Sample-Oates admitted that Defendant's policies and procedures dictate that alleged victims of

hazing are to be interviewed. Id. at 8-12.

Surprisingly, Ms. Sample-Oates, Defendant's North Atlantic Regional Director,

explained that she had not reviewed any documents from any of the 125 participants in the post-

initiation ceremony which stated that any participant felt that they had been hazed.

Specifically, Ms. Sample-Oates testified regarding any such evidence of hazing as

follows:

```
20      Q    Have you reviewed any documents which are
21   statements from the 125 undergraduates who were admitted
22   in 2005; have you reviewed any documents from them where
0041
 1   they stated they felt they were being hazed?
 2          MS. BATES:  Objection, it's not clear you
 3   read documents from them.  You may answer the question.
 4      A    No.
 5      Q    Are you aware of any documents from those 125
 6   individuals from the 2005 Howard University membership
 7   intake class that alleged that they felt they were being
 8   hazed?
 9      A    No.
10      Q    Have you read any documents or seen any
11   documents where those 125 women at Howard University for
12   the 2005 class said they felt humiliated?
13      A    No. Id. at 40:20-22; 41:1-13.
```

Ms. Sample-Oates went on to admit, when asked if any of these 125 women came forward to

state that they had been hazed, that:

```
 2      Q    Did any of the 125 young women from the
 3   Howard 2005 membership intake class come forward and say
 4   that they were hazed by my clients?
 5      A    I'm not aware of that; I was not involved
```

31


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

```
6   with that.
7       Q    Have you read any documents that say that?
8       A    No, I have not…
11      Q    Did you see any document -- that from one of
12  those 125 women -- where it stated that they felt that
13  they shouldn't have been out there?
14      A    I did not.
15      Q    Did you see any document from those 125 women
16  that stated that they didn't want to be out there and
17  they were forced to be out there?
18      A    I did not.
19      Q    Did you see any document that stated that
20  they felt uncomfortable about the weather out there?
21      A    I did not. Id. at 46:2-8; 60:11-21.
```

Ms. Sample-Oates further admitted that she had not reviewed any documentation that contained

any evidence that the 125 participants in the post-initiation ceremony reported that either Plaintiff

engaged in any activity that would meet the Defendant's definition of hazing.  Specifically, Ms.

Sample-Oates admitted that:

```
1       Q    Okay.  Have you see any written document that
2   -- this is going to be a long sentence because I'm
3   reading from here, counsel -- any written document from
4   one of the 125 individuals from the Howard University
5   2005 membership intake class that stated that my clients,
6   either one of them, caused them shame?
7       A    I have not seen it.
8       Q    What about abuse?
9       A    No.
10      Q    An insult?
11      A    No.
12      Q    Humiliation?
13      A    No.
14      Q    Intimidation?
15      A    No.
16      Q    Disgrace?
17      A    No.
18      Q    That they participated in an underground
19  hazing?
20      A    I haven't seen a document that says that.
21      Q    Financial hazing?
22      A    No…
11      Q    Okay.  Back to the other question.  Have you
```


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

12   seen any document as it relates to my clients written by
13   any one of the 125 women from Howard University's 2005
14   membership intake class that said that my clients engaged
15   in pre-pledging?
16      A    No.
17      Q    Post-pledging?
18      A    No.
19      Q    Post-initiation pledging?
20      A    No.
21      Q    You stated earlier that hazing is more
22   serious than even stealing?
0080
 1      A    Yes.
 2      Q    Can you tell me why?
 3      A    Well, hazing could result in death; it's
 4   physically abusing somebody or mentally abusing them.
 5   Money you can get back but people you can't.
 6      Q    Have you seen any document where there's any
 7   allegation that my clients physically abused any of the
 8   125 women from the Howard University 2005 membership
 9   intake class?
10      A    I have not seen documents for that…
 9      Q    I'm going to show you Exhibit 6 again and I'm
10   going to ask you a quick question about that.  You stated
11   that Exhibit 6 -- the letter from Ms. Daley -- says that
12   my clients were out with 125 women in 35-degree weather
13   at nighttime and the women were singing, is that correct?
14      A    If that's what this letter says, yes.
15      Q    Does it say that the activity caused those
16   125 women to be at risk of serious bodily injury?
17      A    No, it does not say that. Id. at 78; 79:11-22; 80:1-10; 81:9-
17.

