## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

JOIE JOLEVARE, et al.                                  )
                                                       )
              Plaintiffs,                              )
                                                       )
       v.                                              )        Civil Action No. 05-1982 (RBW)
                                                       )
ALPHA KAPPA ALPHA                                      )
SORORITY, INC.,                                        )
                                                       )
              Defendant,                               )
_____)

## <u>MEMORANDUM OPINION</u>

On October 6, 2005, the plaintiffs, Joie Jolevare and Salome Tinker, filed the

complaint in this action[1] alleging violations of the District of Columbia Human Rights Act

("DCHRA"), D.C. Code § 2-1402.11 (2001) (Count I), breach of contract (Count II),

defamation (Count III), and negligence (Count IV). Specifically, the plaintiffs contend that

the defendant, Alpha Kappa Alpha Sorority, Inc. ("AKA"), committed these violations when

it suspended the plaintiffs for alleged acts of hazing in connection with the initiation of new

members into the sorority. Currently before this Court are the plaintiffs' motion for

summary judgment ("Pls.' Mot.") and the defendant's cross-motion for summary judgment

("Def.'s Cross-Mot.").[2] Upon consideration of the parties' submissions and the record, the

_____

[1] Diversity of citizenship jurisdiction exists in this action under 28 U.S.C. § 1332 (2001) because plaintiff Jolevare is a citizen of the Commonwealth of Virginia, plaintiff Tinker is a citizen of the District of Columbia, defendant Alpha Kappa Alpha Sorority, Incorporated is an Illinois corporation, and the amount in controversy exceeds $75,000.00. Complaint ("Compl.") at 1.

[2] The following papers have also been submitted in connection with this motion: (1) Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pls.'
(continued...)

Court must deny the plaintiffs' motion for summary judgment and grant the defendant's

cross-motion for summary judgment.[3]

---

[2](...continued)

Mem."), (2) Defendant Alpha Kappa Alpha Sorority Inc.'s  Memorandum in Opposition to Plaintiffs'
Motion for Summary Judgment  ("Def.'s Opp'n"), (3) Plaintiffs' Reply To Defendant's Opposition to
Plaintiffs' Motion for Summary Judgment  ("Pls.' Reply"), (4) Defendant Alpha Kappa Alpha Sorority
Inc.'s  Memorandum in Support of its Cross-Motion for Summary Judgment ("Def.'s Cross-Mem."), (5)
Plaintiffs' Opposition to Defendant's Cross-Motion for Summary Judgment ("Pls.' Opp'n to Def.'s
Cross-Mot."), and Defendant Alpha Kappa Alpha Sorority Inc.'s Reply to Plaintiff's Opposition to
Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply to Pls.' Opp'n to Def.'s Cross-Mot.").

[3] The plaintiffs filed a motion to strike the certification (affidavit) of Joy Daley, which was
attached to the defendant's cross-motion for summary judgment, on the grounds that the "[d]efendant. . .
failed to abide by this Court's amended Scheduling Order by failing to produce Ms. Daley for her
deposition, [thus]. . . den[ying] the [plaintiff the] opportunity of examination and cross-examination of
Ms. Daley as [to] the facts asserted in her Certification." Plaintiffs Motion to Strike the Affidavit of Ms.
Daley From the Defendant's Opposition to the Plaintiffs' Motion for Summary Judgment and the
Defendant's Cross Motion for Summary Judgment at 4. In opposition, the defendant filed a motion to
strike the plaintiffs' motion on the grounds that it is not "within [the defendant's] power to compel" Ms.
Daley to attend a deposition. Defendant Alpha Kappa Alpha Sorority Inc.'s Motion for Summary
Judgment and the Defendant's Cross Motion for Summary Judgment, or in the alternative, Opposition to
Plaintiff's Motion to Strike Affidavit fo Ms. Daley ("Def.'s Mot. To Stirke") at 3. The Court first notes
that on November 7, 2006, the parties filed a joint motion for an extension of time to depose the
defendant's corporate representative and Joy Elaine Daley beyond the date for the close of discovery.
Joint Motion for an Extension of Time to Depose the Defendant and Ms. Daley beyond the date for the
close of discovery. (Docket Entry Number ("No.") 31). In the joint motion, the plaintiffs advised the
Court that they had not "been able to depose Joy Elaine Daley [ ] because they [had] not been able to
effect service of a subpoena on Ms. Daley for her deposition." Id. ¶ 5. However, the plaintiffs further
indicated that they had "located Ms. Daley and . . . [would] successfully serve[ ] [her] with a subpoena on
or before November 30, 2006." Id. Further, the parties advised the Court that subject to the Court's
approval, Ms. Daley's deposition would be taken on December 14, 2006. Id. ¶ 6. Subsequently, on
November 9, 2006, the Court granted the parties' joint motion and entered an amended scheduling order
indicating, inter alia, that based on the parties' joint motion, Ms. Daley was to be deposed by December
14, 2006. Court Order (Docket Entry No. 32). However, it was not until over a month later, and after the
defendant had filed its cross-motion for summary judgment, that the plaintiffs brought to the Court's
attention that they had not yet deposed Ms. Daley despite the fact that the Court had advised the parties
in the same order that discovery had to be completed by December 15, 2006. While this Court
appreciates that  "[a]s a general proposition each party to a civil law suit has the right to take depositions
of the other party . . . ." Colonial Times, Inc. v. Gasch, 509 F.2d 517, 521 (D.C. Cir. 1975), it cannot be
overlooked that the plaintiffs failed to advise the Court of their inability to take Ms. Daley's deposition
before the discovery period expired. Dag Enterprises, Inc. v. Exxon Mobil Corp., 226 F.R.D. 95, 105
(D.D.C. 2005) (holding that when the deadline for discovery expires, parties are obligated to seek a
modification of the Scheduling Order by demonstrating "good cause".). The plaintiff's motion to strike

(continued...)