Moreover, Ms. Sample-Oates testified that Ms. Daley's letter regarding Defendant's

recommendations in this case stated that, "[m]embers of the Undergraduate Activities Committee

were found at approximately 2:00 a.m. singing in the parking lot at 35-degree temperature…" Id.

at 47:21-22; 48:1-2.  However, Ms. Sample-Oates admitted that Defendant did not have any

policies and/or procedures providing restrictions or prohibitions on time and temperature for

practices and/or ceremonies.



When questions about such provisions, Ms. Sample-Oates specifically admitted that:

20     Q     Is there anything in Exhibits 1, 2, 3, 4, and
21  5 that prohibits having activities when it's 50 degrees?
22     A     No.
0043
1     Q     What about when it's 35 degrees?
2     A     No.
3     Q     What about 25 degrees?
4     A     No.
5     Q     How actively were you involved in the
6  undergraduate activities when you were basileus?
7     A     Very.
8     Q     And did you ever attend any events when it
9  was cold?
10     A     Yes.
11     Q     Were you aware whether or not the colleges
12  were open when it was cold?
13     A     Yes.
14     Q     What about when it snowed?
15     A     Were they open?
16     Q     Yes.
17     A     Yes, uh-hum.
18     Q     Did you ever have any activities when it
19  snowed?
20     A     Sometimes we did; if it was too bad, we
21  cancelled them.
22     Q     Too bad meaning what?
0044
1     A     Driving conditions were bad, too much snow,
2  too much ice on the ground.
3     Q     So not because of the coldness but because of
4  the safety issue as it relates to the driving conditions?
5     A     Yes.
6     Q     In your position as a Regional Director, have
7  you ever had to have meetings with 10 people?
8     A     Yes.
9     Q     How hard is it to arrange meetings with 10
10  people?
11     A     Hard.
12     Q     Can you tell me why?
13     A     Well, people have different schedules and all
14  10 of them may not be able to attend.
15     Q     Okay.  Do you think it would be much more
16  difficult if you had over 100 people?
17     A     Yes.
18     Q     How difficult do you think it would be to get
19  100 undergraduates together at one particular time to

34


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

```
20  learn the songs and the steps for a coming-out show?
21      A    Very difficult.
22      Q    In Exhibits 1, 2, 3, 4, and 5, can you tell
0045
1   me which one of these documents has a provision in there
2   that talks about the time that individuals could come
3   together to practice for a coming-out show?
4       A    The time for practices?
5       Q    Yes.
6       A    None, no documents.
7       Q    So there's nothing in writing that delineates
8   the time that they can practice?
9       A    No. Id. at 42:20-22; 43-44; 45:1-9.
```

Although Defendant's had a duty to follow the policies and procedures outlined in the Anti-Hazing Handbook, Defendant breached this duty when it suspended Plaintiffs without regard for its own policies, procedures, rules, regulations, and/or guidelines and in violation of Plaintiffs' rights afforded to them by Defendant's Anti-Hazing Handbook.

As such, Plaintiffs are entitled to judgment as a matter of law and this Court must enter summary judgment in favor of Plaintiffs on their claim of negligence and deny Defendant's instant motion.

## <u>CONCLUSION</u>

Because there are not any disputes of material facts in this case and Plaintiffs are entitled to judgment as a matter of law on all counts of Plaintiffs Complaint, Plaintiffs respectfully request that this Court deny Defendant's instant Motion and grant Summary Judgment in favor of Plaintiffs on all counts of Plaintiffs' Complaint.

Respectfully submitted,

35


created using
BCL easyPDF
Printer Driver
Click here to purchase a license to remove this image

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, Maryland 20772
(301) 599-7620
(301) 599-7623 (Fax)