# I.  FACTUAL BACKGROUND

AKA is a private, voluntary, social organization comprised primarily of African-American women that was established in 1908 to "cultivate and encourage high scholastic and ethical standards, improve the social stature of the  race, promote unity and friendship among college women, and keep alive within graduates an interest in college life and progressive movement emanating therefrom."  Def.'s Cross-Mem., Exhibit ("Ex.") 1(Alpha Kappa Alpha Sorority Incorporated Constitution and Bylaws, (2004)) ("Constitution & Bylaws") at Preamble. AKA consists of numerous individual chapters throughout the country whose memberships are comprised of either college graduates and called graduate chapters or college students and called undergraduate chapters. Id. at 23-24.

Prior to the event that resulted in the plaintiffs' suspension, AKA initiated a national effort to eliminate all forms of hazing after two AKA pledgees drowned during initiation activities in California in September 2002.[4]  Def.'s Opp'n, Ex. 7 (Sample-Oates Cert.) ¶¶ 3-5. As part of this effort, "a moratorium was placed nationally on the sorority for the hazing incident in California," and "[n]o chapter [was authorized to] initiate new members"  Compl.  ¶¶ 5-6. Furthermore, in response to lawsuits brought against the sorority by the relatives of the two

---

[3](...continued)
Ms. Daley's affidavit will therefore be denied, but the Court notes that it  has not relied on Ms. Daley's certification in resolving the parties' summary judgment motions.

[4] On September 9, 2002, two pledgees of a California chapter of AKA drowned in the waters of Dockweiler Beach in California during initiation activities.  Def.'s Opp'n, Ex. 7 (Certification of Evelyn Sample-Oates) ("Sample-Oates Cert.") ¶3.  The families of the two AKA pledgees who drowned subsequently brought wrongful death lawsuits against AKA.  Id.

drowned pledgees, AKA's Supreme Basileus[5] appointed a "Risk Management Task Force to propose bylaws and procedures to reduce the sorority's vulnerability to lawsuit[s]."  Def.'s Opp'n,  Ex. 7 (Sample-Oates Cert.) ¶ 4, Def.'s Cross Mem., Ex. 2 (Alpha Kappa Alpha Sorority, Incorporated Anti-Hazing Handbook, Say "No" to Hazing! (2005)) ("Anti-Hazing Handbook") at 7.  The critical objectives of the Risk Management Task Force were "[t]o increase the required qualifications for graduate advisors, members of graduate advisory councils and mentors," "[t]o develop strategies to change sorors' attitudes and behaviors that reinforce hazing," and "[t]o develop stricter sanctions for violation of the sorority's Anti-Hazing Policy."  Def.'s Cross Mem., Ex. 2 (Anti-Hazing Handbook) at 7-8.  The handbook defines hazing as:

> [A]n act or series of acts which includes, but is not limited to, physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s), while acting in one's capacity as a member of Alpha Kappa Alpha, behavior which is directed against any individual(s) for the purpose of causing shame, abuse, insult, humiliation, intimidation or disgrace, and a variety of prohibited practices, including[,] but not limited to, "underground hazing," "financial hazing," "pre-pledging," "post-pledging," or "post-initiation pledging."

Id. at 9.  In addition to the handbook's indication that hazing is strictly prohibited and will not be tolerated in any form by the organization, the handbook states that the sorority is authorized to conduct fact finding, make determinations, and implement disciplinary processes under its anti-hazing policy.  Id.

The plaintiffs are sorority members who had graduated from Howard University and were also graduate certified advisors for the undergraduate Xi Omega Chapter of AKA ("Xi Omega").  Def.'s Opp'n., Ex. 4 (Deposition of Salome Tinker) (" Tinker Dep.") at 19-20; Compl. ¶¶ 30-31.  However, in 2005, the plaintiffs' memberships were suspended when the

---

[5] The Supreme Basileus performs the duties normally performed by a chief executive officer of a corporation.  Def.'s Cross-Mem., Ex. 1 (Constitution & Bylaws) at 12.

organization determined that the plaintiffs and other graduate members of AKA violated the sorority's anti-hazing guidelines.[6]  Specifically, the plaintiffs were accused as graduate advisors of supervising an outdoor rehearsal after midnight and in cold weather for approximately 125 new undergraduate members of the Alpha Chapter of AKA ("Alpha Chapter") located at Howard University in Washington, D.C.[7]  Def.'s Opp'n., Ex. 4 ( Tinker Dep.) at 19-20, 27-28; Pls.' Mem. Ex. C (Deposition of Evelyn Sample-Oates) ("Sample-Oates Dep.") at 40-41. The rehearsal was conducted in preparation for the new members participation in a campus "introduction show." Pls.' Mem., Ex. A (Memorandum For Appeal From Suspension of Joie Jolevare, dated September 30, 2005) ("Jolevare Letter of Appeal") at 3.  It is undisputed that the rehearsal was terminated when Phyllis Young, the president of Xi Omega, and Pamela Chew, the graduate advisor for Alpha Chapter, arrived at the rehearsal and communicated by telephone with Joy Daley, the Regional Director of the Sorority, about the rehearsal.  Def.'s Opp'n, Ex. 10 (Deposition of Joie Jolevare) ("Jolevare Dep.") at 82, Ex. 12 (First Set of Plaintiffs' Interrogatories) Interrogatory No. 10.  After reviewing the circumstances surrounding the incident, AKA determined that the rehearsal violated its anti-hazing policy, and sometime around September 3, 2005, suspended the plaintiffs along with other graduate members who were

---

[6] In addition to the plaintiffs, AKA  suspended graduate members Miesha Darrough, Ashawntee Dingle, Alexandra Jones, Tamika McCormack, Kamillah Muahmmad, and Karleen Roy.  Def.'s Opp'n, Ex. 7 (Sample-Oates Cert.) ¶ 12.  However, these suspended graduate members of AKA are not parties to this action.

[7] It is undisputed that the rehearsal occurred after midnight on March 21 during the early morning of March 22, 2005, in an outdoor parking lot in Maryland when the temperature was about 35 to 40 degrees Fahrenheit.  Def.'s Opp'n., Ex. 4 (Tinker Dep.) at 27-30, 41-42, 82-83, Ex. 12 (Plaintiffs Joie Christophe Jolevare & Salome Tinker Responses to Alpha Kappa Alpha Sorority, Inc.'s First Set of Interrogatories) ("First Set of Plaintiffs' Interrogatories") Interrogatory No.10; Pls.' Mem., Ex. C (Sample-Oates Dep.) at 40-41; Def.'s Opp'n,  Ex. 7 (Sample-Oates Cert.) ¶ 12.

present at the rehearsal.[8]  Def.'s Opp'n, Ex. 8 (Alpha Kappa Alpha Sorority Incorporated Alpha

Chapter Improprieties and Penalties Letter dated September 3, 2005) ("Improprieties and

Penalties Letter dated September 3, 2005") at 2.  Although the plaintiffs filed internal appeals of

their suspensions with AKA, plaintiff Jolevare abandoned her appeal when she subsequently

filed this lawsuit, while plaintiff Tinker initiated this action prior to filing her appeal with the

sorority.[9]

## II.  STANDARD OF REVIEW

Courts will grant a motion for summary judgment under Rule 56(c) if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for

summary judgment, this Court must view the evidence in the light most favorable to the

nonmoving party. Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir.1992).

---

[8] The plaintiffs were first notified of their potential suspensions at a Xi Omega chapter meeting
on September 3, 2005, when Ms. Daley informed all the attendees at the meeting about the rehearsal,
which was characterized as hazing, and then recommended that the plaintiffs (and others) be suspended
from AKA as a result of their involvement in the rehearsal.  Def.'s Opp'n, Ex. 4 (Tinker Dep.) at 57-64,
Ex. 10 (Jolevare Dep.) at 153-57.   The suspension precluded the plaintiffs from, among other things, (1)
attending chapter meetings, (2) voting on sorority matters, (3) participating in any AKA functions limited
to sorority members, (4) wearing sorority paraphernalia, (5) identifying themselves as members of the
organization, (6) participating in step shows, the membership intake process, and service projects and (8)
attending national or regional meetings. Pls.' Mem., Ex. C (Sample-Oates Dep.) at 69; 74-76.

[9] Specifically, on September 30, 2005, plaintiff Jolevare internally appealed her suspension
through a memorandum submitted to the Executive Director, the Supreme Basileus, and the North
Atlantic Regional Director of AKA.  Pls.' Mem., Ex. A & Def.'s Cross-Mem., Ex. 7 (Jolevare Letter of
Appeal).  However, she subsequently filed the instant action on October 6, 2005, along with plaintiff
Tinker.  See Compl. Despite the filing of this action, on October 7, 2005, plaintiff Tinker purported to
appeal her suspension through a memorandum submitted to the Executive Director, the Supreme
Basileus, and the North Atlantic Regional Director of the sorority.  Pls.' Mem., Ex. B & Def.'s Cross
Mem., Ex. 9 (Memorandum For Appeal From Suspension of Salome Tinker, dated October 7, 2005)
("Tinker Letter of Appeal").

"Likewise, when ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely in dispute." Teva Pharmaceuticals, Industries, Ltd. v. Food and Drug Admin., 355 F. Supp. 2d 111, 116 (D.D.C. 2004) (citing Barr Laboratories, Inc. v. Thompson, 238 F. Supp. 2d 236, 244 (D.D.C. 2002). However, the non-moving party cannot rely on "mere allegations or denials . . ., but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted). Under Rule 56, "if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," summary judgment is warranted. Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C.1998) (citing Celotex Corp. v. Catrett, 477 U .S. 317, 322 (1986)). The party moving for summary judgment bears the burden of establishing the absence of evidence that supports the non-moving party's case. Id. Finally, in considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

### III.  LEGAL ANALYSIS

A.    **The Plaintiff's DCHRA Claim (Count I)**

The plaintiffs allege that the defendant violated the DCHRA, specifically, D.C. Code § 2-1402.11(a)(1), when it suspended them for hazing, while "younger" undergraduate  "student members [of the] [d]efendant's organization were not suspended, despite the defendant's policies and procedures stating that participants and witnesses to hazing that do not come forward are to be suspended."  Pls.' Opp'n at 13.  In opposition, the defendant responds that the plaintiffs

7

cannot prevail on their DCHRA claim because D.C. Code § 2-1402.11(a)(1) "does not apply to

AKA–a private, voluntary organization." Def.'s Opp'n. at 5. Specifically, the defendant asserts

that "[t]he statute itself, and caselaw reviewing this statute[ ], reflects that Section 2-1402.11 of

the District of Columbia Code [ ] only prohibits the conduct described therein of employers,

employment agencies, and labor organizations." Id. Thus, the defendant asserts that the

plaintiffs' DCHRA claim fails because the "portion of the D.C. Human Rights Act upon which

[the] [p]laintiffs rel[y] does not apply and cannot provide redress for them, as AKA is a private,

not public, organization." Id. at 8.

The DCHRA provides in pertinent part:

> (a) General:  It shall be an unlawful discriminatory practice to do any of
> the following acts, wholly or partially for a discriminatory reason based
> upon the actual or perceived: race, color, religion, national origin, sex, age,
> marital status, personal appearance, sexual orientation, gender identity or
> expression, family responsibilities, genetic information, disability,
> matriculation, or political affiliation of any individual:
>
> (1) By an employer. -- To fail or refuse to hire, or to discharge, any
> individual; or otherwise to discriminate against any individual, with
> respect to his compensation, terms, conditions, or privileges of
> employment, including promotion; or to limit, segregate, or classify his
> employees in any way which would deprive or tend to deprive any
> individual of employment opportunities, or otherwise adversely affect his
> status as an employee . . . .

D.C. Code § 2-1402.11(a)(1). Accordingly, the DCHRA makes it unlawful for an employer to

discriminate against an employee because of an employee's age. Id. The DCHRA defines an

employer as:

> any person who, for compensation, employs an individual, except for the
> employer's parent, spouse, children or domestic servants, engaged in work in and
> about the employer's household; any person acting in the interest of such
> employer, directly or indirectly; and any professional association.

D.C.Code § 2-1401.02(10) (2001). Although the plaintiffs assert that "a contract, similar in

nature to an employment contract, existed between [the] [p]laintiffs and [the] defendant

regarding [the] plaintiffs' actions in representing [the] defendant's organization, as well as,

hazing and the procedures to be followed when someone is accused of hazing," Pls.' Reply at 2,

they have not presented any evidence which establishes that an employment contract between the

plaintiffs and the defendant existed.  Further, the plaintiffs have not cited and this Court has not

found any legal authority supporting the position that §§ 2-1401.02 (10) and 2-1402.11(a)(1) of

the DCHRA are applicable to a private, voluntary, social organization and its members.

Moreover, from existing legal authority it is clear that "[o]nly an 'employer' may be held liable

for violations of . . . the DCHRA."  Zuurbier v. Medstar Health, Inc., 306 F. Supp. 2d 1, 6

(D.D.C. 2004) (citing D.C. Code § 2-1402.11(a)(1)); see also Adams v. Hitt Contracting, Inc.,

No. Civ. A. 04-1026, 2005 WL 1903547, *3-4 (D.D.C. July 11, 2005); Nwachukwu v. Rooney,

362 F. Supp. 2d 183, 194-95 (D.D.C. 2005); Purcell v. Thomas, 928 A.2d 699 (D.C. 2007)

(defining employer under the DCHRA).  The DCHRA, like Title VII, prohibits certain

discriminatory practices "[b]y an employer." D.C. Code § 2-1402.11(a)(1). And, it has been

uniformly held that the DCHRA looks to Title VII for its construction.  Sparrow v. United Air

Lines, 216 F.3d 1111, 1114 (D.C. Cir. 2000) (same analysis applied to Title VII discrimination

claims controls discrimination cases brought under the DCHRA); Carpenter v. Fed. Nat'l

Mortgage. Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (District of Columbia Courts rely on federal

court interpretations of Title VII when evaluating DCHRA discrimination claims); Stevens v.

Nat'l R.R. Passenger Corp., No 05-1924, 2007 WL 1830867, *5 (D.D.C. June 26, 2007) (courts

look to Title VII and its jurisprudence when construing the DCHRA); Ramey v. Potomac Elec.

Power Co.; 468 F. Supp. 2d 51, 60 (D.D.C. 2006) (DCHRA claims and federal discrimination

claims are analyzed under the same legal standard); see also Howard Univ. v. Green, 652 A.2d

41, 45 (D.C.1994) (using Title VII as guidance in interpreting the DCHRA ); Wisconsin Ave.

Nursing Home v. Dist. of Columbia Comm'n on Human Rights, 527 A.2d 282, 290 n. 7 (D.C.

1981) (same); Underwood v. Archer Management Servs., 857 F.Supp. 96, 98 (D.D.C. 1994)

(same); Hodges v. Washington Tennis Serv. Int'l, 870 F.Supp. 386 (D.D.C. 1994) (relying

exclusively on Title VII standards in determining whether employer should be held responsible

for harassing conduct of employees under the DCHRA).[10]  Here, the plaintiffs' DCHRA claim

fails because they have not presented sufficient evidence to establish that their relationship with

the defendant was that of an employee and an employer within the meaning of the DCHRA.[11]

---

[10] Title VII of the Civil Rights Act of 1964 defines an employer as:

> a person engaged in an industry affecting commerce who has fifteen or
> more employees for each working day in each of twenty or more
> calendar weeks in the current or preceding calendar year, and any agent
> of such a person, but such term does not include (1) the United States, a
> corporation wholly owned by the Government of the United States, an
> Indian tribe, or any department or agency of the District of Columbia
> subject by statute to procedures of the competitive service (as defined in
> section 2102 of Title 5), or (2) a bona fide private membership club
> (other than a labor organization) which is exempt from taxation under
> section 501(c) of Title 26, except that during the first year after March
> 24, 1972, persons having fewer than twenty-five employees (and their
> agents) shall not be considered employers.

42 U.S.C. § 2000e (b).

[11] Even if the Court could determine that the plaintiffs have presented sufficient evidence to
establish that the defendant and the plaintiffs had an employment relationship, the plaintiffs cannot
establish a prima facie case of age discrimination.  In considering claims brought under the DCHRA, the
courts of this jurisdiction apply "the same three-part, burden-shifting test articulated by the Supreme
Court for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802  (1973)." Futrell v.
Dep't of Labor Fed. Credit Union, 816 A.2d 793, 802-03 (D.C. 2003) (quoting Hollins v. Fed. Nat'l
Mortgage Ass'n, 760 A.2d 570, 571 (2000)) (citations omitted).  Establishing a prima facie case of age
discrimination therefore requires that the plaintiffs make a showing that (1) the plaintiffs belong to a
protected class; (2) were qualified for the position; (3) were terminated; and (4) said action was based on
the plaintiffs' age.  Paquin v. Fannie Mae, 119 F.3d 23, 26 (D.C. Cir. 1997); McManus v. MCI
Commc'ns, Corp., 748 A.2d 954 (D.C. 2000); see also, Hollins, 760 A.2d at 572; Blackman v. Visiting
Nurses Ass'n, 694 A.2d  865, 868 (D.C. 1997).  Here, the plaintiffs cannot establish a prima facie case of

(continued...)

B.     **The Plaintiffs' Breach of Contract Claim (Count II)**

The plaintiffs assert that "a contract existed between the plaintiffs and [the] defendant regarding hazing and the procedures to be followed when someone is accused of hazing." Pls.' Mem. at 25.  The plaintiffs contend that the "[d]efendant breached this contract when it did not follow its own policies and/or procedures before it suspended [the] [p]laintiffs for unsubstantiated allegations of hazing."  Id.  Specifically, the plaintiffs allege that "[their] participation in an [allegedly] approved post-initiation ceremony did not amount to hazing, [the] [d]efendant does not have any statement from any of the 125 participants supporting allegations of hazing, nor does [the] [d]efendant have any documents demonstrating that any of the 125 participants were interview[ed] as part of the 'fact-finding' process as required by [the] [d]efendant's own policies and procedures."  Id. at 25-26.  In response, the defendant argues that the "[p]laintiffs have failed to establish that a contract between themselves and AKA existed during the time period at issue, much less [that] any breach of such contract [occurred]."  Def.'s Opp'n at 10.  Specifically, the defendant contends that "[t]he documents that prospective and current members of AKA must sign regarding hazing are pledges prospective members take that enable them to continue to be considered for membership in AKA," and "serve to ferret out those women who will not commit to aid AKA in its endeavor to stop hazing within the sorority."  Id. at 9.

As an initial matter, the Court notes that under District of Columbia law "courts

---

[11](...continued)

age discrimination because they have not presented any evidence of either their ages or the ages of the other members who were purportedly treated differently.  Thus, they have not demonstrated that they are members of a protected age group, while the other members they reference are not.  Moreover, the plaintiffs  have not presented sufficient evidence to establish that they were suspended solely based on their age.

ordinarily will not interfere with the management and internal affairs of a voluntary association."
Levant v. Whitley, 755 A.2d 1036, 1043 (D.C. 2000) (quoting Avin v. Verta, 106 A.2d 145, 147
(D.C. 1954)); see also NAACP v. Golding, 679 A.2d 554, 558 (Md. 1996) ("as a general rule,
courts will not interfere in the internal affairs of a voluntary membership organization").
"[W]hen a party comes into court for relief [in such situations] it is incumbent upon [her] to
show the existence of facts to justify the interference of the court." United States ex rel. de
Yturbide v. Metropolitan Club, No. 652, 1897 WL 17732, at *13 (D.C. June 9, 1897).  However,
in Levant, the District of Columbia Court of Appeals assumed, without deciding, "that
intervention would be appropriate when an organization failed to follow its own rules." Id. at
1044; see id. at 1043-44 n. 11 (summarizing state of the law in the District of Columbia and
elsewhere).  In Levant, the plaintiff appealed the trial court's grant of summary judgment to
defendant Warrent Whitley, the Most Worshipful Grand Master of the Most Worshipful Prince
Hall Grand Lodge of Free ("MWGM") and Accepted Masons, Prince Hall Affiliation of the
District of Columbia, Inc. ("Prince Hall, D.C."), in an action brought by the plaintiff challenging
her expulsion as Grand Worthy Matron of the Georgiana Thomas Grand Chapter of the Order of
the Eastern Star, Prince Hall Affiliation. Id. at 1038-39.  Ms. Levant argued on appeal, inter alia,
that "(1) she [was] entitled to a judicial remedy in connection with her alleged wrongful
expulsion from office, the allegedly unfair procedures followed by Prince Hall, D.C., and the
breach of her alleged contractual rights; (2) she established a prima facie case of defamation; and
(3) the trial court erred in dismissing her derivative action claim." Id. at 1039-40.  Because the
organization had provided Ms. Levant with notice of the charges, offered her several
opportunities to be heard, and the grievance committee had interviewed roughly two dozen

individuals about the situation, id. at 1045, the District of Columbia Court of Appeals found that

even "assuming that judicial inquiry was appropriate . . . the process accorded Ms. Levant [by the

organization], with regard to her challenge of the MWGM's removal decision, was

fundamentally fair and not in conflict with [the organization's] designated procedures, and

tainted neither by fraud, nor bad faith, nor arbitrary action by [the organization] and its MWGM."

Id. Thus, in the final analyses, the Court of Appeals concluded that judicial intervention into

what was a "dispute between two private voluntary member membership associations [was]

inappropriate . . . ." Id. at 1046.

Here, the Court concludes that even if judicial intervention into disputes between an

organization like AKA and its members is proper in certain situations under District of Columbia

law, the defendant is nonetheless entitled to summary judgment as there is no genuine issue of

material fact that precludes summary judgement being entered for AKA on the plaintiffs' breach

of contract claim for several reasons.  First, the plaintiffs have not cited, and the Court has not

found, any legal authority which supports the proposition that a current or prospective member's

pledge not to act in a certain manner constitutes a contract between that individual and a private,

voluntary, and social organization.  Second, the defendant has fully complied with the policies

and procedures established in its Constitution & Bylaws and the Anti-Hazing handbook. These

documents provide the Regional Director of AKA with discretionary authority to determine

whether a member has violated the sorority's Constitution & Bylaws and its Anti-Hazing

handbook.[12]  Def.'s Mem., Ex. 3 (Constitution & Bylaws) at 46; Def.'s Cross-Mem., Ex. 2 (Anti-

---

[12] The defendant has presented evidence that AKA complied with its policies and procedures as outlined in its Anti-Hazing handbook, Constitution & Bylaws, and its Manual of Standard Procedures in investigating the rehearsal that resulted in the plaintiffs' suspension.  Def.'s Opp'n, Ex. 8 (Improprieties
(continued...)

Hazing Handbook) at 11.  The Regional Director, Ms. Daley, found that the plaintiffs oversaw the hazing of new members and recommended their suspension for being involved in the September 3, 2005,  rehearsal.  Def.'s Opp'n, Ex. 8 (Improprieties and Penalties Letter dated September 3, 2005).  The Constitution and Bylaws further provide that when a member disagrees with the ruling of the Regional Director, she may appeal the Regional Director's recommendation to the Supreme Basileus.  Def.'s Mem., Ex. 3 (Constitution & Bylaws) at 53.  In addition, "if the decision rendered by the Supreme Basileus is unsatisfactory to the [member], the [member] may appeal in writing to the Directorate through the Supreme Basileus."  Id.  On September 30, 2005, plaintiff  Jolevare exercised her right to appeal her recommended suspension by submitting a memorandum submitted to the Executive Director, the Supreme Basileus, and the North Atlantic Regional Director of AKA.  Pls.' Mem., Ex. A & Def.'s Cross Mem., Ex. 7 (Jolevare Letter of Appeal).  However, before the defendant had the opportunity to

---

[12](...continued)
and Penalties Letter dated September 3, 2005), Ex. 4 (Tinker Dep.) at 42 (demonstrating that plaintiff Tinker was contacted by a member of the Anti-Hazing Task Force).  The fact-finding investigation conducted by the Anti-Hazing Task Force included, but was not limited to, interviewing the plaintiffs. Def.'s Opp'n, Ex. 4 (Tinker Dep.) at 42, Ex. 12 (First Set of Interrogatories) Interrogatory No. 7.  The defendant has also presented evidence that AKA's definition of hazing and its handbook, policies, and procedures are not meant to, and do not provide, an exhaustive list of activities that are considered to constitute hazing and are therefore prohibited.  Def.'s Opp'n, Ex. 7 (Sample-Oates Cert. ) ¶ 9.  The sorority's position is supported by the fact that its definition of hazing is expanded beyond those acts specified in the Anti-Hazing Handbook by stating that the term "includes, but not limited to" those specified examples of what constitutes hazing.  Def.'s Cross-Mem., Ex. 2 (Anti-Hazing Handbook) at 9 (emphasis added).  And, although the record does not affirmatively indicate whether Ms. Daley's determination was approved by the Supreme Basileus, there are notations throughout the record indicating that Ms. Daley made the recommendation for the plaintiff's suspension and the organization subsequently suspended them.  Def.'s Opp'n. Ex. 4 (Tinker Dep.) at 61, 64; Def.'s Opp'n  Ex. 7 (Sample-Oates Cert.) ¶ 12; Def.'s Opp'n, Ex. 8 (Improprieties and Penalties Letter dated September 3, 2005). Therefore, even though on a motion for summary judgment the Court must infer the evidence in the light most favorable to the non-moving party, based on the evidence in this record it is reasonable to infer, in regards to the defendant's summary judgment motion, that the Supreme Basileus approved Ms. Daley's recommendation.

resolve  plaintiff Jolevare's appeal, both plaintiffs filed this action on October 6, 2005.  Pls.'

Mem., Ex. A (Jolevare Letter of Appeal) and Ex. B (Tinker Letter of Appeal); Def.'s Cross Mem.

at 7.  Then, on October 7, 2005, plaintiff Tinker purported to also appeal her recommended

suspension through a memorandum submitted to the Executive Director, the Supreme Basileus,

and the North Atlantic Regional Director of AKA who held those offices at the time.  Pls.' Mem.

Ex. B & Def.'s Cross Mem. Ex. 9 (Tinker Letter of Appeal).

    "The common law requirement of a fair procedure does not compel formal proceedings

with all the embellishments of a court trial, nor adherence to a single mode of process." Blodgett

v. University Club, 930 A.2d 210, 230 (D.C. 2007) (quoting  Pinsker v. Pacific Coast Society of

Orthodontists, 526 P.2d 253, 263 (1974) (citation omitted). Rather, "[i]t may be satisfied by any

one of a variety of procedures which afford a fair opportunity for [an individual] to present [her]

position." Id.  Thus, "[i]n some cases, for example, it may be adequate to provide an opportunity

for 'a mere written response'; in other circumstances, 'a personal appearance by the adversely

affected individual and a more extensive hearing [may be] required.'" Id. (quoting Ezekial v.

Winkley, 572 P.2d 32, 39 (1977)).  Here, the defendant complied with the policies and

procedures of its Constitution & Bylaws and the Anti-Hazing handbook by affording the

plaintiffs an opportunity to appeal their suspensions and challenge the fact-finding process and

the organization's final determination.   However, before the defendant was given an opportunity

to resolve plaintiff Jolevare's appeal, this litigation was commenced and it was not until seven

days later that plaintiff Tinker submitted her appeal to the sorority.  Accordingly, there is no

reason to conclude that the defendant has not complied with its own internal policies and

procedures.

Finally, some courts look beyond the organization's constitution and by-laws and consider whether the procedures followed satisfy "the requirements of substantial fairness." Levant, 755 A.2d at 1045-46 (citation omitted); Golding, 679 A.2d at 561 ("members in a private organization are entitled to at least rudimentary procedural protections, such as notice and an opportunity to be heard") (citation omitted). However, a member facing organizational discipline is not entitled to the same type of process afforded by our civil and criminal justice systems. Accord National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191 (1988) ("Embedded in our Fourteenth Amendment[13] jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be"). Instead, when courts do interfere, they look to common law concepts of fundamental "procedural fairness." See Pinsker, 526 P.2d at 262. As noted above, here, the defendant complied with the policies and procedures required by its Constitution & Bylaws and the Anti-Hazing handbook by providing the plaintiff with notice of the charges, conducting an investigation of the alleged hazing incident, which included hearing from the plaintiffs, and affording the plaintiffs an opportunity to appeal their suspensions. However, before the defendant was given an opportunity to resolve the appeals, the plaintiffs instituted their actions in this Court. The plaintiff can therefore not legitimately complain that they have not been provided fundamental procedural fairness. Accordingly, the Court finds that the plaintiffs have not presented sufficient evidence to raise a genuine issue of material fact as to their breach of contract claim.

---

[13] In the District of Columbia, the Fifth, rather than the Fourteenth Amendment applies. Bolling v. Sharpe, 347 U.S. 497 (1954).

C.    **The Plaintiff's Defamation Claim (Count III)**

The plaintiffs assert that the defendant made defamatory statements about them when it published statements on its website that they were suspended for hazing policy violations. Compl. ¶¶ 58-63.  The plaintiffs request that this Court grant summary judgment in their favor on the defamation claim because "(1) [the defendant] made false statements concerning [the] [p]laintiffs, namely that they participated in hazing; (2) [the defendant] published said statements on its national website; (3) [ the] [d]efendant was at least negligent in publishing said statements as it did not have any evidence that [the] [p]laintiffs had participated in hazing and thus, knew said statements to be false; and (4) [the] [d]efendant's publications of said statements has caused [the] [p]laintiffs harm to [their] reputation, standing in the community, and loss of enjoyment of privileges of members in [the] [d]efendant's organization."    Pls.' Mot. at 29.  In opposition, the defendant responds that the "plaintiffs cannot prevail on their defamation claim because the alleged defamatory statement is true," and therefore the "plaintiffs have failed to establish a necessary element of their defamation claim."  Def.'s Opp'n at 11; Def.'s Cross Mem. at 12.   Specifically, the defendant contends that "the publication on the AKA website that [the] [p]laintiffs were suspended for hazing is true because the plaintiffs, were, in fact suspended by AKA for hazing,"  Def.'s Opp'n at 11, and accordingly "there is and can be no dispute that [the] [p]laintiffs were suspended because AKA concluded that they had participated in hazing." Id.  Thus, the defendant requests that it be awarded summary judgment on the plaintiff's defamation claim, and for the reasons set forth below, the Court agrees with the defendant.

Under District of Columbia law, a statement is defamatory if it "tends to injure a plaintiff

17

in her trade, profession or community standing, or lower her in the estimation of the community."
Smith v. District of Columbia, 399 A.2d 213, 220 (D.C. 1979) (quoting Olinger v. Am. Savings
& Loan Ass'n, 409 F.2d 142, 144 (D.C. Cir. 1969)); see also Benic v. Reuters America, Inc., 357
F. Supp. 2d 216, 221 (D.D.C. 2004).  And under District of Columbia law, "[a] plaintiff bringing
a defamation action must show: (1) that the defendant[] made a false and defamatory statement
concerning the plaintiff; (2) that the defendant published the statement without privilege to a
third party; (3) that the defendant's fault in publishing the statement amounted to at least
negligence; and (4) either that the statement was actionable as a matter of law irrespective of
special harm or that its publication caused the plaintiff special harm." Clawson v. St. Louis Post-
Dispatch, L.L.C., 906 A.2d 308, 312-13 (D.C. 2006) (quoting Beeton v. District of Columbia,
779 A.2d 918, 923 (D.C. 2001)).

　　　The first element of a plaintiff's prima facie case of defamation requires a showing that
the defendant made a false and defamatory statement concerning the plaintiff.  Here, the
plaintiffs assert that the defendant's statements regarding their participation in hazing is false
based upon AKA's definition of the term in its Anti-Hazing handbook because "there [is] neither
any evidence, nor was it ever alleged, that [the] [p]laintiffs committed physical acts such as
hitting, striking, laying hands upon or threatening to do bodily harm to any individual" prior to
the induction of the new sorority members who were allegedly hazed.  Pls.' Mem. at 30.  As
support for their position, the plaintiffs point to the lack of any evidence that the new members
felt that they had been hazed or reported that the plaintiffs had engaged in any activity defined as
hazing by the Anti-Hazing handbook.  Id. at 30-32.  The defendant takes exception with the
plaintiffs' position, arguing that the "[pl]aintiffs cannot prevail on their defamation claim

18

because the alleged defamatory statement is true," Def.'s Opp'n at 11, and "AKA's definition of hazing and its attendant handbook, policies, and procedures are not meant to, and do not provide, an exhaustive list of activities that are considered to constitute hazing . . .," id. at 12.  The Court agrees that the plaintiffs have not presented sufficient evidence to raise a genuine issue of material fact as to the falsity of the defendant's statement made about them.

The circumstances surrounding the events the defendant contends amounted to hazing are not in dispute.  Namely, the plaintiffs were active members of the Xi Omega graduate chapter of AKA, having graduated from Howard University and remained active in the sorority as graduate advisors.  The Xi Omega Chapter graduate advisors were responsible for supervising the initiation of new members into the sorority's undergraduate Alpha Chapter of AKA ("Alpha Chapter") at Howard University. Def.'s Opp'n., Ex. 4 ( Tinker Dep.) at 26-28; Pls.' Mem., Ex. A (Jolevare Letter of Appeal) at 2-3, Ex. C (Sample-Oates Dep.) at 13-17, 38-39, Compl. ¶ 28.  On March 21, 2005,  the plaintiffs' presided over an after-midnight, outdoor "rehearsal" involving, approximately 125 new undergraduate sorority members of AKA's Alpha Chapter.  Def.'s Opp'n., Ex. 4 (Tinker Dep.) at 19-20, 27-28; Pls.' Mem., Ex. C (Sample-Oates Dep.) at 40-41. The new undergraduate sorority members who AKA concluded had been hazed were rehearsing for a show that would introduce them as new members of the sorority.  Pls.' Mem., Ex. A (Jolevare Suspension Letter) at 3.  The Xi Omega Chapter graduate members were responsible for helping the newly initiated undergraduate members learn the AKA song and prepare for the inaugural performance they would present on Howard University's campus.  Id.; Compl. ¶ 28. Moreover, the setting of the rehearsal is also not in dispute – it occurred after midnight, in an outdoor parking lot in Maryland when the temperature was approximately 35 to 40 degrees

Fahrenheit.  Def.'s Opp'n., Ex. 4 (Tinker Dep.) at 27-30, 41-42, 82-83, Ex. 12 (First Set of

Plaintiffs' Interrogatories) Interrogatory No.10, Pls.' Mem., Ex. C (Sample-Oates Dep.) at 40-41;

Def.'s Opp'n, Ex. 7 (Sample-Oates Cert.) ¶12.  The rehearsal was terminated by Phyllis Young,

the president of the Xi Omega Chapter, and Pamela Chew, the graduate chapter advisor of Alpha

Chapter at that time.  Def.'s Opp'n, Ex. 10 (Deposition of Joie Jolevare) ("Jolevare Dep.") at 82,

Ex. 12 (First Set of Plaintiffs' Interrogatories) Interrogatory No. 10. After reviewing the

circumstances surrounding the rehearsal, AKA determined that it violated AKA's anti-hazing

policy because of the time, place and conditions under which the rehearsal occurred. Def.'s

Opp'n, Ex. 8 (Improprieties and Penalties Letter dated September 3, 2005) at 2.

A defendant may attack the falsity prong of the plaintiff's prima facie case by

demonstrating the substantial truth of the statement.  Prins v. International Tel. and Tel. Corp.,

757 F. Supp. 87, 91-92 (D.D.C. 1991) (citations omitted).  "Truth is an absolute defense to

defamation claims." Benic, 357 F. Supp. 2d at 221 (citing  Olinger, 409 F.2d at 144) . This

defense to a defamation claim "may be established by demonstrating that the statements in

question are 'substantially true.'" Benic, 357 F. Supp. 2d at 221 (citing Lohrenz v. Donnelly, 223

F. Supp. 2d 25, 59 (D.D.C.2002)). "'Substantially true' means that the 'gist' of the statement is

true or that the statement is substantially true, as it would be understood by its intended

audience." Benic, 357 F. Supp. 2d at 221 (citing Moss v. Stockard, 580 A.2d 1011, 1023 (D.C.

1990)).  In other words, literal truth is not required, and a "showing of the truth of the 'gist' or

'sting' of the allegedly defamatory imputation is sufficient." Prins, 757 F.Supp. at 91 -92

(quoting Vachet v. Central Newspapers, Inc., 816 F.2d 313, 316 (7th Cir.1987)); see also AIDS

Counseling & Testing Centers v. Group W Television, Inc., 903 F.2d 1000, 1004 (4th Cir.1990);

Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 302 (2d Cir.1986).

Here, it is undisputed that the plaintiffs were suspended by AKA after the organization determined that they had participated in hazing. This discretionary determination was made by the Regional Director in compliance with the sorority's Constitution & Bylaws.  Def.'s Opp'n, Ex. 3 (Constitution & Bylaws) at 46.  In a defamation action "[t]he task is to 'determine as a threshold matter whether a challenged statement is capable of a defamatory meaning; and whether it is verifiable-that is, whether a plaintiff can prove that it is false.'" Lane v. Random House, Inc., 985 F.Supp. 141, 151 (D.D.C. 1995) (quoting Moldea v. New York Times Co., 22 F.3d 310, 316-17 (D.C. 1994) (citing Moldea v. New York Times, 15 F.3d 1137, 1142-45 (1994)). "The burden of proving falsity rests squarely on the plaintiff.  He or she must demonstrate either that the statement is factual and untrue, or an opinion based implicitly on facts that are untrue." Lane, 985 F.Supp.at 151.  As noted above, the circumstances surrounding the early morning outdoor rehearsal are uncontested by the plaintiff as to the time, place, conditions, and participants.  Therefore, on this record, the Court finds that the plaintiffs have not raised a genuine issue of material fact as to the falsity of the organization's publication of their suspensions for engaging in what the sorority properly concluded amounted to hazing. Accordingly, the plaintiffs motion for summary judgment on their defamation claim must be denied and the defendant's cross-motion for summary judgment must be granted.

D.    **The Plaintiffs' Negligence Claim (Count IV)**

The plaintiffs assert that the defendant was negligent when it suspended them because (1) "[it] had a duty to abide by its own policies and procedures regarding the investigation and/or resolution of allegations of hazing," Pls.' Mem. at 37, and (2) "[it] breached that duty when it

21

suspended [the] plaintiffs in contravention of its own policies and procedures," id.  In opposition,

the defendant responds that the "[p]laintiffs have failed to identify any common law duty that a

private, voluntary organization–such as AKA–owes its members."  Def.'s Opp'n at 14.  Further,

the defendant asserts that the "plaintiffs. . . cannot establish an applicable standard of care . . ."

and have also not "alleged any cognizable injury that would entitle them to relief."  Id.   This

Court agrees that the plaintiffs' have failed to establish that the defendant breached a duty owed

to the plaintiffs.

Under District of Columbia law, a plaintiff asserting a claim  of negligence must establish

that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached its duty; and (3) the

breach was the proximate cause of (4) damages sustained by the plaintiff.  District of Columbia

v. Cooper, 483 A.2d 317, 321 (D.C.1984); see also Trifax Corp. v. District of Columbia, 53 F.

Supp. 2d 20, 29 (D.D.C.1999) (applying District of Columbia law and granting a defendant's

motion to dismiss a negligence claim where the plaintiff could not demonstrate the existence of a

duty).  Although the plaintiffs allege that the "[d]efendant had a duty to abide by its own policies

and procedures regarding the investigation and/or resolution of allegations of hazing," Pls.'

Mem. at 37, they have not presented any evidence that raises a genuine issue of material fact that

the defendant owed a duty to the plaintiffs and that such duty was breached.

"The foundation of modern negligence law is the existence of a duty owed by the

defendant to the plaintiff.  Negligence is a breach of duty; if there is no duty, there can be no

breach, and hence no negligence."  N.O.L. v. District of Columbia, 674 A.2d 498, 499 n.2 (D.C.

1995) (citing Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928)).  Thus, "[o]ne of

the essential elements of a cause of action in negligence is that the conduct complained of

22

invaded some interest of the plaintiff which, by virtue either of statute or of the common law, is entitled to protection as against the defendant." Wooldridge Mfg. Co. v. United States, 235 F.2d 513, 513 (D.C. Cir. 1956). The existence of a legal duty being an essential element of a negligence claim under District of Columbia law, the plaintiffs "must specify a negligent act and characterize the duty whose breach might have resulted in negligence liability." District of Columbia v. White, 442 A.2d 159, 162 (D.C. 1982) (quoting Kelton v. District of Columbia, 413 A.2d 919, 922 n.5 (D.C. 1980)); see also Pied Piper, Inc. v. Datanational Corp., 901 F. Supp. 212, 215 (S.D.W.Va.1995) (dismissing negligence claim for failure to state a claim because the plaintiff failed to establish the existence of a legal duty between two business entities dealing with each other at arm's length). And a complaint alleging negligence may not rest on mere "conclusory assertions" as to the existence of any element of the claim, including duty. White, 442 A.2d at 162. Thus, the "plaintiff must allege facts which show that the defendant breached some legally imposed duty owed to the plaintiff," id., which the plaintiffs have failed to do.

However, even assuming the plaintiffs could establish that the defendant owed them a duty, they can not establish that such a duty was breached because, as previously discussed, the record clearly demonstrates that the defendant complied with the policies and procedures required by its Constitution & Bylaws and its Anti-Hazing handbook by conducting an investigation of the alleged hazing incident, during which the plaintiffs were afforded the opportunity to present their positions, reaching a conclusion on the charges, and affording the plaintiffs an opportunity to appeal the organization's determination to the leadership of the sorority. Having failed to show that a duty owed to them by the sorority was breached, AKA is entitled to summary judgment on the plaintiffs' negligence claim.

23

## IV.  CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment as to all of their claims is **DENIED** and the defendants' cross-motion for summary judgment is **GRANTED** on all claims of the plaintiffs' complaint.

**SO ORDERED**.

/s/_____
  REGGIE B. WALTON
  United States District Judge